## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BICENT HOLDINGS LLC, *et al.*,[1] | ) | Case No. 12-11304 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

## DISCLOSURE STATEMENT FOR DEBTORS'
## JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Joel A. Waite (No. 2925)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel for the Debtors and Debtors in Possession*

Dated: Wilmington, Delaware
April 30, 2012

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Bicent Holdings LLC (9347); Bicent R.F. LLC (8269); Bicent Funding LLC (2270); Bicent Power LLC (8567); Colorado Energy Management, LLC (8296); CEM Energy Services, Inc. (9642); Colorado Cogen Operators, LLC (3737); San Joaquin Cogen, L.L.C. (8299); Rocky Mountain Power, LLC (7088); Hartwell, LLC (N/A); Hartwell Power Company (5414); Hartwell Independent Power Partners, LLC (7195); Hart County IPP, LLC (7194). The Debtors' mailing address is 2575 Park Lane, 2nd Floor, Lafayette, Colorado 80026.

# TABLE OF CONTENTS

Page

I. INTRODUCTION.................................................................................2
    A.   Holders of Claims Entitled to Vote...........................................5
    B.   Voting Procedures......................................................................6
    C.   Confirmation Hearing ................................................................7

II. SUMMARY OF CLASSIFICATION AND TREATMENT UNDER
    THE PLAN ........................................................................................8

III. OVERVIEW OF CHAPTER 11......................................................15

IV. COMPANY BACKGROUND ........................................................15
    A.   The Debtors...............................................................................15
    B.   The Businesses..........................................................................16
    C.   Debtors' Prepetition Capital Structure......................................19

V. EVENTS LEADING TO THE COMMENCEMENT OF THE
    CHAPTER 11 CASES ....................................................................21
    A.   Market Pressures and Declining Revenues Impaired the Debtors'
          Ability to Service The Prepetition Credit Agreements. ............22
    B.   Significant Legal Proceedings Have Impacted the Debtors'
          Business. ...................................................................................23
    C.   The Debtors' Prepetition Restructuring Negotiations................24
    D.   The Debtors Commence The Chapter 11 Cases. ......................26

VI. THE CHAPTER 11 CASES............................................................28
    A.   Significant "First Day" Motions; Retention of Professionals....28
    B.   DIP Facility and Letter of Credit Facility .................................29
    C.   Official Committee of Unsecured Creditors ..............................29

VII. SUMMARY OF THE PLAN ...........................................................30
    A.   Classification and Treatment of Administrative Claims, Claims and
          Equity Interests Under the Plan ................................................30
    B.   Provisions Regarding Implementation  and Corporate Governance
          of the Reorganized Debtors ......................................................41
    C.   Substantive Consolidation ........................................................46
    D.   Provisions Regarding Means of Implementation, Voting,
          Distributions and Treatment of Disputed Claims ......................49
    E.   Effect of Confirmation of the Plan............................................56
    F.   Retention of Jurisdiction ...........................................................62
    G.   Miscellaneous Provisions..........................................................63
    H.   Executory Contracts and Unexpired Leases .............................66
    I.   Benefit Plans .............................................................................68

J.      Confirmation and Effectiveness of the Plan ...............................................69

VIII.    **PROJECTIONS** ...............................................71

IX.    **VALUATION** ...............................................71

X.    **CERTAIN RISK FACTORS TO BE CONSIDERED** ...................................71

    A.      Projected Financial Information ...............................................71
    B.      Risks Related to the Company's Business and Operations .......................72
    C.      Ability to Refinance Certain Indebtedness and
              Restrictions Imposed by Indebtedness.......................................76
    D.      Certain Bankruptcy Law Considerations...................................77
    E.      Certain Risks Relating to the Equity Securities under the Plan.................78

XI.    **CONFIRMATION PROCEDURE**......................................................79

XII.    **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**..............................................................82

    A.      Alternative Plan of Reorganization or Plan of Liquidation .......................82
    B.      Liquidation Under Chapter 7 ...............................................82

XIII.    **SECURITIES LAW MATTERS** ...............................................83

    A.      Bankruptcy Code Exemptions from Registration Requirements...............83

XIV.    **CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS** .............86

    A.      Consequences to the Debtors...............................................87
    B.      Consequences to Holders of Certain Claims ...........................88
    C.      Information Reporting and Withholding ...................................94

XV.    **CONCLUSION** ...............................................95

01:12060597.1

## <u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (AS SAME MAY BE AMENDED FROM TIME TO TIME, THE "<u>DISCLOSURE STATEMENT</u>") AND THE *DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE* (AS SAME MAY BE AMENDED FROM TIME TO TIME, THE "<u>PLAN</u>", A COPY OF WHICH IS ATTACHED AS <u>EXHIBIT A</u> HERETO) IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, THIS DISCLOSURE STATEMENT AND ALL EXHIBITS TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  **ALL CREDITORS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  <u>SEE</u> ARTICLE X BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR ANY OTHER SECURITIES REGULATORY AUTHORITY NOR HAS THE SEC OR ANY OTHER SECURITIES REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT.  ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE

DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY.  AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS' AND REORGANIZED DEBTORS' BUSINESSES.  IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW IN ARTICLE X.  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED.  EXCEPT AS OTHERWISE REQUIRED BY LAW, NEITHER THE DEBTORS NOR REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

# I.

## INTRODUCTION

On April 23, 2012 (the "Petition Date"), Bicent Holdings, LLC ("Bicent Holdings"), Bicent R.F. LLC, Bicent Funding, LLC ("Bicent Funding"), Bicent Power LLC ("Bicent Power"), Colorado Energy Management, LLC, CEM Energy Services, Inc., Colorado Cogen Operators, LLC, San Joaquin Cogen, L.L.C. ("SJC"), Rocky Mountain Power, LLC

("RMP"), Hartwell, LLC, Hartwell Power Company, Hartwell Independent Power Partners, LLC, and Hart County IPP, LLC (collectively, the "Debtors," and together with their non-debtor affiliates, the "Company") filed petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors' bankruptcy cases are jointly administered for procedural purposes only.

On April 30, 2012, the Debtors filed their proposed pre-negotiated joint plan of reorganization (the "Plan")[2] which sets forth the manner in which Claims against and Equity Interests in the Debtors will be treated.  This Disclosure Statement (the "Disclosure Statement") describes certain aspects of the Plan, the Debtors' businesses and related matters.

The Company has negotiated the terms of the Plan with the First Lien Agent, a steering committee of the Debtors' first lien secured lenders (the "Steering Committee of First Lien Lenders"), the Second Lien Agent and a steering committee of the Debtors' second lien secured lenders (the "Steering Committee of Second Lien Lenders," and collectively with the Steering Committee of First Lien Lenders, the "Lender Steering Committees").  As a result of such negotiations, the Company and members of the Lender Steering Committees entered into the Restructuring Support Agreement dated as of April 18, 2012 in which the lenders party thereto agreed, subject to certain conditions and limitations set forth therein and following proper solicitation of such members' acceptances of the Plan in accordance with section 1125 of the Bankruptcy Code, among other things, to vote for and otherwise support the Plan.  The members of the Lender Steering Committees hold significantly in excess of the two-thirds of claims outstanding under the First Lien Credit Facility and the Second Lien Credit Facility, respectively. Given the pre-negotiated nature of the Plan and the support it enjoys, the Debtors anticipate emerging from chapter 11 as soon as August 2012.

Generally, the Plan contemplates (among other things):  (i) payment in full in Cash to holders of Allowed (a) Administrative Claims, (b) Fee Claims, (c) Priority Tax Claims, and (d) Other Priority Claims; (ii) (a) holders of DIP Financing Claims shall receive payment in full in Cash of all DIP Financing Claims or shall have such DIP Financing Claims refinanced or converted in accordance with the terms of the DIP Credit Facility and the Exit Facility in satisfaction of the DIP Financing Claims and (b) holders of DIP Fee Claims shall receive payment in full in Cash of all DIP Fee Claims; (iii) holders of Allowed Other Secured Claims shall be either Reinstated, receive payment in full in cash or receive the Collateral securing each holder's Allowed Other Secured Claim; (iv) holders of Allowed First Lien Credit Facility Claims shall receive, on a *pro rata* basis, (a) 95% of the New Bicent Common Interests to be issued on the Effective Date subject to dilution on account of the exercise of the New Warrants and profits interests issued pursuant to the Management Agreement and (b) distributions of Brush Sale Proceeds, if any; (v) holders of Allowed Second Lien Credit Facility Claims shall receive, on a *pro rata* basis, (a) Cash in an amount equal to $1,500,000 in the aggregate and (b) New Warrants, and all outstanding Second Lien Agent Fee Claims shall be paid in Cash in full; provided that the Class of Second Lien Credit Facility Claims votes to accept the Plan; (vi) holders of Allowed Mezzanine Credit Facility Claims shall neither receive distributions nor

---

[2]    All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

retain any property under the Plan; (vii) holders of Allowed General Unsecured Claims shall neither receive distributions nor retain any property under Plan; provided however, holders of Insurance Claims may be entitled to recovery solely as provided for in the Plan; (viii) holders of Allowed Intercompany Claims shall, at the option of the Debtors and with the consent of the Requisite Consenting First Lien Lenders, be either Reinstated or eliminated in full or in part by offset, distribution, cancellation, assumption or contribution of such Intercompany Claim; (ix) holders of Allowed Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power shall neither receive distributions nor retain any property on account of such Equity Interests and such Equity Interests shall be cancelled; (x) holders of Allowed Equity Interests in the Subsidiaries shall have such Equity Interests Reinstated; (xi) holders of Subordinated Securities Claims shall neither receive distributions nor retain any property under Plan; and (xii) holders of Subordinated Claims shall neither receive distributions nor retain any property under Plan.

This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with (i) the solicitation of acceptances of the Debtors' Plan and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for July 30, 2012, at 2:00 p.m., prevailing Eastern Time.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A);

- The Disclosure Statement Approval Order (Exhibit B);

- The Debtors' Financial Projections (Exhibit C);

- The Debtors' Liquidation Analysis (Exhibit D); and

- The Debtors' Prepetition Organizational Chart (Exhibit E).

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan.

On [_____], 2012, after notice and a hearing, the Court approved the Disclosure Statement, having determined that the Disclosure Statement contains "adequate information" as that term is defined in section 1125 of the Bankruptcy Code. Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to

creditors and other parties in interest, and the cost of providing additional information….″  11 U.S.C. § 1125(a)(1).

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT.  ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot.  Each holder of a Claim entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots before voting on the Plan.  These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

A.       **Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired are entitled to vote to accept or reject a proposed chapter 11 plan.  Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted such plan and are not entitled to vote to accept or reject such plan.  Classes of claims or equity interests in which the holders of claims or equity interests are impaired but are not entitled to receive or retain any property on account of such claims or equity interests are deemed to have rejected such plan and similarly are not entitled to vote to accept or reject such plan.

Classes 3 (First Lien Credit Facility Claims), 4 (Second Lien Credit Facility Claims), 5 (Mezzanine Credit Facility Claims), 6 (General Unsecured Claims), 7 (Intercompany Claims) and 8 (Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power) under the Plan are Impaired.  Classes 3 and 4 (to the extent Class 4 votes to accept the Plan) will receive distributions under the Plan and are entitled to vote to accept or reject the Plan.  Classes 5, 6, 7, 8, 10 and 11 will receive no distributions pursuant to the Plan and, thus, pursuant to section 1126(g) of the Bankruptcy Code, such holders are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.  Classes 1 (Other Priority Claims), 2 (Other Secured Claims) and 9 (Equity Interests in Subsidiaries) under the Plan are unimpaired.  Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims or Interests in Classes 1,

2 and 9 are conclusively deemed to have accepted the Plan and therefore may not vote to accept or reject the Plan.  ACCORDINGLY, A BALLOT TO ACCEPT OR REJECT THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3 AND 4.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and represent more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  For a more detailed description of the requirements for confirmation of the Plan, <u>see</u> Article XI below.

Because Classes 5, 6, 7, 8, 10 and 11 are deemed to reject the Plan, the Debtors, with the consent of the Requisite First Lien Consenting Lenders, and to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party, will seek to have the Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code; <u>provided</u>, that the Debtors shall not seek nor be permitted to confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to Class 3.  Section 1129(b) permits the Court to confirm a plan of reorganization notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or equity interests.  Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, <u>see</u> Article XI below.

For a summary of the treatment of each Class of Claims and Interests, <u>see</u> Article II below.

### B.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used for each separate Class of Claims.  Please vote and return your Ballot(s).

If you received a Ballot from a broker, bank or other institution, return the completed Ballot(s) to such broker, bank or other institution promptly so that it can be forwarded to the Debtors' voting tabulation agent, Epiq Bankruptcy Solutions, LLC.  If you received a Ballot(s) from the Debtors, please vote and return your Ballot(s) directly to the following address:  (i) for regular mail:  Bicent Holdings Ballot Processing, Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 5014, New York, NY 10150-5014 or (ii) for overnight mail/federal express: Bicent Holdings Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017.

DO NOT RETURN ANY INSTRUMENTS OR AGREEMENTS THAT YOU MAY HAVE WITH YOUR BALLOT(S).

TO BE COUNTED, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY <u>RECEIVED</u> BY EPIQ BANKRUPTCY

SOLUTIONS, LLC AT THE ABOVE ADDRESS NO LATER THAN [_]:00 [_].M., PREVAILING EASTERN TIME, ON [_____], 2012.

In addition, Ballots cast by alleged creditors whose Claims (a) are not listed on the Debtors' Schedules of liabilities or (b) are listed as disputed, contingent and/or unliquidated on the Debtors' Schedules of liabilities, but who have timely filed proofs of claim in unliquidated or unknown amounts that are not the subject of an objection filed by the Debtors will have their Ballots counted towards satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, but will not have their Ballots counted toward satisfying the aggregate Claim amount requirements of that section, unless the holder of such Claim has obtained an order of the Court temporarily allowing such Claim for the purpose of voting on the Plan, or as otherwise agreed to by the Debtors and such holder, with the consent of the Requisite DIP Lenders.

Pursuant to the Disclosure Statement Order, the Court set [_____], 2012, the date of the entry of the Disclosure Statement Order, as the record date (the "Voting Record Date") for voting on the Plan.  Accordingly, only holders of record as of [_____], 2012 will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot(s), received a damaged Ballot(s) or lost your Ballot(s), or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call [_____] at (___) ___-____ from 9 a.m. to 6 p.m., prevailing Eastern Time, Monday through Friday.

## C.    Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Court has scheduled a hearing to consider confirmation of the Plan for July 30, 2012 at 2:00 p.m. prevailing Eastern Time before the Honorable Kevin Gross, United States Bankruptcy Court, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801 (the "Confirmation Hearing").  The Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before July 23, 2012 at 4:00 p.m., prevailing Eastern Time.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim(s) or other Interest(s) held by the objector. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Any such objection must be filed with the Court and served so that it is received by the Court and the following parties and the other parties requesting notice in these cases on or before July 23, 2012 at 4:00 p.m., prevailing Eastern Time:

To the Debtors:  Bicent Power LLC, 575 Broadway, Third Floor, New York, NY 10012, attention: General Counsel, Tel:  (212) 343-8353, Fax:  (212) 343-9949 with a copy to Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N. King Street, Wilmington, DE 19801, attention:  Pauline K. Morgan, Esq., Tel:  (302) 571-6600, Fax:  (302) 571-1253.

To the Creditors' Committee:  [      ].

To the First Lien Agent or DIP Agent:  In care of Milbank Tweed, Hadley & McCloy, 1 Chase Manhattan Plaza, New York, New York 10005, attention Abhilash M. Raval, Esq. and Michael E. Comerford, Esq., Tel: (212) 530-5123, Fax: (212) 822-5123.

The Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Tel.: (302) 573-6491, Fax: (302) 573-6497.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and orders of the Court.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.  THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.

## II.

## SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Equity Interests thereunder.

SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.[3]

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| Unclassified | Administrative Claims | Unimpaired | No (deemed to accept) | Each holder of an Allowed Administrative Claim shall receive from the Debtors (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of the Effective Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors and such holder shall have agreed upon in writing; provided, however, that Allowed Ordinary Course Administrative Claims that are not due to be paid on the Effective Date shall be paid in full in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided, further, that First Lien Agent Fee Claims, DIP Fee Claims and Swap Counterparties Fee Claims, to the extent outstanding, shall be paid in full in Cash on the Effective Date, without any requirement for the filing of fee applications with the Court, provided, further, that if, and only if, the Class of Second Lien Credit Facility Claims votes to accept the Plan, the Reorganized Debtors shall pay the Second Lien Agent Fee Claims in full in Cash on the Effective Date, and without any requirement for the filing of a fee application with the Court. | 100% |
| Unclassified | Fee Claims | Unimpaired | No (deemed to accept) | All requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed with the Court and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, counsel to any Creditors' Committee, counsel to the First Lien Agent and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than forty-five (45) days after the Effective Date. Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective | 100% |

---

[3]    This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

01:12060597.1

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|-------|-------------|------------|------------------|-----------------------------|----------------------|
| | | | | Date. Objections to any Fee Claims must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, and the requesting party no later than seventy-five (75) days after the Effective Date. For the avoidance of doubt, this treatment of Fee Claims under the Plan shall not apply to the DIP Fee Claims, the First Lien Agent Fee Claims, Second Lien Agent Fee Claims or the Swap Counterparties Fee Claims. | |
| Unclassified | Priority Tax Claims | Unimpaired | No (deemed to accept) | Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors (subject to the consent of the Requisite First Lien Consenting Lenders) or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, but no later than thirty (30) days after the Effective Date, or (b) through equal annual installment payments in cash (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; (ii) over a period ending not later than five (5) years after the Petition Date; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan. | 100% |
| Unclassified | DIP Financing Claims; DIP Fee Claims; Backstop Fee | Unimpaired | No (deemed to accept) | On or before the Effective Date, (a) holders of DIP Financing Claims shall receive payment in full in Cash of all DIP Financing Claims or shall have such DIP Financing Claims refinanced or converted in accordance with the terms of the DIP Credit Facility and the Exit Facility and (b) holders of DIP Fee Claims shall receive payment in full in Cash of all DIP Fee Claims, except to the extent that the holders of DIP Financing Claims or DIP Fee Claims agree to a different treatment. Notwithstanding anything to the contrary contained in the Plan, the liens and security interests securing the DIP Financing Claims shall continue in full force and effect until the DIP Financing Claims have been paid in full in Cash or refinanced as part of (or converted into) the Exit Facility, unless the holders of the DIP Financing Claims agree to a different treatment; provided further that, notwithstanding anything to the contrary in the Plan, the DIP Financing Claims and DIP Fee Claims shall not be waived, discharged, or released unless and until such claims are paid in full in Cash, or, solely with respect to the DIP Financing Claims, unless and until the DIP Financing Claims are refinanced or converted in accordance with the terms of the DIP Credit Facility and the Exit Facility.

Any and all indemnification obligations that are provided in connection with the | 100% |

10

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| | | | | DIP Credit Facility shall continue and be in effect with the same force and to the same extent in connection with the execution and entry into the Exit Facility.<br><br>On the Effective Date, each Backstop Lender shall receive its *pro rata* share of the Backstop Fee (based upon each Backstop Lender's backstop commitments under the DIP Credit Facility); provided that each Backstop Lender, as a condition precedent to receiving its respective share of distribution of New Bicent Common Interests, shall be required to execute the New Bicent LLC Agreement and deliver to New Bicent Power a counterpart signature page to the New Bicent LLC Agreement; provided further that the issuance of the New Bicent Common Interests in accordance with this paragraph shall be subject to dilution on account of the exercise of the New Warrants. | |
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | Except to the extent that a holder of an Allowed Other Priority Claim shall have agreed in writing to a different treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim in Class 1 shall receive payment in an amount equal to such Allowed Other Priority Claim in full in Cash as soon as practicable after the later of the Effective Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim. | 100% |
| Class 2 | Other Secured Claims | Unimpaired | No (deemed to accept) | Except to the extent that a holder of an Allowed Other Secured Claim shall have agreed in writing to a different treatment, at the option of the Debtors, subject to the consent of the Requisite First Lien Consenting Lenders, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of (a) thirty (30) days after Effective Date, and (b) the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable (but no later than thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim) or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any | 100% |

11

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| | | | | interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim as soon as is practicable, on the later of (y) thirty (30) days after Effective Date and (z) the date such Other Secured Claim becomes an Allowed Other Secured Claim. | |
| Class 3 | First Lien Credit Facility Claims | Impaired | Yes | (i) each holder of an Allowed First Lien Credit Facility Claim in Class 3 shall receive, in full and final satisfaction of such Claim, on the Effective Date, its *Pro Rata* share (based upon the principal amount of First Lien Credit Facility Claims held by each holder) of (a) 95% of the New Bicent Common Interests to be issued on the Effective Date; provided, that each holder of an Allowed First Lien Credit Facility Claim in Class 3, as a condition precedent to receiving its respective share of such distribution of New Bicent Common Interests, shall be required to execute the New Bicent LLC Agreement and deliver to New Bicent Power a counterpart signature page to the New Bicent LLC Agreement; provided further that the issuance of the New Bicent Common Interests in accordance with this paragraph shall be subject to dilution on account of the exercise of the New Warrants and profits interests issued pursuant to the Management Agreement, and (b) distributions of Brush Sale Proceeds, if any, as provided for in Article VII.A of the Plan; and<br><br>(ii) all outstanding First Lien Agent Fee Claims and Swap Counterparties Fee Claims shall be paid in Cash, in full, to the First Lien Agent and Swap Counterparties, respectively, on or before the Effective Date. | To Come |
| Class 4 | Second Lien Credit Facility Claims | Impaired | Yes | Except to the extent that a holder of a Second Lien Credit Facility Claim shall have agreed in writing to a different treatment, on or as soon as reasonably practicable after the Effective Date:  (i) each holder of an Allowed Second Lien Credit Facility Claim in Class 4 shall receive, in full and final satisfaction of such Claim, its *Pro Rata* share (based upon the principal amount of Second Lien Credit Facility Claims held by each holder) of (a) Cash in an amount equal to $1,500,000 in the aggregate, and (b) New Warrants; and (ii) all outstanding Second Lien Agent Fee Claims shall be paid in Cash in full; provided that to receive the foregoing distributions in (i) and (ii), (1) the Class of Second Lien Credit Facility Claims must vote to accept the Plan and (2) each such holder, as a condition precedent to receiving its respective share of such distribution of New Warrants, shall execute and deliver to New Bicent Power a counterpart signature page to each of the New Warrant Documents that provides for a signature by the holders | To Come |

12

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| | | | | of New Warrants; provided further that the issuance of the New Warrants in accordance with the Plan shall be subject to dilution on account of profits interests issued pursuant to the Management Agreement.  The New Warrant Documents shall be binding on all parties receiving, and all holders of, New Warrants, including all transferees of New Warrants, regardless of whether such parties execute the New Warrant Documents.  If the Class of Second Lien Credit Facility Claims does not vote to accept the Plan, holders of Allowed Second Lien Credit Facility Claims shall neither receive distributions nor retain any property under the Plan on account of such Allowed Second Lien Credit Facility Claims. | |
| Class 5 | Mezzanine Credit Facility Claims | Impaired | No (deemed to reject) | The holders of Mezzanine Credit Facility Claims shall neither receive distributions nor retain any property under the Plan on account of such Mezzanine Credit Facility Claims. | 0% |
| Class 6 | General Unsecured Claims | Impaired | No (deemed to reject) | The holders of General Unsecured Claims shall neither receive distributions nor retain any property under the Plan on account of such General Unsecured Claims; provided, however, that holders of Insured Claims may be entitled to recovery solely in accordance with the Plan. | 0% |
| Class 7 | Intercompany Claims | Impaired | No (deemed to reject) | At the option of the Debtors, with the consent of the Requisite First Lien Consenting Lenders, or the Reorganized Debtors, as applicable, each Intercompany Claim shall be, either (i) Reinstated, in full or in part, and treated in the ordinary course of business, or (ii) eliminated in full or in part by offset, distribution, cancellation, assumption or contribution of such Intercompany Claim or otherwise; provided, however, that any election by the Debtors, with the consent of the Requisite First Lien Consenting Lenders, or the Reorganized Debtors under the Plan shall not impact any recoveries under the Plan; provided, further, that if Intercompany Claims are Reinstated they shall be subordinated in right of payment to all other Claims.  The holders of Intercompany Claims shall not receive or retain any property on account of such Intercompany Claims to the extent such claim is cancelled and discharged as provided in the Plan. | 0% |
| Class 8 | Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent | Impaired | No (deemed to reject) | The holders of Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power shall neither receive distributions nor retain any property under the Plan on account of such Equity Interests.  On the Effective Date, the Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power shall be cancelled. | 0% |

13

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| | Funding and Bicent Power | | | | |
| Class 9 | Equity Interests in Subsidiaries | Unimpaired | No (deemed to accept) | The holders of Equity Interests in the Subsidiaries shall have such Equity Interests Reinstated on the Effective Date. | 100% |
| Class 10 | Subordinated Securities Claims | Impaired | No (deemed to reject) | The holders of Subordinated Securities Claims shall neither received distributions nor retain any property under the Plan on account of such Subordinated Securities Claims. | 0% |
| Class 11 | Subordinated Claims | Impaired | No (deemed to reject) | The holders of Subordinated Claims shall neither received distributions nor retain any property under the Plan on account of such Subordinated Securities Claims. | 0% |

14

## III.

## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or equity interests in a debtor are generally permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

## IV.

## COMPANY BACKGROUND

### A.    The Debtors

The Company currently owns and operates four electricity generation facilities in California, Colorado and Montana (each a "Plant," and collectively, the "Plants") and an electric power industry services business. The Plants, which have an aggregate production capability of over 381 MW and are diversified by fuel type, include one coal-fired plant and three natural gas-fired plants. The Company is privately held and primarily operates through Bicent Power, a Delaware limited liability company formed in April 2007.

On July 10, 2007, Bicent Power acquired interests (the "Acquisition") in Centennial Power, LLC ("Centennial") and Colorado Energy Management, LLC ("CEM") from MDU Resources Group, Inc. ("MDU"). Through the Acquisition, Bicent Power acquired the following entities that wholly own electric power generating facilities: (i) Colorado Power Partners ("CPP") and BIV Generation Company, LLC ("BIV," and together with CPP, "Brush Power"), indirect owners of the Brush 1&3 and Brush 4D natural gas-fired facilities (the "Brush Plants"), located in Brush, Colorado; (ii) RMP, owner of the Hardin coal-fired facility (the "Hardin Plant"), located in Hardin, Montana; (iii) SJC, owner of the San Joaquin natural gas-fired facility (the "San Joaquin Plant"), located in Lathrop, California; and (iv) Mountain View Power Partners, LLC ("Mountain View"), owner of the Mountain View wind facility located in Palm Springs, California, which was subsequently sold in March 2008. Bicent Power also acquired a 50% interest in an additional electric power generating facility, Hartwell Energy Limited Partnership located in Hartwell, Georgia, which was subsequently sold in October 2009. In addition to the Plants, as part of the Acquisition, Bicent acquired a 100% interest in a power industry services company, CEM, headquartered in Lafayette, Colorado.

In connection with the Acquisition, Bicent Power entered into a Management Agreement dated as of July 10, 2007 with Beowulf Energy LLC (as it may be amended from time to time, the "Existing Management Agreement"). The Management Agreement provides that Beowulf Energy LLC will provide management services to Bicent Power and its subsidiaries during the term of the Management Agreement, including, but not limited to, general executive and management services, assistance in the identification, support, negotiation and analysis of acquisitions, dispositions and financial alternatives and human resource functions.

Bicent Holdings, a Delaware limited liability company, is a holding company that wholly owns Bicent R.F. LLC, which in turn wholly owns Bicent Funding, which in turn wholly owns Bicent Power, the Company's principal operating entity and the primary obligor on the Debtors' prepetition first and second lien secured bank debt.

**B.     The Businesses**

1.     The Plants

The Plants are located in California, Montana and Colorado, which are all part of the Western Electricity Coordinating Council ("WECC") region of the United States, and is the largest electric reliability region in the United States. The WECC region covers approximately 1.8 million square miles in 14 western states, western Canada and northern Mexico. WECC provides electric service to over 80 million people and is comprised of eight sub-regions, including (i) California-North; (ii) California-South; (iii) Northwest; (iv) Rocky Mountains; (v) Desert Southwest; (vi) Basin; (vii) WECC-Canada; and (viii) WECC-Mexico.

The Plants supply 100% of their output under mid- to long-term tolling agreements or power purchase agreements ("PPAs") with high-quality, creditworthy, load-serving entities. PPA pricing for the gas and coal resources includes a fixed monthly capacity charge and a variable energy charge. The PPAs for the gas-fired plants are structured as tolling agreements, with full fuel cost pass-through provisions to the PPA counterparties. The coal

supply for the coal-fired plant is provided under a fixed-price, three-year agreement with a two-year renewal option at established fixed prices.

In addition, the Company entered into an agreement in June 2007 with Barclays Bank PLC, which includes, among other things, a commodity swap for electricity for the period from November 1, 2010 through December 31, 2015, excluding the calendar month of June for each year within the period (the "Commodity Swap Agreement"). The Commodity Swap Agreement was intended to reduce the Company's exposure to energy price fluctuations under the existing PPA at RMP by obligating the Company to pay the counterparty a market price (as defined in the Commodity Swap Agreement) per MW hour during the effective period of the Commodity Swap Agreement and obligating the counterparty to pay the Company a fixed price per MW hour. The Commodity Swap Agreement counterparty paid monthly advances under the host contract during the period from August 20, 2007 to November 22, 2010, which the Company effectively pays interest on by lowering the fixed price to be paid by the counterparty under the Commodity Swap Agreement. The Company is obligated to repay these advances, in the amount of approximately $52.6 million during the period from February 22, 2016 to January 21, 2020. If Barclays Bank PLC elects to terminate the Commodity Swap Agreement, it must provide the Company with a termination notice 20 days in advance of the termination (unless such notice period is otherwise modified or waived).

The Company owns the following Plants:

(a)     Brush Plants.  Located 90 miles northeast of Denver, Colorado, Brush Power indirectly owns the Brush 1&3 and Brush 4D natural gas-fired facilities. Brush 1&3 commenced commercial operations in October 1990 and consists of one 60 MW combined-cycle unit and one 30 MW simple-cycle unit. Brush 4D, located adjacent to Brush 1&3, is a 147 MW combined-cycle generating unit that is capable of operating in simple-cycle mode at 50-60 MW, depending on ambient conditions. Brush 4D commenced commercial operations in May 2002.[4]

(b)     Hardin Plant.  The Hardin Plant, a 120 MW coal-fired facility located approximately 40 miles southeast of Billings, Montana, is 100% owned by RMP. The Hardin Plant began commercial operations in April 2006 as the first pulverized coal plant to be built in the state of Montana in over 20 years. The facility includes an overhauled and upgraded GE steam turbine generator and a refurbished Mitchell Engineering / Babcock & Wilcox boiler. The plant is controlled by a new state-of-the-art distributed control system. The Hardin Plant was constructed utilizing BACT for new emission sources, including a spray dry absorber, fabric filter baghouse and selective catalytic reduction unit. As a result, the Hardin Plant is one of the cleanest burning coal plants in operation in the United States.

---

[4]     Adjacent to the Brush 1&3 Plant and the Brush 4D Plant is Brush 2, a gas-fired cogeneration facility owned by non-Debtor Brush Cogeneration Partners ("BCP"), which is owned by Veresen, Inc. CPP, BIV, and BCP are parties to a certain joint use and cooperation agreement, pursuant to which the Brush Plants share certain equipment, systems, administrative offices, easements, and allocate project costs pursuant to a delineated protocol.

01:12060597.1

(c)    San Joaquin Plant.  The San Joaquin Plant, wholly owned by SJC, is a 48 MW natural gas-fired, simple-cycle facility located approximately 70 miles east of San Francisco in Lathrop, California.  The San Joaquin Plant began commercial operations in January 1990.

2.    Power Management Services Unit

CEM is the Company's power management services unit.  Through CEM,[5] the Company provides comprehensive services to successfully build, operate and maintain power plants.  Headquartered north of Denver in Lafayette, Colorado, CEM provides operations and maintenance ("O&M"), asset management, construction management and engineering, procurement and construction ("EPC") services to both Bicent Power and third-party energy companies.  As of December 31, 2011, CEM provided O&M services to the Plants as well as non-Debtor-owned power plants in Vernon, California (the "Malburg Plant"), Brush, Colorado (the "Brush 2 Plant"), and Morgan County, Colorado (the "Manchief Plant," and together with the Malburg Plant and the Brush 2 Plant, the "Third-Party Plants").

CEM has proven EPC experience in the development and construction of new combustion turbine generators projects and the construction and management experience of coal-fired generation projects.  CEM has completed several EPC projects, including the Hardin Plant and the Brush Plants.

CEM has also developed a unique expertise in refurbishing older power plants to improve cost-efficiency, reduce emissions and achieve comparatively lower heat rates.  CEM has significant expertise in combined-cycle engineering design as well as major turbine overhauls, retrofits and upgrades.

The Company, through CEM and Colorado Cogen Operators, LLC, has a current workforce of approximately 115 employees, of which 114 are full-time employees and one is a part-time employee.  The Company employs thirty-two (32) individuals at Brush 1&3, Brush 4D, the Brush 2 Plant, and the Manchief Plant, forty-one (41) individuals at the Hardin Plant, five (5) individuals at the San Joaquin Plant, eighteen (18) individuals at the Malburg Plant, and nineteen (19) individuals at CEM's corporate headquarters in Lafayette, Colorado.  Within 20 days of the commencement of the Chapter 11 Cases, the Debtors will file a motion to reject those certain employment agreements (including any amendments, modification or supplements), which contain, among other things, change of control provisions and are each dated December 15, 2010 and by and between Colorado Energy Management LLC and its four respective employees.

---

[5]    Certain services are provided by Colorado Cogen Operators, LLC, a wholly owned subsidiary of CEM.

01:12060597.1

C.    **Debtors' Prepetition Capital Structure**

1.    Indebtedness under Prepetition Credit Agreements

(a)    First Lien Credit Facility

Bicent Power, as borrower, Bicent Funding and the subsidiary guarantors named therein, as guarantors, the lenders party thereto and Barclays Bank PLC, as collateral agent and administrative agent, are parties to the First Lien Credit Agreement dated as of July 10, 2007. The First Lien Credit Agreement provides for an aggregate commitment of $480 million consisting of a $330 million term loan facility (the "Term B Facility"), a $30 million revolving credit commitment, a $120 million letter of credit facility and a $10 million swing line commitment. The proceeds from borrowings under the Term B Facility were used, together with the Term C Facility (as defined below) proceeds, the proceeds from the Mezzanine Credit Facility and the equity capital, to fund the Acquisition. Bicent Power's obligations under the First Lien Credit Agreement are guaranteed by all of Bicent Power's subsidiaries and secured by a first lien on substantially all of the Company's assets as well as pledges of all of the shares of capital stock or other equity interests in all of Bicent Power's subsidiaries (the "Prepetition Collateral"). All of the Debtors in the Chapter 11 Cases guaranteed the obligations under the First Lien Credit Agreement, other than Bicent Holdings and Bicent R.F. LLC. The maturity date for amounts due under the revolving credit facility and the swing line facility is July 10, 2012. The Term B Facility which has principal amortization in the amount of $825,000 per calendar quarter matures on June 30, 2014.

As of the Petition Date, the aggregate principal amount of loans outstanding under the First Lien Credit Facility was approximately $117.1 million in principal obligations on the Term B Facility, approximately $16.4 million outstanding under the revolving credit facility and approximately $13.8 million for First Lien Credit Facility reimbursement obligations on account of previously drawn letters of credit, plus all accrued but unpaid interest, fees and other amounts due thereof or with respect thereto. The aggregate face amount of outstanding letters of credit issued under the First Lien Credit Agreement was approximately $31.6 million as of the Petition Date.

The First Lien Credit Agreement requires Bicent Power to maintain interest rate hedge agreements covering a notional amount of not less than 50% of the aggregate then-outstanding principal of the Term B Facility (the "Interest Rate Swap Agreements").[6] The

---

[6]    The Interest Rate Swap Agreements include that certain (i) Amended Rate Swap Confirmation dated May 30, 2007 between Barclays Bank plc and Mountain Acquisition Company LLC, (ii) Rate Swap Confirmation dated June 11, 2007 between Barclays Bank plc and Bicent Power, (iii) ISDA Master Agreement dated October 9, 2007 between Barclays Bank plc and Bicent Power, and the related ISDA Schedule and each related schedule, exhibit or annex thereto, (iv) Amended Rate Swap Confirmation dated September 20, 2007 between Barclays Bank plc and Bicent Power, (v) Commodity Swap Confirmation dated June 13, 2007 between Barclays Bank plc and Bicent Power, (vi) Hardin Hedge Agreement dated June 10, 2007, (vii) ISDA Master Agreement, dated June 14, 2007, between Barclays Bank plc and Bicent Power, along with the related ISDA Schedule and confirmation pursuant thereto on June 13, 2007, and each related schedule, exhibit or annex thereto, (viii) Commodity Hedge and Power Sale Agreement entered into in respect of Brush 4D Gas Fired Project ((i) through (viii) above collectively the "Barclays Swap

Interest Rate Swap Agreements effectively convert a portion of the Company's floating-rate debt to fixed-rate debt. The Debtors' obligations under the Interest Rate Swap Agreements are secured by the Prepetition Collateral on a *pari passu* basis with the Term B Facility. GS Bank terminated the GS Swap Agreements before the Petition Date. On April 4, 2012, GS Bank provided a calculation statement for payment upon early termination of the GS Swap Agreement in the amount of $11.3 million. As of the Petition Date, Barclays Bank PLC had sent the Company a notice of default under the Barclays Swap Agreement.

(b)    Second Lien Credit Facility

Bicent Power, as borrower, Bicent Funding and the subsidiary guarantors named therein, as guarantors, the lenders party thereto and U.S. Bank National Association, as successor collateral agent and administrative agent, are parties to the Second Lien Credit Agreement dated as of July 10, 2007. The Second Lien Credit Agreement consists of a $130 million term loan facility (the "Term C Facility"). The proceeds from borrowings under the Second Lien Credit Agreement, together with the Term B Facility proceeds, the proceeds from the Mezzanine Credit Facility and the equity capital, were used to fund the Acquisition. Bicent Power's obligations under the Second Lien Credit Agreement are guaranteed by substantially all of Bicent Power's subsidiaries and secured by a second lien on substantially all of the Company's assets as well as pledges of all of the shares of capital stock or other equity interests in substantially all of Bicent Power's subsidiaries. All of the Debtors in the Chapter 11 Cases guaranteed the obligations under the Second Lien Credit Agreement, other than Bicent Holdings and Bicent R.F. LLC. The Term C Facility matures on December 31, 2014. As of the Petition Date, the aggregate principal amount of loans outstanding under the Second Lien Credit Agreement was approximately $128.5 million plus accrued and unpaid interest.

(c)    Intercreditor Agreement

The First Lien Agent, the Second Lien Agent, Barclays Bank PLC, as the First Lien Commodity Hedge Counterparty (as defined therein), Goldman Sachs Capital Markets, L.P. as Hedge Bank (as defined therein), Bicent Power, and the guarantors named therein are parties to that certain Collateral Agency and Intercreditor Agreement, dated as of July 10, 2007 (as amended, supplemented or otherwise modified, the "Intercreditor Agreement"), which sets forth the relative lien priorities and other rights and remedies of the First Lien Credit Facility Lenders and the Second Lien Credit Facility Lenders with respect to, among other things, the Prepetition Collateral.

---

Agreement"), (ix) ISDA Master Agreement dated as of October 16, 2007, between Goldman Sachs Bank USA (formerly known as Goldman Sachs Capital Markets L.P.) ("GS Bank"), (x) the Revised Confirmation dated June 27, 2007, as amended on July 2, 2009, between GS Bank and Bicent Power, and (xi) the Confirmation dated September 7, 2007, between GS Bank and the Bicent Power ((ix), (x) and (xi) collectively, the "GS Swap Agreement").

(d)     Mezzanine Credit Facility

Bicent R.F. LLC, as borrower, and Barclays Bank PLC, as a lender, collateral agent and administrative agent, are parties to the Mezzanine Credit Agreement dated as of July 10, 2007.  The Mezzanine Credit Agreement provides for, among other things, loans of up to $50 million to fund a portion of the Acquisition and matures on June 30, 2015.  Bicent R.F. LLC's obligations under the Mezzanine Credit Facility are secured by pledges of the limited liability company interests of Bicent Funding.  Bicent R.F. LLC is a holding company whose only asset is the limited liability company interests of Bicent Power and the obligations of Bicent R.F. LLC under the Mezzanine Credit Agreement are not secured.  As of the Petition Date, the aggregate principal amount of loans outstanding under the Mezzanine Credit Agreement was approximately $50 million plus accrued and unpaid interest.

2.     Equity Interests in Bicent Power and Bicent Holdings

On July 10, 2007, Bicent Power's Amended and Restated Limited Liability Company Agreement became effective whereby the original holders of the limited liability company interests in Bicent Power each contributed all of their respective interests in Bicent Power to Bicent Funding and whereby Bicent Funding became the sole holder of limited liability company interests in Bicent Power.  Bicent Funding is in turn a wholly owned subsidiary of Bicent R.F. LLC, which in turn is a wholly owned subsidiary of Bicent Holdings.  Bicent Holdings is 100% owned by Bicent Prime Holdings LLC, which in turn is 87.07% owned by Natural Gas Partners VIII, L.P., Natural Gas Partners IX, L.P. and NGP IX Offshore Holdings, L.P. (collectively, "NGP") and 12.93% by Beowulf (Bicent) LLC.

**V.**

**EVENTS LEADING TO THE COMMENCEMENT
OF THE CHAPTER 11 CASES**

As discussed above, the Debtors have approximately $325.7 million[7] of outstanding principal indebtedness under the First Lien Credit Agreement, Second Lien Credit Agreement and Mezzanine Credit Agreement (collectively, the "Prepetition Credit Agreements").  A series of unforeseen events made it impossible for the Debtors to comply with certain covenants contained in the Prepetition Credit Agreements, and to otherwise refinance the debt under the Prepetition Credit Agreements, some of which is maturing in 2012, which ultimately led to the filing of the Chapter 11 Cases.

---

[7]     This figure includes the First Lien Credit Facility reimbursement obligations on account of previously drawn letters of credit and excludes the face amount of outstanding letters of credit issued under the First Lien Credit Agreement and the amounts outstanding under the Interest Rate Swap Agreements.

A. **Market Pressures and Declining Revenues Impaired the Debtors' Ability to Service the Prepetition Credit Agreements.**

The Acquisition occurred in July 2007 before the rapid decline of the economy and tightening of the U.S. financial markets in the second half of 2008, which resulted in the effective collapse of the U.S. credit markets. The loans under the Prepetition Credit Agreements were made under the assumptions that business would continue to grow and that the capital markets would remain stable allowing the Prepetition Credit Agreements to be refinanced on similar terms. These assumptions did not hold. The Debtors ended up with more debt than they could service in today's U.S. economy.

The decline in the value of the collateral securing the Prepetition Credit Agreements also negatively impacted the Debtors ability to refinance them. The price of natural gas, which is closely tied to the price of electricity in much of the U.S. (including regions where the Plants are located)[8], has fallen from about $7 or $8 per mmbtu in June 2007 to about $2.01 as of the Petition Date (a decline of approximately over 70%). While this decline did not necessarily have an immediate impact on the Company's cash flow because nearly all of the capacity and energy generated by the Plants is contracted or hedged through at least 2015, it has had a significant impact on the value of the Debtors' assets – the Plants – given the decline in the Debtors' potential future earnings capacity.

Bicent Power's acquisition of Centennial and CEM was based in large part on CEM receiving approximately $19 million in incentive and bonus fees in connection with the completion of a combined cycle power plant in Hobbs, New Mexico (the "Hobbs Project") and CEM's continued growth in the power management services sector. However, as a result of the commencement and prosecution of an arbitration captioned *Lea Power Partners, LLC ("LPP")* v. *Colorado Energy Management, LLC* (the "Hobbs Arbitration"), CEM estimates it lost in excess of $50 million[9] in cash flow, comprised of lost incentive and bonus fees expected from the completion of the Hobbs Project, legal expenses incurred in defending the Hobbs Arbitration and lost O&M fees it would have received in connection with operating the Hobbs Project. The indirect damage to CEM from the Hobbs Arbitration, while difficult to quantify precisely, was also very significant since customers were unwilling to enter into new O&M and EPC contracts with CEM while it was defending against the gross negligence claims alleged in the Hobbs Arbitration. As a result of the Hobbs Arbitration, CEM has been unable to secure any new O&M business and has lost three contracts that it had at the time of the Acquisition.

---

[8]    Natural gas sets the price of electricity in much of the United States as it represents the marginal generating source. Therefore, gas fired generators will bid their power into the spot market as long as the price they receive is higher than their variable cost of generation (the vast majority of which is the price of fuel).

[9]    This figure excludes approximately $21 million in net damages awarded to LPP in the Hobbs Arbitration.

### B.    Significant Legal Proceedings Have Impacted the Debtors' Business.

#### 1.    The Hobbs Arbitration

LPP initiated the Hobbs Arbitration on December 7, 2009.  The Hobbs Arbitration arose out of an EPC contract entered into by and between CEM and LPP in November 2006 (the "Hobbs Contract") for the construction of the Hobbs Project.  LPP, the owner of the Hobbs Project, alleged that CEM, the contractor, was grossly negligent in performing its duties under the Hobbs Contract and sought over $114 million in damages for such alleged gross negligence. CEM filed several counterclaims, including one alleging that LPP breached its duty to pay a $12 million Cost Bonus Incentive Fee (the "Heat Rate Claim") and a $1 million Joint Development Agreement completion bonus (the "JDA Claim").  A 10-day arbitration proceeding took place in September of 2011 and the arbitrator issued the arbitration award on January 13, 2012.  With respect to LPP's claims against CEM, the arbitrator found that LPP did not demonstrate that CEM's conduct amounted to gross negligence.  He also found that any claim for delay damages was barred by the fact that LPP's own conduct contributed to the delays.  However, the arbitrator found that CEM breached the Hobbs Contract and awarded LPP $22,043,302 in damages.[10] With respect to CEM's counterclaims, the arbitrator ruled in favor of CEM on its $1 million JDA Claim, but ruled against CEM on the Heat Rate Claim.  CEM has since filed a petition to vacate the arbitration award in the Supreme Court of the State of New York, which has yet to rule on CEM's petition.  CEM otherwise disputes the damages award by the arbitrator and any purported claims asserted by LPP shall be accorded the treatment in Class 6 of the Plan.

#### 2.    Indemnification Claims

In connection with the Hobbs Arbitration, CEM and Bicent Power are also involved in litigation in the Supreme Court of the State of New York with Centennial Energy Holdings, Inc. ("CEHI") and Centennial Energy Resources LLC ("CER"), MDU subsidiaries from which Bicent Power acquired CEM in 2007.  At the time the Hobbs Contract was executed in 2006, CEM was still an indirect subsidiary of MDU.  After CEM and LPP executed the Hobbs Contract, LPP and CEHI entered into a Guaranty Agreement dated February 12, 2007 (the "Guaranty Agreement") that provided CEHI would indemnify LPP for losses resulting from any breach of the Hobbs Contract by CEM.  On June 10, 2007, Bicent Power acquired CEM in the Acquisition pursuant to the Purchase and Sale Agreement between CER and Bicent Power dated as of April 25, 2007 (the "PSA") which, among other things, provided for the indemnification of Bicent Power for certain losses from third party claims arising from CEM's actions taken before the closing date of the PSA.  The PSA also provided that Bicent Power would seek a discharge of any obligations by CEHI under the Guaranty Agreement.  Bicent Power was unable to obtain a discharge of the Guaranty Agreement, and, as a result, the PSA was amended such that Bicent Power agreed to have a $10 million letter of credit in place that CEHI was to draw upon in the event CEHI was required to make any payments to LPP under the Guaranty Agreement.

---

[10]    The actual amount of the damages was found to be in the aggregate of $40,497,000, however, liabilities were capped under the EPC contract in the amount of $22,043,302.

Upon the commencement of the Hobbs Arbitration, in a letter dated December 11, 2009, Bicent Power notified CEHI and CER of LPP's arbitration claim and their right to participate in the defense of the claim, informed CEHI that the Guaranty Agreement did not obligate CEHI to make any payments to LPP at that time and asserted its indemnification rights under the PSA because the allegations in the arbitration arose, at least in part, from the operation of CEM before the closing date of the PSA. CEHI and CER declined to assume the defense of the arbitration claim. Shortly thereafter, CEHI and CER filed an action in Delaware Chancery Court seeking a declaratory judgment that they were not liable under the Guaranty Agreement for LPP's claims against CEM. The Delaware Chancery Court dismissed the action without prejudice, ruling that the matter was not ripe for adjudication until the arbitration between LLP and CEM concluded. CEHI and CER next sought to intervene directly in the Hobbs Arbitration, but the arbitrator did not have subject matter jurisdiction to hear their motion. CEHI and CER then brought the current action in the Supreme Court for the State of New York alleging various breach of contract claims and common-law indemnification claims against CEM and Bicent Power. CEM and Bicent Power filed counterclaims seeking indemnification for costs and expenses incurred by CEM and Bicent Power in connection with the Hobbs Arbitration pursuant to the PSA. CEHI and CER have denied liability for any indemnification obligations. This action is still pending and is currently in the discovery phase of the litigation.

## C.    The Debtors' Prepetition Restructuring Negotiations.

### 1.    The Debtors' Initiate Discussions with the First Lien Agent and Steering Committee of First Lien Lenders.

In response to the Debtors' depressed financial performance and declining financial condition, and after thoroughly evaluating their options, the Debtors undertook the process of negotiating a balance sheet restructuring with certain lenders party to the Prepetition Credit Agreements. To that end, the Debtors retained Moelis & Company LLC, as their financial advisor and investment banker on December 22, 2011, and Young Conaway Stargatt & Taylor, LLP, as their bankruptcy counsel on January 20, 2012, to advise in restructuring negotiations, any resulting transactions and the Chapter 11 Cases. The Debtors also engaged Paul, Weiss, Rifkind, Wharton & Garrison LLP, their existing corporate counsel, to assist in connection with any restructuring proposals and the implementation thereof. In addition to the balance sheet restructuring, the Debtors evaluated other potential restructuring alternatives, including possible asset sales, to maximize enterprise value for the Debtors' estates.

The Debtors began discussions with Barclays Bank PLC, the collateral and administrative agent under the First Lien Credit Agreement regarding a potential restructuring a number of months prior to the Petition Date. Some time thereafter, the First Lien Agent formed the Steering Committee of First Lien Lenders. As part of the restructuring negotiations, the First Lien Agent and the Steering Committee of First Lien Lenders commenced a due diligence process and the First Lien Agent engaged Milbank, Tweed, Hadley & McCloy LLP as its counsel in connection with the Debtors' potential restructuring. The First Lien Agent later retained RPA Advisors, LLC, as financial advisor, to assist with its diligence and analysis.

In the Fall of 2011, the First Lien Agent, which also served as collateral agent and administrative agent under the Second Lien Credit Agreement (in such capacity, the "Second

Lien Agent"), requested that Bicent Power consent to it being replaced as Second Lien Agent in the event that the interests of the First Lien Credit Facility Lenders and the Second Lien Credit Facility Lenders diverged depending on which prepetition lenders would be considered the Debtors' fulcrum security.  On December 30, 2011, Barclays Bank PLC, in its capacity as Second Lien Agent, the Second Lien Credit Facility Lenders party thereto and U.S. Bank National Association entered into that certain Successor Agent Agreement whereby Barclays Bank PLC resigned as the Second Lien Agent and U.S. Bank National Association became the Second Lien Agent under the Second Lien Agreement.

> 2.    The Debtors Successfully Negotiate a Prearranged Chapter 11 Plan.

The Debtors first negotiated the parameters of a potential restructuring with the First Lien Agent's advisors in which the First Lien Credit Facility Lenders would acquire the equity of the Debtors on account of their First Lien Credit Facility Claims.  The members of the Steering Committee of First Lien Lenders then entered into confidentiality agreements with the Debtors in February 2012 in an effort to finalize the terms of the restructuring.  The Debtors, the First Lien Agent and its advisors engaged in extensive discussions on a restricted basis concerning the terms of the restructuring, which ultimately resulted in the terms embodied in the Plan.  Negotiations with the First Lien Agent and Steering Committee of First Lien Lenders continued up to the filing of the Chapter 11 Cases after the confidentiality agreements with the members of the Steering Committee of First Lien Lenders expired.

On March 6, 2012, the Debtors entered into a Lock-Up Agreement (the "Second Lien Lock-Up") with certain Second Lien Credit Facility Lenders, which are members of the Steering Committee of Second Lien Lenders, and provided such lenders with the restructuring proposals being negotiated with the First Lien Agent and the Steering Committee of First Lien Lenders.  Under the Second Lien Lock-Up, the Second Lien Credit Facility Lenders party thereto agreed to keep the details of the restructuring confidential and not to transfer any of their Second Lien Credit Facility Claims until the Second Lien Lock-Up terminated.  The Second Lien Lock-Up terminated on March 26, 2012.  Thereafter, the Debtors, the First Lien Agent, the Steering Committee of First Lien Lenders and the Second Lien Credit Facility Lenders party to the Second Lien Lock-Up and their advisors continued to engage in discussions regarding the terms of the restructuring.  On April 3, the Debtors entered into a loan transfer restriction agreement with certain Second Lien Credit Facility Lenders whereby such lenders agreed not to transfer any loans under the Second Lien Credit Agreement for a certain period of time to further facilitate negotiations between the parties.

After good faith, arm's-length negotiations among the Debtors, the First Lien Agent, the Second Lien Agent and the members of the Lender Steering Committees and their respective counsel and financial advisors, the Debtors reached an agreement with the First Lien Agent, the Second Lien Agent and the members of the Lender Steering Committees with respect to a consensual restructuring on the terms set forth in the Plan, and formalized by the Restructuring Support Agreement dated as of April 18, 2012.  The Debtors received an executed Restructuring Support Agreement from First Lien Consenting Lenders and Second Lien Consenting Lenders holding significantly in excess of the two-thirds of claims outstanding under the First Lien Credit Facility and the Second Lien Credit Facility, respectively.

3.      Defaults under the First and Second Lien Credit Agreements

As the Debtors engaged in discussions with the First Lien Agent and the Steering Committee of First Lien Lenders, the Debtors had difficulty complying with certain financial covenants in the First Lien Credit Agreement after the Debtors had to write off certain receivables for incentive and bonus fees due in connection with the Hobbs Project.  Ultimately, the Debtors defaulted under the financial covenant in the First Lien Credit Agreement for the period ending December 31, 2011.  The First Lien Credit Agreement provided for a 15-day cure period of such default subsequent to the reporting deadline.  During this time, the Debtors negotiated with counsel to the First Lien Agent on behalf of the Steering Committee of First Lien Lenders regarding a forbearance under the First Lien Credit Agreement.

On February 24, 2012, the Debtors entered into a forbearance agreement (the "Forbearance Agreement") pursuant to which the First Lien Agent and the members of the Steering Committee of First Lien Lenders agreed to forbear from exercising their rights and remedies on account of the financial covenant default and any possible defaults or events of default in connection with the Hobbs Arbitration through March 19, 2012.  On March 19, 2012, the Forbearance Agreement was amended to (i) extend the forbearance period to April 2, 2012 and (ii) add that the First Lien Agent and the members of the Steering Committee of First Lien Lenders party thereto would also forbear from exercising their rights and remedies on account of the Debtors' failure to make a principal repayment under the First Lien Credit Agreement.  On March 30, 2012, the Debtors failed to make (i) the principal repayment on the Term B Facility under the First Lien Credit Agreement and (ii) interest payments under the First Lien Credit Agreement and the Second Lien Credit Agreement.  On April 2, 2012, the Forbearance Agreement was further amended to (i) extend the forbearance period to April 9, 2012 and (ii) add that the First Lien Agent and the members of the Steering Committee of First Lien Lenders party thereto would also forbear from exercising their rights and remedies on account of (A) the Debtors' failure to make an interest payment on March 30, 2012 and (B) any cross defaults relating to the Second Lien Credit Facility and Swap Agreements.  On April 6, 2012, the loans under the Second Lien Credit Agreement were accelerated upon the Debtors failure to cure the missed interest payment due on March 30, 2012 within a five business day grace period.  On April 9, 2012 and April 16, 2012, the Forbearance Agreement was further amended to extend the forbearance period to April 16, 2012 and April 18, 2012, respectively.

**D.      The Debtors Commence The Chapter 11 Cases.**

The Debtors filed the Chapter 11 Cases to effectuate the terms of the Restructuring Support Agreement.  Based on the Restructuring Support Agreement, the Debtors are prepared to expeditiously seek confirmation of the Plan.  Indeed, because the Plan is based on a consensual deal with the Debtors' key stakeholders and contemplates a significant de-leveraging of the Debtors' balance sheet, confirmation of the Plan is expected to occur over a relatively short timeframe.  Specifically, pursuant to the Restructuring Support Agreement, the Debtors, the First Lien Consenting Lenders and the Second Lien Consenting Lenders have agreed that this Disclosure Statement and the Plan will be filed with the Bankruptcy Court within five (5) business days of the Petition Date, an order approving this Disclosure Statement will be approved within fifty-five (55) days of the Petition Date, the Plan will be confirmed within one

hundred and five (105) days of the Petition Date and the Plan will become effective within one hundred and twenty (120) days of the Petition Date.

Pursuant to the RSA, subject to the terms and conditions thereof and the approval by the Bankruptcy Court of a Disclosure Statement, and other solicitation materials in respect of the Plan as containing "adequate information" under section 1125 of the Bankruptcy Code, the First Lien Consenting Lenders and the Second Lien Consulting Lenders party thereto agreed to, among other things, (i) vote any Claims held by such lenders in favor of the Plan, (ii) not object, on any grounds, to the terms, conditions, nature or amount of the debtor-in-possession financing, (iii) forbear from exercising any of its rights and remedies under the First Lien Credit Facility and Second Lien Credit Facility against any non-Debtor Guarantor (as defined in the RSA) except to the extent contemplated by the Plan and (iv) not take any other action, including without limitation, initiating or joining any legal proceeding inconsistent with, or which would reasonable lead to a delay in the consummation of the restructuring contemplated by the Plan.

The RSA contemplates certain termination events upon the option of either the Requisite Consenting Lenders (as defined in the RSA) or the Debtors, or both as the case may be, in certain circumstances.  The Requisite Consenting Lenders (as defined in the RSA) may elect to terminate the RSA and the obligations thereunder including but not limited to the following circumstances:  (1) in the event of a breach by the Debtors of any of the undertakings, representations, warranties or covenants as set forth in the RSA that would have a material adverse impact on the First Lien Consenting Lenders or with respect to the consummation of the Restructuring (as defined in the RSA) or, with respect to the Second Lien Credit Facility Lenders, the economic treatment of the Second Lien Consenting Lenders set forth in the Plan or the New Warrant Term Sheet, which remains uncured for a period of 5 business days after the Debtors' receipt of notice from the Requisite Consenting Lenders (as defined in the RSA) of such breach; (2) if the Debtors lose the exclusive right to file and solicit acceptances of a chapter 11 plan; (3) if an examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Cases or the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code or the Chapter 11 Cases shall have been dismissed by order of the Bankruptcy Court; (4) if the Debtors file any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with the RSA and such motion or pleading has not been withdrawn within two Business Days of the Debtors receiving notice from the Requisite First Lien Consenting Lenders (or the Requisite Second Lien Consenting Lenders solely if such motion or pleading adversely affects the economic treatment of the Second Lien Consenting Lenders set forth in the Plan or the New Warrant Term Sheet) that such motion or pleading is inconsistent with the RSA; (5) if the Debtors move for, or the Bankruptcy Court enters, an order authorizing or directing the assumption or rejection of any executory contract or unexpired lease without the consent of Requisite First Lien Consenting Lenders; (6) if the Debtors exercise their "fiduciary out" as debtors-in-possession as provided for in the RSA; and (7) if the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material assets of the Debtors, without the written consent of the Requisite First Lien Consenting Lenders.

The  Debtors may terminate the RSA and the obligations thereunder if, among other things, (1) the First Lien Consenting Lenders and Second Lien Consenting Lenders breach

any of the representations, warranties or covenants as set forth in the RSA that would have a material adverse impact on the Debtors, or with respect to the consummation of the Restructuring (as defined in the RSA), which remains uncured for a period of 5 business days after the receipt by such lenders of notice of such breach; (2) any governmental authority, including any regulatory authority or court of competent jurisdiction, issues any ruling or order enjoining the consummation of a material portion of the Restructuring (as defined in the RSA), which remains uncured for a period of 5 business days; (3) after the DIP Credit Agreement is effective, there is a notice of acceleration under the DIP Credit Agreement; (4) the Debtors exercise their fiduciary duties as debtors-in-possession as set forth the RSA; and (5) forms of definitive exit financing documents on terms, tenor and conditions consistent with the commitment letter with respect to the Exit Facility attached as an exhibit to the RSA and acceptable to the Requisite Consenting Lenders (as defined in the RSA) and the Debtors have not been agreed to prior to the commencement of the Plan confirmation hearing.

The RSA will automatically terminate in the event an order approving the Debtors' assumption of the RSA is not entered within 30 days of the Petition Date, unless Requisite First Lien Consenting Lenders (and Requisite Second Lien Consenting Lenders whose consent shall not be unreasonably withheld) provide written notice to the Debtors prior to such automatic termination date that they waive the automatic termination of the RSA or agree to an extension of the automatic termination date.

## VI.

## THE CHAPTER 11 CASES

### A.    Significant "First Day" Motions; Retention of Professionals

On the Petition Date, the Debtors filed motions seeking the Court's approval of several orders authorizing the Debtors to pay various prepetition claims, to ease the strain on the Debtors' relationships with customers, employees and vendors as a consequence of the filings. These motions sought authority for the Debtors, among other things, to (i) pay prepetition compensation, benefits and expense reimbursements to employees, as well as to continue certain workers' compensation programs and insurance policies; (ii) pay certain property and use and *ad valorem* taxes that the Debtors are required to collect from third parties and remit to the appropriate taxing authorities, as well as certain permit, licensing, processing and related fees; (iii) pay prepetition claims of certain critical vendors and freight carriers, including those vendors who may hold claims pursuant to sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code (the "Critical Vendor Motion"); and (iv) as discussed further herein, obtain postpetition financing on a first priority priming lien, super-priority administrative expense basis and to grant adequate protection to certain of the Debtors' prepetition lenders.  The Debtors also filed motions seeking relief from certain administrative requirements of the Bankruptcy Code and to establish procedures to resolve adequate assurance requests for their over fifty (50) utility accounts.  On April 24, 2012, the Bankruptcy Court entered orders approving the relief sought by the Debtors in the motions described above on either an interim or final basis.

In addition, shortly after the Petition Date, the Debtors filed several applications seeking orders authorizing the retention of certain professionals.  Specifically, the Debtors seek

to retain (i) Young Conaway Stargatt & Taylor, LLP, as counsel; (ii) Paul, Weiss Rifkind, Wharton & Garrison LLP, as special corporate and transactions counsel; (iii) Moelis & Company LLC, as financial advisor and investment banker; (iv) Epiq Bankruptcy Solutions, LLC, as claims and noticing agent and administrative advisor; and (v) certain ordinary course professionals.

### B.    DIP Facility and Letter of Credit Facility

To provide the Debtors with the liquidity necessary to continue operating and to maintain normal vendor relations postpetition, the Debtors procured a debtor-in-possession financing facility (the "DIP Facility") consisting of a secured superpriority new money term loan facility and a letter of credit facility, as set forth in that certain Secured Super-Priority Debtor-in-Possession Credit and Guaranty Agreement to be dated as of the closing date thereof (as amended from time to time, the "DIP Credit Agreement", together with each of the other Loan Documents (as defined therein), the "DIP Documents"), by and among Bicent Power, as Borrower, the parent and subsidiary guarantors party thereto, Barclays Bank PLC, as administrative agent and collateral agent (in such capacity, the "DIP Agent") and the lenders party thereto from time to time (together with the DIP Agent, the "DIP Lenders").

The DIP Facility consists of a super-priority priming multi-draw term loan facility in an aggregate principal amount of $25 million, plus a synthetic letter of credit facility of up to $32 million to be used to replace (or be deemed to replace) prepetition letters of credit under the First Lien Credit Agreement as they mature.  The DIP Facility matures upon the earliest of: (a) the date that is one hundred fifty days (150) from the Petition Date, (b) the date that is thirty (30) days after the entry of the interim order approving the DIP Facility if the final order approving the DIP Facility has not been entered by such date (or such later date as shall be agreed in writing by the DIP Agent acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement)), (c) the date of substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a chapter 11 plan in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (d) following any applicable notice and grace periods, the acceleration of the loans or termination of the commitments under the DIP Facility, including, without limitation, as a result of the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement), (e) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases or orders the conversion of any Chapter 11 Case to a Chapter 7 liquidation, unless the enforcement of any such order has been stayed or (f) the date the Bankruptcy Court appoints a trustee, receiver or an examiner with enlarged powers.  On April 24, 2012, the Bankruptcy Court entered an order (the "Interim DIP Order") approving the DIP Facility on an interim basis and authorized the Debtors to borrow money pursuant to the DIP Documents in an amount not to exceed $6 million during Interim Period (as defined in the Interim DIP Order), plus a synthetic letter of credit facility of up to $32 million; provided that, up to $2.225 million of such synthetic letter of credit facility shall be available during the Interim Period.

### C.    Official Committee of Unsecured Creditors

No Creditors' Committee has been appointed as of the date of the filing of this Disclosure Statement.

# VII.

## SUMMARY OF THE PLAN

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THIS DISCLOSURE STATEMENT.

### A.    Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  An "allowed" administrative expense, claim or equity interest simply means that the Debtors agree, or in the event of a dispute, that the Court determines, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, the Debtors.  Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim or equity interest is automatically "allowed" unless the debtor or another party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed.  These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest on unsecured and/or undersecured obligations, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims.  In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and equity interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the Debtors into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.  Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan).  If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or interests, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired"

unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights.  Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with postpetition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Consistent with the foregoing requirements the Plan divides the Claims against, and Equity Interests in, the Debtors into the following Classes and affords the treatments hereby described:

| Class | Designation | Impairment |
|-------|-------------|------------|
| Unclassified | Administrative Claims | Paid in Full |
| Unclassified | Fee Claims | Paid in Full |
| Unclassified | Priority Tax Claims | Paid in Full |
| Unclassified | DIP Financing Claims | Paid in Full |
| Class 1 | Other Priority Claims | Unimpaired |
| Class 2 | Other Secured Claims | Unimpaired |
| Class 3 | First Lien Credit Facility Claims | Impaired |
| Class 4 | Second Lien Credit Facility Claims | Impaired |
| Class 5 | Mezzanine Credit Facility Claims | Impaired |
| Class 6 | General Unsecured Claims | Impaired |
| Class 7 | Intercompany Claims | Impaired |
| Class 8 | Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power | Impaired |

| Class 9 | Equity Interests in Subsidiaries | Unimpaired |
| Class 10 | Subordinated Securities Claims | Impaired |
| Class 11 | Subordinated Claims | Impaired |

For purposes of computing distributions under the Plan, Allowed Claims do not include postpetition interest unless otherwise specified in the Plan.

1.    Unclassified — Administrative Claims

Administrative Claims include any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' business, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, the Fee Claims, any fees or charges assessed against the Debtors' estates under section 1930 of chapter 123 of title 28 of the United States Code, any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code, DIP Financing Claims, the DIP Fee Claims, the First Lien Agent Fee Claims, the Second Lien Agent Fee Claims and Swap Counterparties Fee Claims.

Each holder of an Allowed Administrative Claim shall receive from the Debtors (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of the Effective Date and the date such Administrative Claim becomes such Allowed Administrative Claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors and such holder shall have agreed upon in writing; provided, however, that Allowed Ordinary Course Administrative Claims that are not due to be paid on the Effective Date shall be paid in full in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided, further, that First Lien Agent Fee Claims, DIP Fee Claims and Swap Counterparties Fee Claims, to the extent outstanding, shall be paid in full in Cash on the Effective Date, without any requirement for the filing of fee applications with the Court; provided, further, that if, and only if, the Class of Second Lien Credit Facility Claims votes to accept the Plan, the Reorganized Debtors shall pay the Second Lien Agent Fee Claims in full in Cash on the Effective Date, and without any requirement for the filing of a fee application with the Court.

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing applications for allowance of Administrative Claims (except for (i) Fee Claims, (ii) Ordinary Course Administrative Claims, (iii) the post-petition claims of the First Lien Agent under the First Lien Credit Facility, (iv) the post-petition claims of the DIP Agent and the DIP

Lenders under the DIP Credit Facility, (v) the fees and expenses of the professionals of the First Lien Agent under the First Lien Credit Facility and the DIP Agent under the DIP Credit Facility, (vi) the Swap Counterparties Fee Claims, and (vii) DIP Financing Claims), which date will be the first business day that is thirty (30) days after the Confirmation Date (the "Administrative Claims Bar Date").  Holders of Administrative Claims, except for those identified in (i)-(vii) in the prior sentence not paid prior to the Confirmation Date shall submit written requests for payment on or before the Administrative Claims Bar Date or forever be barred from doing so and collecting payment on such Claims.  The notice of confirmation of the Plan to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute good and sufficient notice of the Administrative Claims Bar Date.  The Reorganized Debtors shall have 120 days (or such longer period as may be allowed by order of the Court, which may be entered without notice or a hearing) following the Administrative Claims Bar Date to review and object to all Administrative Claims.  **Failure of a holder of an Administrative Claim(s) to timely and properly file and serve a written notice or request for payment on or before the Administrative Claims Bar Date shall result in such holder's Administrative Claim(s) being forever barred and discharged.**

2.     Unclassified — Fee Claims

Fee Claims are Administrative Claims under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including reasonable expenses of the members of the Creditors' Committee incurred as members of the Creditors' Committee in discharge of their duties as such), but specifically excluding the fees and expenses incurred by the professionals and advisors to the DIP Agent, the First Lien Agent, the Second Lien Agent and the Swap Counterparties.

All requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed with the Court and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, counsel to any Creditors' Committee, counsel to the First Lien Agent and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than forty-five (45) days after the Effective Date.  Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims that do not file and serve such applications by the required deadline shall be forever barred from asserting such Fee Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date.  Objections to any Fee Claims must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, and the requesting party no later than seventy-five (75) days after the Effective Date.  For the avoidance of doubt, this treatment of Fee Claims shall not apply to the DIP Fee Claims, the First Lien Agent Fee Claims, Second Lien Agent Fee Claims or the Swap Counterparties Fee Claims.

3.     Unclassified — Priority Tax Claims

Priority Tax Claims include any unsecured Claim that is entitled to a priority in right of payment under sections 502(i) or 507(a)(8) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors (subject to the consent of the Requisite First Lien Consenting Lenders) or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, but no later than thirty (30) days after the Effective Date, or (b) through equal annual installment payments in cash (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; (ii) over a period ending not later than five (5) years after the Petition Date; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan.

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing applications for allowance of Priority Tax Claims or any Other Priority Claims, which date will be the first business day that is thirty (30) days after the Confirmation Date (the "Priority Claims Bar Date"), unless such date is less than 180 days after the Petition Date, in which case, the Priority Claims Bar Date will be 180 days from the Petition Date solely with respect to Priority Tax Claims. Holders of Priority Tax Claims or any Other Priority Claims shall submit written requests for payment on or before the Priority Claims Bar Date or forever be barred from doing so and collecting payment on such Claims. The notice of confirmation of the Plan to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Priority Claims Bar Date and constitute good and sufficient notice of the Priority Claims Bar Date. The Reorganized Debtors shall have 120 days (or such longer period as may be allowed by order of the Court, which may be entered without notice or a hearing) following the Priority Claims Bar Date to review and object to all Priority Tax and Other Priority Claims. **Failure of a holder of a Priority Tax Claim(s) or Other Priority Claim(s) to timely and properly file and serve a written notice or request for payment on or before the Priority Claims Bar Date shall result in such holder's Priority Claim(s) being forever barred and discharged.**

### 4.    Unclassified — DIP Financing Claims; DIP Fee Claims; Backstop Fee

DIP Financing Claims are all Claims arising under or relating to the DIP Credit Facility and all agreements and instruments relating thereto (excluding DIP Fee Claims) pursuant to the DIP Credit Facility and the order(s) approving same, which shall be Allowed in full and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

DIP Fee Claims are all Claims, to the extent not already paid, for the fees, documented expenses, costs and other charges of the DIP Agent under the DIP Credit Facility (including the fees and expenses of counsel and the financial advisor to the DIP Agent) without any requirement for the filing of retention applications or fee applications in the Chapter 11 Cases, which shall be Allowed in full and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise),

counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

The Backstop Fee is the 5% of New Bicent Common Interests (subject to dilution by the exercise of New Warrants and profits interests issued pursuant to the Management Agreement) that the Backstop Lenders shall receive as a fee on the Effective Date for backstopping the DIP Credit Facility in accordance with the terms of the DIP Credit Facility and as approved pursuant to the Interim DIP Order; provided that, for the avoidance of doubt, the Backstop Lenders shall not receive any other Distributions on account of the Backstop Fee.

On or before the Effective Date, (a) holders of DIP Financing Claims shall receive payment in full in Cash of all DIP Financing Claims or shall have such DIP Financing Claims refinanced or converted in accordance with the terms of the DIP Credit Facility and the Exit Facility and (b) holders of DIP Fee Claims shall receive payment in full in Cash of all DIP Fee Claims, except to the extent that the holders of DIP Financing Claims or DIP Fee Claims agree to a different treatment. Notwithstanding anything to the contrary contained in the Plan, the liens and security interests securing the DIP Financing Claims shall continue in full force and effect until the DIP Financing Claims have been paid in full in Cash or refinanced as part of (or converted into) the Exit Facility, unless the holders of the DIP Financing Claims agree to a different treatment; provided further that, notwithstanding anything to the contrary in the Plan, the DIP Financing Claims and DIP Fee Claims shall not be waived, discharged, or released unless and until such claims are paid in full in Cash, or, solely with respect to the DIP Financing Claims, unless and until the DIP Financing Claims are refinanced or converted in accordance with the terms of the DIP Credit Facility and the Exit Facility.

Any and all indemnification obligations that are provided in connection with the DIP Credit Facility shall continue and be in effect with the same force and to the same extent in connection with the execution and entry into the Exit Facility.

On the Effective Date, each Backstop Lender shall receive its *pro rata* share of the Backstop Fee (based upon each Backstop Lender's backstop commitments under the DIP Credit Facility); provided that each Backstop Lender, as a condition precedent to receiving its respective share of distribution of New Bicent Common Interests, shall be required to execute the New Bicent LLC Agreement and deliver to New Bicent Power a counterpart signature page to the New Bicent LLC Agreement; provided further that the issuance of the New Bicent Common Interests in accordance with this paragraph shall be subject to dilution on account of the exercise of the New Warrants.

5.    Classification and Treatment of Claims

(a)    Class 1 – Other Priority Claims

Other Priority Claims include any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Claims and Priority Tax Claims), including certain allowed employee compensation and benefit claims of the Debtors' employees incurred within one hundred eighty (180) days prior to the Petition Date.

Except to the extent that a holder of an Allowed Other Priority Claim shall have agreed in writing to a different treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim in Class 1 shall receive payment in an amount equal to such Allowed Other Priority Claim in full in Cash as soon as practicable after the later of the Effective Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim.

Because the Debtors expect the Court to enter an order authorizing the Debtors to pay, among other things, unpaid prepetition employee compensation and benefits, the Debtors estimate that the Allowed Claims in Class 1 that are due and payable pursuant to the Plan on or before the Effective Date will be nominal.

Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims in Class 1 are presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(b)    Class 2 – Other Secured Claims

Other Secured Claims include any Claim (other than the DIP Financing Claims, the DIP Fee Claims, the First Lien Credit Facility Claims and the Second Lien Credit Facility Claims) to the extent reflected in the Schedules or otherwise agreed to be the Debtors, which is secured by a Lien on Collateral, to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

Except to the extent that a holder of an Allowed Other Secured Claim shall have agreed in writing to a different treatment, at the option of the Debtors, subject to the consent of the Requisite First Lien Consenting Lenders, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of (a) thirty (30) days after Effective Date, and (b) the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable (but no later than thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim) or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim as soon as is practicable, on the later of (y) thirty (30) days after Effective Date and (z) the date such Other Secured Claim becomes an Allowed Other Secured Claim.

Notwithstanding the foregoing, to the extent an Allowed Other Secured Claim arises on account of property taxes, such Allowed Other Secured Claim shall be treated as a Priority Tax Claim, and any applicable liens shall remain unimpaired until such Allowed Other

Secured Claim is paid in full. Any applicable interest shall be calculated in a manner consistent with section 511 of the Bankruptcy Code.

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving Distributions under the Plan.

Class 2 is unimpaired under the Plan. Holders of Other Secured Claims in Class 2 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

(c)    Class 3 – First Lien Credit Facility Claims

First Lien Credit Facility Claims are all Claims means all Claims (including, for the avoidance of doubt, the Goldman Termination Payments, the Barclays Termination Payment, if any, Swap Counterparties Fee Claims, and the First Lien Agent Fee Claims) arising under or relating to the First Lien Credit Facility, which shall be Allowed in full and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

The First Lien Credit Facility Claims shall be deemed Allowed Claims, in an aggregate amount equal to (a) approximately $147.2 million plus all accrued and unpaid pre-petition interest and, to the extent allowed under applicable law, post-petition interest, calculated in accordance with the First Lien Credit Facility (i) at the non-default rate until February 24, 2012 and (ii) at the default rate from February 24, 2012 through the Effective Date, plus (b) First Lien Agent Fee Claims and Swap Counterparties Fee Claims, plus (c) the Goldman Termination Payment, plus (d) the Barclays Termination Payment, if any, and shall not be subject to any avoidance, reductions, setoffs, offsets, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objections or any challenges under any applicable law or regulation by any Person.

Except to the extent that a holder of a First Lien Credit Facility Claim shall have agreed in writing to a different treatment:

(i) each holder of an Allowed First Lien Credit Facility Claim in Class 3 shall receive, in full and final satisfaction of such Claim, on the Effective Date, its *Pro Rata* share (based upon the principal amount of First Lien Credit Facility Claims held by each holder) of (a) 95% of the New Bicent Common Interests to be issued on the Effective Date; provided, that each holder of an Allowed First Lien Credit Facility Claim in Class 3, as a condition precedent to receiving its respective share of such distribution of New Bicent Common Interests, shall be required to execute the New Bicent LLC Agreement and deliver to New Bicent Power a counterpart signature page to the New Bicent LLC Agreement; provided further that the issuance of the New Bicent Common Interests in accordance with this paragraph shall be subject to dilution on account of the exercise of the New Warrants and profits interests issued pursuant to

01:12060597.1

the Management Agreement, and (b) distributions of Brush Sale Proceeds, if any, as provided for in Article VII.A of the Plan; and

(ii) all outstanding First Lien Agent Fee Claims and Swap Counterparties Fee Claims shall be paid in Cash, in full, to the First Lien Agent and Swap Counterparties, respectively, on or before the Effective Date.

Notwithstanding anything to the contrary in the Plan and notwithstanding the satisfaction, release, termination and extinguishment of the Claims and Liens of the First Lien Secured Parties against the Debtors pursuant to the Plan, nothing in the Plan or the Confirmation Order shall release, terminate, extinguish, prejudice or in any way affect the Liens, guaranties, and claims of the First Lien Secured Parties securing any rights, claims, interests and obligations against, in or with respect to any non-debtor affiliates or subsidiaries of the Debtors, and such Liens, guaranties and claims shall remain intact and enforceable in accordance with applicable non-bankruptcy law as if the Liens, guaranties and claims against the Debtors had not been extinguished or cancelled in the first instance.

Class 3 is Impaired under the Plan.  The holders of First Lien Credit Facility Claims in Class 3 are entitled to vote to accept or reject the Plan.

(d)    Class 4 — Second Lien Credit Facility Claims

Second Lien Credit Facility Claims are all Claims arising under or relating to the Second Lien Credit Facility, which shall be Allowed in full and shall not be subject to avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

The Second Lien Credit Facility Claims shall be deemed Allowed Claims, in an aggregate amount equal to approximately $128.5 million plus all accrued and unpaid pre-petition interest calculated in accordance with the Second Lien Credit Facility (i) at the non-default rate until April 6, 2012 and (ii) at the default rate from April 6, 2012 through the Petition Date, and shall not be subject to any avoidance, reductions, setoffs, offsets, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objections or any challenges under any applicable law or regulation by any Person.

Except to the extent that a holder of a Second Lien Credit Facility Claim shall have agreed in writing to a different treatment, on or as soon as reasonably practicable after the Effective Date:  (i) each holder of an Allowed Second Lien Credit Facility Claim in Class 4 shall receive, in full and final satisfaction of such Claim, its *Pro Rata* share (based upon the principal amount of Second Lien Credit Facility Claims held by each holder) of (a) Cash in an amount equal to $1,500,000 in the aggregate, and (b) New Warrants; and (ii) all outstanding Second Lien Agent Fee Claims shall be paid in Cash in full; provided that to receive the foregoing distributions in (i) and (ii), (1) the Class of Second Lien Credit Facility Claims must vote to accept the Plan and (2) each such holder, as a condition precedent to receiving its respective share of such distribution of New Warrants, shall execute and deliver to New Bicent Power a

counterpart signature page to each of the New Warrant Documents that provides for a signature by the holders of New Warrants; provided further that the issuance of the New Warrants in accordance with the Plan shall be subject to dilution on account of profits interests issued pursuant to the Management Agreement. The New Warrant Documents shall be binding on all parties receiving, and all holders of, New Warrants, including all transferees of New Warrants, regardless of whether such parties execute the New Warrant Documents. If the Class of Second Lien Credit Facility Claims does not vote to accept the Plan, holders of Allowed Second Lien Credit Facility Claims shall neither receive distributions nor retain any property under the Plan on account of such Allowed Second Lien Credit Facility Claims.

Class 4 is Impaired under the Plan. Each holder of an Allowed Second Lien Credit Facility Claim in Class 4 is entitled to vote to accept or reject the Plan.

(e)    Class 5 – Mezzanine Credit Facility Claims

Mezzanine Credit Facility Claims means any all Claims arising under or relating to the Mezzanine Credit Facility.

The holders of Mezzanine Credit Facility Claims shall neither receive distributions nor retain any property under the Plan on account of such Mezzanine Credit Facility Claims.

Class 5 is Impaired under the Plan. Holders of Allowed Mezzanine Credit Facility Claims in Class 5 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

(f)    Class 6 — General Unsecured Claims

A General Unsecured Claim is a Claim against any of the Debtors that is not an Administrative Claim, Ordinary Course Administrative Claim, Priority Tax Claim, Other Priority Claim, Fee Claim, DIP Financing Claim, DIP Fee Claim, Backstop Fee, Other Secured Claim, First Lien Agent Fee Claim, Second Lien Agent Fee Claim, Swap Counterparties Fee Claim, First Lien Credit Facility Claim, Termination Payment, Second Lien Credit Facility Claim, Mezzanine Credit Facility Claim, Subordinated Securities Claim or Subordinated Claim and shall include, without limitation, (a) Claims of employees of the Debtors that are not Priority Claims, (b) Claims arising as a result of the rejection by any of the Debtors of executory contracts or unexpired leases pursuant to section 365 of the Bankruptcy Code, (c) Claims arising as a result of pre-Petition Date litigation against any of the Debtors that are not subordinated under section 510(b) of the Bankruptcy Code, (d) Claims of vendors, suppliers and/or customers that are not Other Priority Claims, (e) Tort Claims, (f) Insured Claims, and (g) any LPP Claim.

The holders of General Unsecured Claims shall neither receive distributions nor retain any property under the Plan on account of such General Unsecured Claims; provided, however, that holders of Insured Claims may be entitled to recovery solely in accordance with Article VII.E of the Plan.

Class 6 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims in Class 6 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

(g)    Class 7 — Intercompany Claims

Intercompany Claims are any Claim held by one of the Debtors against any other Debtor, including (a) any account reflecting intercompany book entries by such Debtor with respect to any other Debtor, (b) any Claim not reflected in book entries that is held by such Debtor, and (c) any derivative Claim asserted or assertable by or on behalf of such Debtor against any other Debtor.

At the option of the Debtors, with the consent of the Requisite First Lien Consenting Lenders, or the Reorganized Debtors, as applicable, each Intercompany Claim shall be, either (i) Reinstated, in full or in part, and treated in the ordinary course of business, or (ii) eliminated in full or in part by offset, distribution, cancellation, assumption or contribution of such Intercompany Claim or otherwise; provided, however, that any election by the Debtors, with the consent of the Requisite First Lien Consenting Lenders, or the Reorganized Debtors shall not impact any recoveries under the Plan; provided, further, that if Intercompany Claims are Reinstated they shall be subordinated in right of payment to all other Claims.  The holders of Intercompany Claims shall not receive or retain any property on account of such Intercompany Claims to the extent such claim is cancelled and discharged as provided in the Plan.

Class 7 is Impaired under the Plan.  The holders of Intercompany Claims in Class 7 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

(h)    Class 8 — Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power

An Equity Interest in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest.

The holders of Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power shall neither receive distributions nor retain any property under the Plan on account of such Equity Interests.  On the Effective Date, the Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power shall be cancelled.

Class 8 is Impaired under the Plan.  The holders of Equity Interests in Class 8 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

(i)    Class 9 – Equity Interests in Subsidiaries

An Equity Interest in the Subsidiaries means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an

ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest.

The holders of Equity Interests in the Subsidiaries shall have such Equity Interests Reinstated on the Effective Date.

Class 9 is Unimpaired under the Plan. The holders of Allowed Equity Interests in the Subsidiaries in Class 9 are presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(j)      Class 10 – Subordinated Securities Claims

Subordinated Securities Claims are Claims subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a Security of any of the Debtors, or for damages arising from the purchase of sale of such a Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim. For the avoidance of doubt, the Second Lien Credit Facility Claims are not Subordinated Securities Claims.

The holders of Subordinated Securities Claims shall neither received distributions nor retain any property under the Plan on account of such Subordinated Securities Claims.

Class 10 is Impaired under the Plan. Holders of Subordinated Securities Claims in Class 10 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

(k)      Class 11 – Subordinated Claims

Subordinated Claims are any Claim that is determined to be subordinated to other Claims pursuant to section 510(c) of the Bankruptcy Code.

The holders of Subordinated Claims shall neither received distributions nor retain any property under the Plan on account of such Subordinated Claims.

Class 11 is Impaired under the Plan. Holders of Subordinated Claims in Class 11 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

**B.      Provisions Regarding Implementation
and Corporate Governance of the Reorganized Debtors**

1.      Restructuring and Other Transactions.

(a)      Restructuring Transactions

(i)      Without limiting any rights and remedies of the Debtors, Reorganized Debtors, the DIP Agent, the DIP Lenders, the First Lien Agent, or the First Lien Secured Parties under the Plan or applicable law, (i) prior to the Effective Date, the Debtors (with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting

the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party), and (ii) on or after the Effective Date, the Reorganized Debtors, may enter into such transactions and may take such actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or to otherwise simplify the overall corporate structure of the Debtors.  Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations or dissolutions, as may be determined by the Debtors, prior to the Effective Date (with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party), or Reorganized Debtors, on or after the Effective Date, to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Debtors or Reorganized Debtors vesting in one or more surviving, resulting, or acquiring corporations (collectively, the "Restructuring Transactions"); provided such Restructuring Transactions comply with the terms of (including applicable lender or shareholder consent requirements), and are not prohibited by, the Plan or the Restructuring Support Agreement.

(ii)    The actions to effect the Restructuring Transactions may include (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and that satisfy the applicable requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions; provided that, the actions and documents referred to in (i) through (iv) shall be subject through the Effective Date to the consent of and shall be in form and substance satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, the applicable affected party.  In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to the Debtors or Reorganized Debtors, such surviving, resulting or acquiring corporation will perform the obligations of the Debtors or Reorganized Debtors pursuant to the Plan to pay or otherwise satisfy the Allowed Claims to the extent not already paid or satisfied.

(iii)  The Restructuring Transactions shall include, without limitation, the following actions on the Effective Date:

(a)    100% of the equity interests in New Rocky Mountain shall be deemed automatically transferred to New Bicent Power, the result of which shall cause New Rocky Mountain to be directly owned by New Bicent Power.

(b)     Simultaneously, (1) in accordance with Article IV.H of the Plan, all of the Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power shall be cancelled, and (2) the New Bicent Common Interests shall be issued to the First Lien Agent on behalf of the holders of Allowed First Lien Credit Facility Claims, in accordance with Article IV.C of the Plan.

(c)     The First Lien Agent shall then distribute 100% of the New Bicent Common Interests (subject to dilution by the exercise of the New Warrants and profits interests issued pursuant to the Management Agreement) to the holders of Allowed First Lien Credit Facility Claims and the Backstop Lenders, in accordance with Articles IV.C.2 and III.E. of the Plan.  The Second Lien Agent shall, as applicable, issue to the holders of Allowed Second Lien Credit Facility Claims to the extent Class 4 has voted to accept the Plan their *pro rata* share of New Warrants in accordance with Article IV.D of the Plan.

(d)     The Hartwell Debtors shall be dissolved without the need to file a certificate of dissolution or take any other action with respect to or receive any approval or any governmental authority that would ordinarily be required under applicable law to dissolve or implement the termination of the legal existence of the Hartwell Debtors.  As part of the dissolution and winding-up of the Hartwell Debtors, all assets of the Hartwell Debtors shall be deemed automatically transferred to New Bicent Power without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person.

(b)     Tax Reporting.

(i)     All parties (including the Reorganized Debtors, the holders of Preconfirmation Equity Interests and the holders of New Bicent Common Interests and New Warrants) shall report for all U.S. federal income tax purposes the Restructuring Transactions as a sale of the assets of Bicent Power to the holders of First Lien Credit Facility Claims and Second Lien Credit Facility Claims (to the extent Class 4 votes to accept the Plan and the holders of Allowed Second Lien Credit Facility Claims receive New Warrants), followed by a contribution of those assets to New Bicent Power (a new partnership for U.S. federal income tax purposes) in exchange for the consideration described in Articles IV.C. and D of the Plan in a transaction intended to be governed by Section 721 of the United States Internal Revenue Code of 1986, as amended.

(ii)     As soon as possible after the Effective Date, but in no event later than thirty (30) days thereafter, the New Board shall determine the value of the assets of New Bicent Power and its subsidiaries that were deemed sold pursuant to the Plan, and the portions of such value which are allocable, respectively, to the New Bicent Common Interests and New Warrants. Such allocation shall take into account the relative fair market values of the New Bicent Common Interests and New Warrants. The New Board shall apprise, in

writing, all parties to the New Bicent LLC Agreement and the holders of Preconfirmation Equity Interests of such valuation and allocation. The valuation and allocation shall be used consistently by all parties to the New Bicent LLC Agreement (including the Reorganized Debtors and the holders of New Bicent Common Interests and New Warrants) and the holders of Preconfirmation Equity Interests for all U.S. federal income tax purposes.

(iii)  Consistent with the intent that New Bicent Power shall initially be treated as a partnership for federal income tax purposes, no election shall be made by New Bicent Power (or any direct or indirect subsidiaries) to be taxed as a corporation for federal income tax purposes that is effective on or prior to the Effective Date. All parties (including the Reorganized Debtors and the holders of New Bicent Common Interests and New Warrants, if any) shall not treat the holders of New Warrants, if any, as owning partnership interests in New Bicent Power for federal income tax purposes by reason of their ownership of any such New Warrants, unless the New Board determines otherwise.

(iv)  The parties (including the Debtors and Reorganized Debtors, the holders of Preconfirmation Equity Interests, and the holders of New Bicent Common Interests and New Warrants shall treat the Brush Sale and Indemnification Claims Sale as sales of assets for U.S. federal income tax purposes to the purchasers in exchange for Cash (and assumed liabilities, if any).

(c)    Asset Sales

The Debtors are authorized to sell (and/or direct one or more of their affiliates or subsidiaries to sell) the Brush Assets, as applicable, (i) pursuant to section 363 of the Bankruptcy Code, (ii) pursuant to the Plan or (iii) pursuant to the rights and remedies exercised by the First Lien Agent as directed by Required First Lien Lenders pursuant to the First Lien Credit Facility, Intercreditor Agreement, and any related documentation; provided, however, that any Brush Sale shall only be authorized, pursued and consummated with the consent of, and on the terms and documentation satisfactory to, the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of, and on the terms and documentation approved by, the applicable affected party.  Brush Sale Proceeds shall be distributed as provided for pursuant to Article VII.A of the Plan.

The Debtors are authorized to sell and assign the Indemnification Claims to a third party; provided that such sale and assignment shall only be authorized, pursued and consummated with the consent of, and on the terms and documentation satisfactory to, the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of, and on the terms and documentation approved by, the applicable affected party.  Indemnification Proceeds shall be distributed as provided for pursuant to Article VII.A of the Plan.

(d)    Incurrence of New Indebtedness

The Reorganized Debtors' entry into the Exit Facility, the incurrence of the indebtedness thereunder on the Effective Date, and the payment of any associated fees and expenses, are hereby authorized without the need for any further corporate action, any further

action by holders of Claims or Interests, or any further court, corporate, board, member, partner, Equity Interest holder or other approval, authority or action.

### 2.    Appointment of Officers and Directors.

The initial board of directors of New Bicent Power shall be a six-member board of which (a) five (5) voting members shall be designated by the Requisite Consenting First Lien Lenders as part of the Plan Supplement, and (b) one (1) non-voting member shall be Paul Prager who shall serve as the CEO of the Reorganized Debtors.

### 3.    Powers of Officers.

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

### 4.    Management of Reorganized Debtors.

The Reorganized Debtors shall be managed by Beowulf in accordance with the terms of that certain Second Amended and Restated Management Agreement between Beowulf Energy LLC and New Bicent Power to be entered into on the Effective Date, a copy of which is attached as Exhibit H to the Restructuring Support Agreement and which shall be included in the Plan Supplement.

### 5.    Indemnification of Directors, Officers and Employees.

Upon the Effective Date, the charter, by-laws, operating agreements and other organizational documents of each Reorganized Debtor that is a corporation, and the limited liability company agreement of each Reorganized Debtor that is a limited liability company, shall contain provisions which (i) eliminate the personal liability of the Debtors' and the Reorganized Debtors' then-present and future directors and officers for post-Effective Date monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify the Reorganized Debtors' directors and officers, serving on or after the Effective Date for all post-Effective Date claims and actions to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized, provided, that with respect to each Reorganized Debtor that is a limited liability company, "to the fullest extent permitted by applicable law" shall mean (a) for purposes of clause (i), the fullest extent that would be permitted if such Reorganized Debtor was a corporation and (b) for purposes of clause (ii), the fullest extent to which such Reorganized Debtor, if it was a corporation, could indemnify its directors and officers under the applicable state corporations statute (including Section 145 of the Delaware General Corporation Law for any Reorganized Debtor that is a Delaware limited liability company) and related case law.

6.    <u>Corporate Action.</u>

Except as set forth in the Plan, any action under the Plan to be taken by or required of the Debtors or the Reorganized Debtors, including the adoption or amendment of certificates of incorporation, by-laws, operating agreements and other organizational documents, the issuance of securities, membership interests, partnership interests and instruments or the selection of officers or directors, execution of definitive documentation for the Exit Facility, and/or payment of all fees and expenses authorized pursuant to the Plan, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or Reorganized Debtors' boards of directors or managers, as applicable, security holders or holders of membership or partnership interests.

The Debtors (with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party) or the Reorganized Debtors, as applicable, shall be authorized to execute, deliver, file, and record such documents (including the Plan Supplement Documents), contracts, instruments, releases and other agreements and take such other actions as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further court, corporate, board, shareholder, member, manager or partner approval or action.  In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or membership or partnership interest holders of the applicable Reorganized Debtor.  The certificates, instruments and other documents referred to in Article V.G of the Plan shall be part of the Plan Supplement and in form and substance satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party.

The appropriate officers of the Debtors (with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party) and/or the Reorganized Debtors and members of their respective boards of directors are authorized to issue, execute and deliver, and consummate the transactions, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors and/or the Reorganized Debtors, in each case without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person.

C.    **Substantive Consolidation**

Solely in connection with Distributions to be made to the holders of Allowed Claims, the Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Court provide in the Confirmation Order for the substantive consolidation of the Estates of the Debtors into a single Estate for purposes of the Plan and the Distributions thereunder.  To

the extent a Claim (including any Disputed Claim) becomes an Allowed Claim, such Claim shall be satisfied solely in accordance with the provisions of the Plan.

Pursuant to the Confirmation Order, except as expressly provided in the Plan, (i) all assets and liabilities of the substantively consolidated Debtors will be deemed to be merged solely for purposes of the Plan and Distributions to be made thereunder, (ii) the obligations of each Debtor will be deemed to be the obligation of the substantively consolidated Debtors solely for purposes of the Plan and Distributions thereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the substantively consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor under the Plan will be deemed to be made by the substantively consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the substantively consolidated Debtors.  Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim.  Notwithstanding the foregoing, such substantive consolidation shall not affect (a) the legal and corporate structure of the Reorganized Debtors or (b) guarantees that are required to be maintained post-Effective Date (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will under the Plan be, assumed, (ii) pursuant to the express terms of the Plan, or (iii) in connection with the Exit Facility.  The substantive consolidation proposed in the Plan shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6).  Such obligations shall continue until an order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.  The substantive consolidation effected pursuant to this section shall not affect, without limitation, (i) defenses to any Cause of Action or requirements for any third party to establish mutuality in order to assert a right to setoff, or (ii) distributions out of any insurance policies or proceeds of such policies.

Unless the Court has approved the substantive consolidation of the Estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Estates as set forth in the Plan.  If no objection to substantive consolidation under the Plan is timely filed and served, then the holders of Claims will be deemed to have consented to substantive consolidation for the purpose of the Plan only and the Court may approve substantive consolidation of the Debtors' Estates in the Confirmation Order.  If an objection(s) to the substantive consolidation provided for in the Plan is timely filed and served, a hearing with respect to the substantive consolidation of the Estates and the objection(s) thereto shall be scheduled by the Court, which hearing may coincide with the Confirmation Hearing.

Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan over the objections of creditors.  In re Owens Corning, 419 F.3d 195 (3d Cir. 2005) amended by 2005 U.S. App. Lexis

18043 (Aug. 23, 2005). In reversing the district court's consolidation of a parent company and a number of its subsidiary guarantors, the Third Circuit did not endorse any specific set of "factors" a court should consider in ordering consolidation. Instead, the Third Circuit Court of Appeals articulated a number of "principles" to guide the court in its analysis. Owens Corning, at 211. These principles include: (i) absent compelling circumstances courts must respect entity separateness; (ii) recognition that substantive consolidation nearly always addresses harms caused by debtors disregarding separateness; (iii) mere benefit of administration is "hardly a harm calling substantive consolidation into play"; (iv) substantive consolidation should be used rarely and as a last resort after alternative remedies have been considered and rejected; and (v) substantive consolidation may not be used as a "sword." Id.

Using these principles, the Third Circuit Court of Appeals set forth the standard by which courts in this jurisdiction must weigh requests for substantive consolidation where creditor consent is lacking. Specifically, in ordering substantive consolidation (absent consent of the parties) courts must either find, with respect to the entities in question, that (a) prepetition, they disregarded their separateness "so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity," or (b) postpetition, "their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Id. (emphasis added).

The Debtors believe that substantive consolidation is warranted here because, among other reasons, the Debtors historically operated on a consolidated basis. All Debtors have essentially the same officers and directors. For purposes of the Debtors' negotiation of secured financing, the parties to such financing arrangements treated the Debtors' operations as unitary. Further, as CEM operates all of the Debtors' Plants, and almost all of the Third-Party Plants, many of the Debtors' unsecured creditors viewed the Debtors as a single entity for the purpose of extending credit terms. Further, accounts payable functions were performed via a highly integrated cash management system by the same administrative staff working on behalf of all Debtors.

Given the integration of the Debtors' cash management and other systems, the relatively few creditors of the non-operating Debtors, and the expense of generating separate plans of reorganization for each of the Debtors, the Debtors believe that the overall effect of substantive consolidation will be more beneficial than harmful to creditors and will allow for greater efficiencies and simplification in processing Claims and making distributions to holders of Allowed Claims. Accordingly, the Debtors believe that substantive consolidation of the Debtors' estates under the terms of the Plan will not adversely impact the treatment of any of the Debtors' creditors, but rather will reduce administrative expenses by automatically eliminating duplicative claims asserted against more than one of the Debtors, decreasing the administrative difficulties and costs related to the administration of thirteen (13) separate Debtor's estates separately, as well as eliminating the need to determine professional fees on a case-by-case basis and streamlining the process of making Distributions.

For the reasons articulated above, the Debtors believe that substantive consolidation is justified in these cases.

01:12060597.1

Furthermore, the Debtors reserve the right to seek (subject to the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party) confirmation of the Plan without implementing substantive consolidation (including, without limitation, in the event the Court determines that substantive consolidation of the Debtors as provided for above is not appropriate), and to request that the Court approve the treatment of and distribution to the different Classes under the Plan on a Debtor-by-Debtor basis. In the event the Debtors seek confirmation of the Plan without implementing substantive consolidation of the Debtors as provided for above, any vote in favor of the Plan on a substantively consolidated basis, shall be deemed a vote in favor of the Plan of each of the applicable Debtors on an individual Debtor basis.

### D.   Provisions Regarding Means of Implementation, Voting, Distributions and Treatment of Disputed Claims

1.   <u>Brush Sale Proceeds; Indemnification Proceeds.</u>

Certain wholly owned affiliates that are not Debtors in these Chapter 11 Cases own the assets comprising the Brush 1&3 and Brush 4 power generation facilities. The Plan contemplates the potential sale of the Brush Assets or the equity interests in the direct or indirect owners of the Brush Assets, including, without limitation, Colorado Power Partners, BIV Generation Company, LLC, Brush Generation Company, LLC, Morgan Generation Company, LLC, Brush Power, LLC, and/or Centennial Power, LLC, under (a) section 363 of the Bankruptcy Code, (b) the Plan or (c) pursuant to rights and remedies exercised by the First Lien Agent as directed by Required First Lien Lenders pursuant to the First Lien Credit Facility, Intercreditor Agreement, and any related documentation. Although the non-Debtor affiliates that own the Brush Assets are guarantors under the First Lien Credit Agreement and the Second Lien Credit Agreement, in accordance with the terms of the Restructuring Support Agreement, the First Lien Agent, the First Lien Consenting Lenders, the Second Lien Agent and the Second Lien Consenting Lenders have agreed to forbear from exercising their rights and remedies against the non-Debtor affiliates and their assets.

The holders of First Lien Credit Facility Claims shall receive their *Pro Rata* share of all Brush Sale Proceeds from any Brush Sale that occurs prior to or after the Effective Date (based upon the principal amount of First Lien Credit Facility Claims held by each holder on the Record Date); <u>provided</u> that, for the avoidance of doubt, the payment of Brush Sale Proceeds to the holders of First Lien Credit Facility Claims shall be in addition to, and shall not prejudice, the rights, claims, interests, treatment and distributions provided to the holders of First Lien Credit Facility Claims under the Plan; <u>provided</u> <u>further</u> that the holders of First Lien Credit Facility Claims shall not receive more than 100% of their Allowed First Lien Credit Facility Claims set forth in Article IV.C.1 of the Plan.

The Plan also contemplates that the Debtors may sell, assign or otherwise dispose to a third party the claims, causes of action, and rights of any of the Debtors in connection with any action for indemnification relating to costs, expenses and other amounts incurred in connection with the Hobbs Arbitration, including against MDU Resources Group, Inc.

Any Indemnification Proceeds received by the Debtors or the Reorganized Debtors shall be retained by the Debtors or Reorganized Debtors, as applicable.  Upon the entry of any final judgment, order, settlement, payment or otherwise, or the consummation by the Debtors or the Reorganized Debtors, as the case may be, of any Indemnification Claims Sale, and the receipt by the Debtors or the Reorganized Debtors of the proceeds from any of the foregoing, the Debtors or the Reorganized Debtors shall pay first Cooley LLP, pursuant to its engagement letter dated as of April 17, 2012, and then Beowulf, pursuant to the Management Agreement, the amounts owed to each under its respective agreements; provided that, pursuant to the Management Agreement, no amount shall be payable to Beowulf prior to the Effective Date. The Debtors' engagement letter with Cooley LLP shall be assumed on and as of the Effective Date in accordance with Article XI.A. of the Plan.

2.      Exit Facility.

On the Effective Date, the Debtors shall have closed on the Exit Facility.  The amounts borrowed under the Exit Facility shall be used to (i) pay in full in Cash the DIP Financing Claims and the DIP Fee Claims, (ii) satisfy certain Plan-related expenses, (iii) pay all fees and expenses associated with the Exit Facility, and (iv) fund the Reorganized Debtors' on-going working capital needs.

3.      Voting of Claims.

Each holder of an Allowed Claim in an Impaired Class of Claims entitled to vote on the Plan shall be entitled to vote to accept or reject the Plan as provided thereunder or in any order that may be entered by the Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Court.

4.      Distributions.

(a)      Allowed Claims.

(i)      *Delivery of Distributions.*  Distributions under the Plan shall be made by the Reorganized Debtors or their designee to the holders of Allowed Claims in all Classes at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 by the Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address); except as provided in Article V(1)(a) of the Plan with respect to distributions by the First Lien Agent on behalf of the First Lien Credit Facility Lenders.

(ii)      *Distribution of Cash.*  Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made by wire transfer from a domestic bank selected by the Reorganized Debtors.

(iii)      *Unclaimed Distributions of Cash.*  Any distribution of Cash under the Plan that is unclaimed after one year after it has been delivered (or attempted to be delivered) shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code

and shall become the property of the Reorganized Debtor that is the successor of the Debtor against which such Claim was Allowed notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

(iv) *Saturdays, Sundays, or Legal Holidays*.  If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

(v) *Fractional New Bicent Common Interests.* Notwithstanding any other provision in the Plan to the contrary, no fractional interests of New Bicent Common Interests or New Warrants (if any) shall be issued or distributed pursuant to the Plan.  Whenever any payment of a fraction of a unit of New Bicent Common Interests or a fraction of a New Warrant would otherwise be required under the Plan, the actual distribution made shall reflect a rounding of such fraction to the nearest whole unit or warrant (up or down), as the case may be, with units or warrants less than half units or warrants being rounded down and fractions equal to half units or warrants or greater than half units or warrants being rounded up.  If two or more holders are entitled to equal fractional entitlements and the number of holders so entitled exceeds the number of whole units or warrants, as the case may be, which remain to be allocated, the Reorganized Debtors shall allocate the remaining whole units or warrants to such holders by random lot or such other impartial method as the Reorganized Debtors deem fair, in the Reorganized Debtors' sole discretion.  Upon the allocation of all of the whole New Bicent Common Interests and New Warrants (if any) authorized under the Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

(vi) *Distributions for Claims Allowed as of the Effective Date*. On the Effective Date, the Reorganized Debtors shall distribute Cash and New Bicent Common Interests, as applicable, to the holders of Claims in Class 3.

(vii) *Distributions for Claims Allowed as of the Initial Distribution Date*.  On the Initial Distribution Date, the Reorganized Debtors shall provide Distributions under the Plan as set forth in the Plan, to the extent not already provided, and if Class 4 votes to accept the Plan, the Reorganized Debtors shall provide the distributions of New Warrants and Cash to the holders of Allowed Claims in Class 4 in accordance with Article IV.D of the Plan.

(viii) *Distributions as of the Record Date.*  As of the close of business on the Record Date, the Claims register shall be closed, and there shall be no further changes in the record holders of any Claims or Equity Interests.  The Debtors (with the consent of the First Lien Agent) and the Reorganized Debtors shall have no obligation to, but may in their sole and absolute discretion, recognize any transfer of any Claims occurring after the Record Date.  The Debtors and the Reorganized Debtors shall be entitled to recognize and

deal for purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Record Date.

(ix) *Interest on Claims*.  Except as specifically provided for in the Plan or the Final DIP Order, no Claims (including Administrative Claims), Allowed or otherwise, shall be entitled, under any circumstances, to receive any interest on a Claim.

(x) *Allocation Between Principal and Accrued Interest*.  The aggregate consideration paid to holders of Claims with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claim (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

(b)    Objections To And Resolution Of Claims.

The Reorganized Debtors shall have the exclusive right to make and to file objections to, or otherwise contest the allowance of, Administrative Claims (other than Fee Claims) and Claims subsequent to the Confirmation Date.  Unless otherwise ordered by the Court, objections to, or other proceedings concerning the allowance of Administrative Claims and Claims (other than Tort Claims) shall be filed and served upon the holders of the Administrative Claims or Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable, but in no event later than the Claims Objection Deadline. Objections to Fee Claims shall be filed and served within seventy-five (75) days of the Effective Date (or such longer period as may be allowed by order of the Court).

Objections to, or other proceedings contesting the allowance of, Administrative Claims and Claims may be litigated to judgment, settled or withdrawn, in the Reorganized Debtors' sole discretion.  The Reorganized Debtors may settle any such objections or proceedings without Court approval or may seek Court approval without notice to any Person. Notwithstanding anything in the Plan to the contrary, Tort Claims shall be liquidated, determined and satisfied in accordance with Article VII.E of the Plan.  While an objection and any related proceeding is pending against an Administrative Claim or Claim, no distributions on account of such claims shall be made until the Administrative Claim or Claim is Allowed.

Unless an order of the Court specifically provides for a later date, any party filing a proof of Claim after the bar date established by the Court with respect to an Administrative Claim, Priority Tax Claim or Other Priority Claim shall not be entitled to treatment as a creditor with respect to such Claim for the purposes of voting on and distribution under the Plan, unless and until the party filing such Claim either obtains the written consent of the Reorganized Debtors to file such Claim late or obtains an order of the Court upon written motion on notice to the Reorganized Debtors that permits the filing of the Claim.  If any proof of Claim with respect to an Administrative Claim, Priority Tax Claim or Other Priority Claim is permitted to be filed after the Claims Objection Deadline, the Reorganized Debtors shall have ninety (90) days from the date of such order or agreement to object to such Claim, which deadline may be extended by the Court on motion of the Reorganized Debtors without a hearing or notice to Creditors.

For the avoidance of doubt, this Article VII.D.2 of the Plan shall not apply to the

DIP Financing Claims, DIP Fee Claims, the Backstop Fee, First Lien Credit Facility Claims, First Lien Agent Fee Claims, Termination Payments, Swap Counterparties Fee Claims, Second Lien Agent Fee Claims, and/or Second Lien Credit Facility Claims, which claims shall be Allowed in full and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(c)    Distributions Following Allowance<b>.</b>

Notwithstanding anything to the contrary set forth in the Plan or in the Confirmation Order, each holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Initial Distribution Date shall receive the Distribution to which such holder of an Allowed Claim is entitled at such time that the Reorganized Debtors determine, in their discretion, to make subsequent Distributions to holders of other Allowed Claims following the Initial Distribution Date, <u>provided</u> that the Reorganized Debtors shall make such Distributions at least semi-annually.  Nothing set forth in the Plan is intended to, nor shall it, prohibit the Debtors, in their discretion, from making a Distribution on account of any Disputed Claim at any time after such Disputed Claim becomes an Allowed Claim.  For the avoidance of doubt, distributions under the Plan shall not be made to the holder of any Disputed Claim unless and until such Claim is Allowed and only in the amount such Claim is Allowed.

(d)    Setoff.

The Debtors, with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party, or Reorganized Debtors may, but shall not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim in respect of which distribution shall be made), any claims of any nature whatsoever that the Debtors or Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim the Debtors or Reorganized Debtors may have against the holder of such Claim, <u>provided</u>, that in the event the Debtors or Reorganized Debtors seek to exercise such setoff rights against the holder of a Claim that is a debtor in a case under the Bankruptcy Code, the Debtors or Reorganized Debtors shall comply with the requirements of the Bankruptcy Code, including seeking relief from the automatic stay; <u>provided</u>, <u>further</u>, that nothing contained in the Plan is intended to limit the ability of a Swap Counterparty or holder of a Claim to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 556, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment.

5.    <u>Insured Claims.</u>

Any Insured Claims including employer liability claims and Tort Claims, but specifically excluding Workers' Compensation Claims, as to which the Debtors have insurance coverage for such claim shall be determined and liquidated in accordance with applicable non-

01:12060597.1

bankruptcy law.  Recovery on account of any such Claims shall be limited to applicable insurance.

6.    Estimation.

The Reorganized Debtors may at any time, request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim.  The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim.  If the Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan, or (c) a maximum limitation on such Claim, as determined by the Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors, or the Reorganized Debtors as the case may be, may elect to object to ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

7.    Nonconsensual Confirmation.

The Debtors, with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party, will seek to have the Court confirm the Plan under section 1129(b) of the Bankruptcy Code; provided, that the Debtors shall not seek nor be permitted to confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to Class 3.

8.    New Bicent LLC Agreement.

On the Effective Date, New Bicent Power and all of the holders of New Bicent Common Interests then outstanding shall be deemed to be parties to an amended and restated limited liability company agreement of New Bicent Power (the "New Bicent LLC Agreement"), substantially in the form contained in the Plan Supplement, without the need for execution by any such holder other than New Bicent Power.  Holders of Allowed First Lien Credit Facility Claims shall not receive their respective distributions of New Bicent Common Interests pursuant to the Plan (including, as applicable, in their capacities as Backstop Lenders) unless and until each such holder executes the New Bicent LLC Agreement and delivers to New Bicent Power a counterpart signature page to the New Bicent LLC Agreement.

Holders of New Warrants shall not receive their respective New Bicent Common Interests pursuant to the exercise of any New Warrants unless and until each such holder of New Warrants executes and delivers to New Bicent Power documentation, in form and substance satisfactory to New Bicent Power, and consistent with the Warrant Term Sheet, pursuant to which such holder of New Warrants agrees to become a party to the New Bicent LLC Agreement and be bound by all of the terms and conditions of the New Bicent LLC Agreement, and executes the New Bicent LLC Agreement and delivers to New Bicent Power a counterpart signature page thereto.  The New Bicent LLC Agreement shall be binding on all parties

receiving, and all holders of, New Bicent Common Interests (including New Bicent Common Interests issued pursuant to the exercise of New Warrants), including all transferees of New Bicent Common Interests, regardless of whether such parties execute the New Bicent LLC Agreement.  In the period pending distribution of the New Bicent Common Interests to any holder entitled pursuant to the Plan to receive New Bicent Common Interests, such holder shall be bound by and shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such holder's New Bicent Common Interests (including receiving any proceeds of permitted transfers of such New Bicent Common Interests) and to exercise all other rights in respect of the New Bicent Common Interests (so that such holder shall be deemed for tax purposes to be the owner of the New Bicent Common Interests).

      9.    <u>Liens.</u>

      (a)    Notwithstanding anything to the contrary contained in the Plan, the substantive consolidation of the Debtors pursuant to Article VI of the Plan shall not affect the extent or validity of any Lien.

      (b)    Upon the treatment or other satisfaction of any secured Claims in accordance with the Plan, the Liens securing such secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; <u>provided</u> that, notwithstanding anything to the contrary in the Plan and notwithstanding the satisfaction, release, termination and extinguishment of the Claims and Liens of the First Lien Secured Parties against the Debtors pursuant to the Plan, nothing in the Plan or the Confirmation Order shall release, terminate, extinguish, prejudice or in any way affect the Liens, guaranties, and claims of the First Lien Secured Parties securing any rights, claims, interests and obligations against, in or with respect to any non-debtor affiliates or subsidiaries of the Debtors, and such Liens, guaranties and claims shall remain intact and enforceable in accordance with applicable non-bankruptcy law as if the Liens, guaranties and claims against the Debtors had not been extinguished or cancelled in the first instance.

      10.    <u>Swap Agreements.</u>

      Each Swap Agreement is a "swap agreement," "forward contract," and "master netting agreement" as those terms are defined in sections 101(53B), 101(25), and 101(38A), respectively, of the Bankruptcy Code.  Each Swap Counterparty is a "swap participant," "financial participant," "forward contract merchant," and "master netting agreement participant" as those terms are defined in sections 101(53B), 101(22A), 101(26), and 101(38B), respectively, of the Bankruptcy Code.  Each Swap Agreement and Swap Counterparty is entitled to, and shall have, all the rights and protections afforded to "swap agreements," "forward contracts," "master netting agreements," "swap participants," "financial participants," "forward contract merchants," and "master netting agreement participants" under the Bankruptcy Code, including, without limitation, under sections 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 546(e), 546(g), 546(j), 548(d)(2)(B), 548(d)(2)(D), 548(d)(2)(E), 553(a)(2)(B)(ii), 553(a)(3)(C), 553(b)(1), 556, 560, 561, and 562 of the Bankruptcy Code and any other "safe harbor" provisions under the Bankruptcy Code or other applicable law.  For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the Swap Agreements, Goldman Termination Payment,

Barclays Termination Payment, and any other obligations under or in connection with the Swap Agreements shall be enforceable by the Swap Counterparties pursuant to sections 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 556, 560, and 561 of the Bankruptcy Code, notwithstanding the automatic stay provided under section 362(a) of the Bankruptcy Code or any order of the Court.

The Swap Agreements, Goldman Termination Payment, and Barclays Termination Payment shall not, in any manner, be subject to any challenge, dispute, subordination, avoidance, or objection, whether directly or indirectly, including with respect to their validity or enforceability, or that any claims or obligations thereunder are not entitled to the same treatment as the First Lien Credit Facility Claims.

        11.     Enforcement of Subordination.

The classification and manner of satisfying all Claims and Equity Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Notwithstanding the occurrence of the Effective Date, the Intercreditor Agreement shall be enforceable among the parties thereto in determining the relative priorities and rights of the First Lien Secured Parties and the Second Lien Secured Parties, such priorities and rights shall continue to be governed by the Intercreditor Agreement, the First Lien Credit Facility and the Second Lien Credit Facility, including with respect to the non-Debtors party to the First Lien Credit Agreement and Second Lien Credit Agreement; provided, however, that notwithstanding the Intercreditor Agreement or otherwise, the holders of the Second Lien Credit Facility Claims, shall not be required to pay or turn over any distributions received by them as holders of Allowed Second Lien Credit Facility Claims pursuant to Article IV.D of the Plan (including the New Warrants).

    **E.**     **Effect of Confirmation of the Plan**

        1.     Continued Corporate Existence.

Bicent Power and the Subsidiaries, as New Bicent Power and the Reorganized Subsidiaries respectively, shall continue to exist after the Effective Date with all powers of a corporation or limited liability company, as the case may be, under the laws of the respective states governing their formation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith. In addition, the Reorganized Debtors may operate their business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or by the Court, subject only to the terms and conditions of the Plan as well as the documents and instruments executed and delivered in connection therewith, including the documents and instruments included in the Plan Supplement. The Reorganized Debtors shall be responsible for filing required post-confirmation reports and each Reorganized Debtor shall pay quarterly fees of such Debtor due to the Office of the United States Trustee until such time as a final decree is entered closing the applicable Chapter 11 Case or the Bankruptcy Code orders otherwise.

2.      Dissolution of Creditors' Committee.

Any Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, any Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents shall terminate as of the Effective Date; provided, however, such attorneys and financial advisors shall be entitled to pursue their own Fee Claims and represent the Creditors' Committee in connection with the review of and the right to be heard in connection with all Fee Claims.

3.      Vesting of Property.

The property of Bicent Power's and the Subsidiaries' estates, including all Causes of Action, shall be revested in the Reorganized Debtors, as applicable, on the Effective Date.

4.      **Discharge of the Debtors.**

**The rights afforded under the Plan and the treatment of all Claims and Equity Interests under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Debtors in Possession, the Reorganized Debtors or any of their respective assets or properties, arising prior to the Effective Date.  Except as otherwise expressly specified in the Plan or the Confirmation Order, the Confirmation Order shall act as of the Effective Date, to the fullest extent provided under section 1141(d) and other applicable provisions of the Bankruptcy Code, as a discharge of all debts of, Claims against, and Liens on the Debtors or their estates, their respective assets and properties, arising at any time before the Effective Date, regardless of whether a proof of Claim with respect thereto was filed, whether the Claim is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a distribution thereunder.  Except as otherwise expressly specified in the Plan or the Confirmation Order, after the Effective Date, any holder of such discharged Claim shall be precluded from asserting against the Debtors, the Reorganized Debtors, or any of their respective assets or properties, any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order.  For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, the DIP Financing Claims and DIP Fee Claims shall not be waived, discharged, or released unless and until such claims are paid in full in Cash, or, solely with respect to the DIP Financing Claims, unless and until the DIP Financing Claims are refinanced or converted in accordance with the terms of the DIP Credit Facility and the Exit Facility.**

5.      **Injunction.**

**Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Court, all entities who have held, hold, or may hold Claims**

**against the Debtors or their estates that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors, with respect to any such Claim, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors on account of any such Claim, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim, and (d) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim. Such injunction shall extend to successors of the Debtors (including the Reorganized Debtors) and their respective properties and interests in property. Such injunction shall not apply in respect of Ordinary Course Administrative Claims, the DIP Fee Claims, the First Lien Agent Fee Claims, Second Lien Agent Fee Claims and/or the Swap Counterparties Fee Claims.**

6.      Preservation of Causes of Action.

        The Reorganized Debtors shall retain all Causes of Action, other than as expressly provided in the Plan. Except as expressly provided in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Cause of Action. Nothing contained in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Causes of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date that is not specifically waived or relinquished by the Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any claim that are not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

7.      Votes Solicited in Good Faith.

        The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors, the First Lien Agent, the Second Lien Agent and the DIP Agent (and each of their respective affiliates, agents, directors, officers, members, shareholders, managers, partners, employees, advisors, attorneys and representatives) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in connection with the Plan and the offer and issuance of the New Bicent Common Interests (and New Warrants, if applicable) offered and to be issued under the Plan and therefore have not, and on account of the Plan or the offer and issuance of the New Bicent Common Interests (and New Warrants, if applicable) will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer

or issuance of the New Bicent Common Interests (and New Warrants, if applicable) offered and distributed under the Plan.

8.    Administrative Claims Incurred After the Confirmation Date.

Administrative Claims incurred by the Debtors after the Confirmation Date including Claims for Professionals' fees and expenses incurred after such date, may be paid by the Debtors in the ordinary course of business and without application for or Court approval.

9.    **Releases by the Debtors.**

**On the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their Estates, shall be deemed to release unconditionally (a) all of their respective direct and indirect shareholders and owners as well as their, and each of their direct and indirect shareholders' and owners', respective officers, directors, members, employees, partners, managers, advisors, attorneys, financial advisors, accountants, and other professionals and representatives, including Bicent Prime Holdings LLC, Beowulf, Beowulf (Bicent) LLC, Beowulf (Bicent) IU LLC, Natural Gas Partners VIII, L.P., Natural Gas Partners IX, L.P., NGP IX Offshore Holdings, L.P. and Paul Prager, (b) (i) the DIP Agent, DIP Lenders and the Issuing Bank (as defined in the DIP Credit Facility), (ii) the First Lien Agent, First Lien Credit Facility Lenders, First Lien Consenting Lenders, Swap Counterparties and the Issuing Bank (as defined in the First Lien Credit Agreement) and other agents thereunder (in each case, except with respect to the DIP Agent and First Lien Agent, only to the extent such First Lien Credit Facility Lender, First Lien Consenting Lender, Swap Counterparty, Issuing Bank or other agent does not mark its respective Ballot to indicate its refusal to grant the releases by non-Debtors provided for in the Plan), and (iii) the Second Lien Agent, Second Lien Credit Facility Lenders and Second Lien Consenting Lenders (in each case, except with respect to the Second Lien Agent, only to the extent such Second Lien Credit Facility Lender or Second Lien Consenting Lender does not mark its respective Ballot to indicate its refusal to grant the releases by non-Debtors provided for in the Plan); and (c) officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals and representatives of each of the parties listed in clauses (b)(i) through (b)(iii) above (all such parties in (a), (b) and (c), collectively, the "Released Parties," and each a "Released Party") from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise (including without limitation those arising under 11 U.S.C. §§ 541-550 and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses and incidental, consequential and punitive damages payable to third parties), based in whole or in part upon actions taken solely in their respective capacities described above or any omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases or the Plan, except that (i) no individual shall be released from any act or omission that constitutes gross negligence or willful misconduct as determined by a Final Order, (ii) the Reorganized Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of setoff or recoupment against any Claims of any such persons asserted against the**

Debtors, (iii) the foregoing release shall not apply to any obligations that remain outstanding in respect of loans or advances made to individuals by the Debtors, and (iv) the foregoing release applies to the Released Parties solely in their respective capacities described above.

10.     **Releases by non-Debtors.**

On the Effective Date, all Persons who (a) directly or indirectly, have held, hold, or may hold Claims, (b) vote to accept the Plan as set forth on the relevant Ballot, and (c) do not mark their Ballot to indicate their refusal to grant the releases provided in this paragraph, shall be deemed, by virtue of their receipt of Distributions and/or other treatment contemplated under the Plan, to have forever released and covenanted with the Reorganized Debtors and the Released Parties not to (y) sue or otherwise seek recovery from any of the Reorganized Debtors or any Released Party on account of any Claim in any way related to the Debtors or their business and affairs, including any Claim based upon tort, breach of contract, violations of law or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date or (z) assert against any of the Reorganized Debtors or any Released Party any claim, obligation, right, cause of action or liability that any holder of a Claim may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, **provided**, **however**, that (i) none of the Released Parties shall be released from any claim based on any act or omission that constitutes gross negligence or willful misconduct as determined by a Final Order, (ii) the foregoing release shall not apply to obligations of the Debtors or Reorganized Debtors, as the case may be, arising under the Plan, and (iii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan; **provided**, **further** that notwithstanding anything to the contrary in the Plan and notwithstanding the satisfaction, release, termination and extinguishment of the Claims and Liens of the First Lien Secured Parties against the Debtors pursuant to the Plan, nothing in the Plan or the Confirmation Order shall release, terminate, extinguish, prejudice or in any way affect the Liens, guaranties, and claims of the First Lien Secured Parties securing any rights, claims, interests and obligations against, in or with respect to any non-debtor affiliates or subsidiaries of the Debtors, and such Liens, guaranties and claims shall remain intact and enforceable in accordance with applicable non-bankruptcy law as if the Liens, guaranties and claims against the Debtors had not been extinguished or cancelled in the first instance.

11.     **Exculpation and Injunction in Respect of Released Parties.**

(a)     **Exculpation.**

The Debtors, the Reorganized Debtors, and the other Released Parties (i) shall have no liability whatsoever to any holder or purported holder of an Administrative Claim, a Claim, or an Equity Interest for any act or omission in connection with, or arising out of, the Plan, this Disclosure Statement, the Restructuring Support Agreement, the negotiation of the Plan, this Disclosure Statement or the Restructuring

**Support Agreement, the negotiation of the Plan Supplement Documents, the pursuit of approval of the Plan or Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration and implementation of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or this Disclosure Statement or in furtherance thereof except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.**

(b)    <u>**Injunction**</u>.

**Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, a Claim or an Equity Interest shall be permitted to commence or continue any action, employment of process, or any act to collect, offset, or recover any Claim against a Released Party that accrued on or prior to the Effective Date and that has been released or waived pursuant to the Plan.**

12.    <u>Term of Bankruptcy Injunction or Stays.</u>

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

13.    <u>Preservation of Insurance.</u>

The Debtors' discharge and release from all Claims as provided under the Plan, except as necessary to be consistent with the Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors (including its officers and current and former directors), the Reorganized Debtors or any other person or entity. The Debtors shall obtain tail coverage under their existing directors and officers liability insurance policy covering their current officers and directors for any and all Claims brought against them, which coverage shall extend for a period of not less than six (6) years after the Effective Date.

14.    <u>Indemnification Obligations Owed by the Debtors.</u>

Indemnification obligations owed to directors, officers, members, shareholders, managers and employees of the Debtors (or the estates of any of the foregoing) who served or were employed by the Debtors as of or after the Petition Date, excluding claims which have been determined by Final Order to have resulted from gross negligence, willful misconduct, breach of fiduciary duty, or intentional tort, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

01:12060597.1

Indemnification obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and order of the Court, to the extent that such Indemnification Obligations relate to the period after the Petition Date, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

15.    Binding Effect; Plan Binds All Holders of Claims and Equity Interests.

On the Effective Date, and effective as of the Effective Date, the Plan shall, and shall be deemed to, be binding upon the Debtors and all present and former Holders of Claims against and Equity Interests in any Debtor, and their respective predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and for each of the foregoing, each of their respective members, partners, equity-holders, officers, directors, employees, representatives, advisors, attorneys, notaries (pursuant to the laws of the United States and any other jurisdiction), auditors, agents and professionals, in each case acting in such capacity on or any time after the Petition Date, and any Person claiming by or through any of them, regardless of whether any such Holder of a Claim or Equity Interest has voted or failed to vote to accept or reject the Plan.

Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, the Debtors and any other necessary party, at the sole expense of the Debtors, shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to effect a transfer of property, a satisfaction of a Lien or a release of a Claim dealt with by the Plan, and to perform any other act, including, without limitation, the execution of documents necessary to effectuate the Exit Facility, New Warrant Documents, New Bicent LLC Agreement, any other documents necessary to effectuate the Plan and Restructuring Transactions, and all other documents set forth or contemplated in the Plan or Plan Supplement that are necessary for the consummation of the Plan and the transactions contemplated therein.

## F.    Retention of Jurisdiction

The Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes: (1) to hear and determine motions for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan; (4) to resolve disputes as to the ownership of any Claim or Equity Interest; (5) to hear and determine objections to Claims and to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Claim; (6) to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified or vacated; (7) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (8) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order; (9) to

01:12060597.1

hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (10) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; (11) to hear and determine any issue for which the Plan requires a Final Order of the Court; (12) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (13) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered during the period commencing on the Petition Date through and including the Effective Date; (14) to hear and determine any Causes of Action preserved under the Plan under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3); (15) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (16) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article VIII of the Plan and to enforce same; and (17) to enter a final decree closing the Chapter 11 Cases.

### G.    Miscellaneous Provisions

1.    Payment of Statutory Fees.

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date.  Each Reorganized Debtor shall pay such fees payable after the Effective Date until such time as a final decree is entered closing the applicable Chapter 11 Case or the Court orders otherwise.

2.    Modification of the Plan.

The Debtors and Reorganized Debtors, as the case may be, reserve the right and shall be permitted to, in accordance with the Bankruptcy Code and the Bankruptcy Rules, amend or modify the Plan (1) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, except with respect to Class 3 of the Plan; and (2) after the entry of the Confirmation Order upon order of the Court in accordance with section 1127(b) of the Bankruptcy Code; provided, however, that any such amendments or modifications in (1) or (2) or otherwise shall be subject in all respects to the limitations contained in the Plan and the consent of the Requisite First Lien Consenting Lenders and, to the extent such amendments or modifications affect the rights of the DIP Agent or the First Lien Agent, the consent of the applicable affected party.

3.    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or the laws of the state of organization of a particular Debtor, the laws of the State of New York (without reference to the conflicts of laws provisions thereof that would require the application of the law of any other jurisdiction) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

4.        Filing or Execution of Additional Documents.

On or before the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

5.        Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions under the Plan shall be subject to any such withholding and reporting requirements.

6.        Exemption From Transfer Taxes.

Pursuant to, and to the fullest extent permitted by, section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange under the Plan of the New Bicent Common Interests, New Warrants (if any) and the security interests in favor of the lenders under the Exit Facility, (b) the making or assignment of any lease or sublease, (c) the making or delivery of any other instrument whatsoever, (d) any Brush Sale pursuant to, or in accordance with, the Plan, and/or (e) any Indemnification Claims Sale pursuant to, or in accordance with, the Plan, in furtherance of or in connection with the Plan shall not be subject to any stamp tax or other similar tax.

7.        Section 1145 Exemption.

Pursuant to, in accordance with, and solely to the extent provided under section 1145 of the Bankruptcy Code, the issuance of the New Bicent Common Interests and New Warrants (if any) and distributions thereof to the Debtors' creditors under the Plan will be exempt from registration under applicable securities laws (including Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Code, and may be sold without registration to the extent permitted under section 1145 of the Code and is deemed to be a public offering.

8.        Waiver of Federal Rule of Civil Procedure 62(a).

The Debtors, with the consent of the Requisite First Lien Consenting Lenders and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, the consent of the applicable affected party, may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

01:12060597.1

9.      Exhibits/Schedules.

All exhibits and schedules to the Plan and the Plan Supplement Documents are incorporated into and constitute a part of the Plan as if set forth therein, and shall be in form and substance satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party.

10.      Notices.

All notices, requests, and demands to be effective pursuant to the Plan shall be in writing and unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:  Bicent Power LLC, 575 Broadway, Third Floor, New York, NY 10012, Attention: General Counsel, Tel:  (212) 343-8353, Fax:  (212) 343-9949 with a copy to Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attention:  Pauline K. Morgan, Esq., Tel:  (302) 571-6600, Fax:  (302) 571-1253.

To the Creditors' Committee: [      ].

To the Exit Facility Agent, DIP Agent, or First Lien Agent:  In care of Milbank Tweed, Hadley & McCloy, 1 Chase Manhattan Plaza, New York, New York 10005, Attention Albert A. Pisa, Esq., Abhilash M. Raval, Esq. and Michael E. Comerford, Esq., Tel: (212) 530-5000, Fax: (212) 530-5219.

To Goldman Sachs Bank USA, as Swap Counterparty or First Lien Consenting Lender:  In care of Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281, Attention: Ivan Loncar, Esq., Tel: (212) 504-6339, Fax: (212) 504-6666.

To the First Lien Consenting Lenders:  In care of the parties and addresses set forth in the Restructuring Support Agreement beneath each First Lien Consenting Lenders signature block.

To the Second Lien Agent or Second Lien Consenting Lenders:  In care of the parties and addresses set forth in the Restructuring Support Agreement beneath the Second Lien Agent and each Second Lien Consenting Lenders signature block.

11.      Plan Supplement.

Forms of the Plan Supplement Documents (which may be in substantially final form) or term sheets relating to the Exit Facility, the New Bicent LLC Agreement, the New Warrant Documents, the Schedule of Rejected Contracts and Leases, if any, the equity issued under the Plan, amendments to certificates of incorporation, by-laws and other constituent

documents, and such other documents as the Debtors and Requisite First Lien Consenting Lenders determine to be necessary or appropriate to the implementation and/or confirmation of the Plan shall be contained in the Plan Supplement, which will be filed with the Clerk of the Court no later than three (3) business days before the Voting Deadline.  The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at https://ecf.deb.uscourts.gov or at http://dm.epiq11.com/BHL, or a copy of the Plan Supplement Documents may be obtained by sending a written request to the following address: (i) for regular mail:  Bicent Holdings Ballot Processing, Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 5014, New York, NY 10150-5014 or (ii) for overnight mail/federal express: Bicent Holdings Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017.  Holders of Claims or Equity Interests also may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors in accordance with Article X.J of the Plan.  The Plan Supplement and Plan Supplement Documents, as may be amended, modified, or supplemented, shall be in form and substance satisfactory to the Debtors, Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party.

12.    <u>Conflict.</u>

On the Effective Date, the terms of the Plan shall govern in the event of any inconsistency with the summaries of the Plan set forth in this Disclosure Statement or the Restructuring Support Agreement.  Prior to the Effective Date, the Restructuring Support Agreement shall govern in the event of any inconsistency with the summaries of the Plan set forth in this Disclosure Statement or the Restructuring Support Agreement.

13.    <u>Second Lien Consenting Lenders Review and Consent Rights.</u>

Any consent rights of the Requisite Consenting Second Lien Lenders shall be governed by the Restructuring Support Agreement and the Restructuring Support Agreement Attachments.

**H.    Executory Contracts and Unexpired Leases**

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages, if any, incurred by reason of the rejection.  In the case of the Debtors' rejection of leases of real property and employment agreements, such damage claims are subject to certain caps imposed by the Bankruptcy Code.

1.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases.</u>

To the extent not (i) assumed in the Chapter 11 Cases prior to the Confirmation Date, (ii) rejected in the Chapter 11 Cases prior to the Confirmation Date, (iii) subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date, or (iv) specifically identified on the Schedule of Rejected Contracts and Leases,

01:12060597.1

if any, included in the Plan Supplement and rejected pursuant to the Plan, each executory contract and unexpired lease that exists between Debtor and any Person (subject to and conditioned on, in each case, the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, the consent of the applicable affected party) shall be specifically assumed by the Debtor that is a party to such executory contract or unexpired lease as of and subject to the Effective Date.  The Plan and the Confirmation Order shall operate as an order authorizing the Debtors' assumption of such executory contracts and unexpired leases.

As provided in Article XI.C of the Plan, the Debtors shall provide the counterparties to the assumed executory contracts or unexpired leases, the DIP Agent, First Lien Agent, and the Requisite First Lien Consenting Lenders, with sufficient notice regarding the assumption of such executory contracts or unexpired leases in connection with or prior to the filing of the Plan Supplement.  Such notice shall (i) include the amounts payable to non-Debtor counterparties to their respective executory contracts or unexpired leases to cure defaults under such executory contracts or unexpired leases, and (ii) be included in a schedule to the Plan Supplement, which may be filed under seal with a copy to the relevant counterparty, the First Lien Agent, and the Requisite First Lien Consenting Lenders.

## 2.     Limited Extension of Time to Assume or Reject.

In the event of a dispute as to whether a contract or lease is executory or unexpired, the right of the Debtors or Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Court determining that the contract or lease is executory or unexpired.  The deemed assumptions and rejections provided for in this Article XI.B of the Plan shall not apply to such contract or lease.

If the Debtors or the Reorganized Debtors become aware after the Effective Date of the existence of an executory contract or unexpired lease that was not included in the Schedules, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the date on which the Debtors or the Reorganized Debtors become aware of the existence of such contract or lease.  The deemed assumptions and rejections provided for in this Article XI.B of the Plan shall not apply to any such contract or lease.

The Debtors (with consent of Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with consent of the applicable affected party) reserve the right to amend the Schedule of Rejected Contracts and Leases, if any, at any time prior to the Confirmation Date.

## 3.     Cure.

The applicable Debtor or Reorganized Debtor, except as otherwise agreed by the parties, will cure any and all undisputed defaults under any executory contract or unexpired lease that is assumed by such Debtor pursuant to the Plan in accordance with section 365 of the Bankruptcy Code.  The amounts payable to non-Debtor counterparties to cure defaults under any

executory contract or unexpired lease that is assumed by such Debtor shall be listed in a schedule, which may be filed under seal with a copy to the relevant counterparty, the First Lien Agent, and the Requisite First Lien Consenting Lenders, to be filed in the Plan Supplement.  If there is a dispute as of the Effective Date regarding the amount required to cure defaults under any executory contract or unexpired lease that the Reorganized Debtors propose to assume, the Reorganized Debtors shall have until 30 days after entry of a Final Order determining the amount, if any, of the applicable Debtor or Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed by the parties, to determine whether to assume or reject the related executory contract or unexpired lease.  If the applicable Debtor, with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, the consent of the applicable affected agent, or the Reorganized Debtor determines to assume the applicable executory contract or unexpired lease related to the disputed cure, such disputed cure amount shall be paid either within 30 days of the entry of a Final Order determining the amount, if any, of the applicable Debtor or Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

4.      <u>Rejection Damage Claims.</u>

All Claims for damages arising from the rejection of executory contracts or unexpired leases must be filed with the Court in accordance with the terms of the order authorizing such rejection, but in no event later than thirty (30) days after the Effective Date (unless rejected at a later date as a result of a disputed cure amount as set forth in Article XI.C of the Plan).  Any Claims not filed within such time will be forever barred from assertion against the Debtors, their respective estates and the Reorganized Debtors.  All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as General Unsecured Claims, as appropriate under the circumstances.

**I.**      **Benefit Plans**

Except as otherwise provided in the Plan or any assumed or rejected employment agreement, as of and subject to the Effective Date, all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including all savings plans, retirement plans, health care plans, disability plans, incentive plans, and life, accidental death, and dismemberment insurance plans, but excluding any employment and severance agreements, plans or policies (unless, with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with consent of the applicable affected agent, such employment and severance agreements, plans or policies are assumed by the Debtors pursuant to an earlier Court order), shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan, including on the Schedule of Rejected Contracts and Leases, if any (to the extent such rejection does not violate section 1114 of the Bankruptcy Code) and (ii) such executory contracts

or plans as have previously been terminated, or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, contracts, or programs.

### J.    Confirmation and Effectiveness of the Plan

1.    <u>Conditions Precedent to Confirmation.</u>

Confirmation of the Plan is subject to the Confirmation Order being in form and substance acceptable to the Debtors and the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party.

2.    <u>Conditions Precedent to Effectiveness.</u>

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to the Plan:

(1)  the condition precedent to Confirmation above shall have been satisfied, and there shall not be a stay or injunction (or similar prohibition) in effect with respect to the Confirmation Order and the Confirmation Order shall be a Final Order;

(2)  all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained;

(3)  the certificates of incorporation or other organizational documents for each of the Debtors shall have been amended as provided for in the Plan;

(4)  the New Bicent Common Interests and New Warrants (if any) to be issued shall be consistent with the Plan and shall have been issued concurrently with the Effective Date;

(5)  the DIP Financing Claims, DIP Fee Claims, Backstop Fee, First Lien Agent Fee Claims, Second Lien Agent Fee Claims and Swap Counterparties Fee Claims shall have been paid in full in accordance with the Plan;

(6)  each of the Plan Supplement Documents shall be in form and substance satisfactory to the Debtors and the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(7)  all material consents, actions, documents, certificates and agreements necessary to implement the Plan, including any required Governmental or Regulatory Approvals, shall have been obtained, effected or executed and delivered to the required parties, and, to the extent required, filed with the applicable governmental unites in accordance with applicable laws; and

(8)  the Reorganized Debtors shall have entered into and consummated the Exit Facility and paid all fees and expenses associated with the Exit Facility.

3.  Waiver of Conditions.

The Debtors may waive any of the conditions set forth in in the Plan at any time with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party, and without leave of or order of the Court and without any formal action.

4.  Effect of Failure of Conditions.

If the Effective Date does not occur on or before forty-five (45) days after the Confirmation Date, or such later date as may be agreed by the Debtors and the Requisite First Lien Consenting Lenders, upon notification submitted by the Debtors to the Court:  (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors unless extended by Court order.

5.  Vacatur of Confirmation Order.

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

6.  Revocation, Withdrawal, or Non-Consummation.

(a)  Right to Revoke or Withdraw.

Subject to the terms of, and without prejudice to the rights of any party under, the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date, with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party; provided that the foregoing consent rights shall be subject to the Debtors' fiduciary duties as debtors in possession as set forth in the Restructuring Support Agreement.

(b)    Effect of Withdrawal, Revocation, or Non-Consummation.

If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired leases, or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void.  In such event, nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Interests in the Debtors or any Claims against any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

# VIII.

# PROJECTIONS

# [TO COME]

# IX.

# VALUATION

# [TO COME]

# X.

# CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.    **Projected Financial Information**

The Financial Projections included in this Disclosure Statement are dependent upon the successful implementation of the Reorganized Debtors' business plan and the validity of the assumptions contained therein.  These projections reflect numerous assumptions, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, the Reorganized Debtors' anticipated future performance, the future performance of the electric generation industry, certain assumptions with respect to the Reorganized Debtors' competitors, general business and economic conditions and other matters, many of which are

beyond the control of the Reorganized Debtors.  In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Reorganized Debtors' actual financial results.  Although the Reorganized Debtors believe that the Financial Projections are reasonably attainable, variations between the actual financial results and those projected may occur and be material.

**B.      Risks Related to the Company's Business and Operations**

      1.      <u>Price Fluctuations in the Wholesale Power and Natural Gas Markets</u>

Market prices for power, generation capacity, ancillary services, natural gas and coal are unpredictable and fluctuate substantially.  As mentioned above, the price of electricity is closely tied to the price of natural gas in much of the United States (including regions where the Plants are located).  Unlike most other commodities, power can only be stored on a very limited basis and generally must be produced concurrently with its use.  As a result, power prices are subject to significant volatility due to supply and demand imbalances, especially in the day-ahead and spot markets.  Long- and short-term power and natural gas prices may also fluctuate substantially due to other factors outside of the Company's control, including, among others:

- increases and decreases in generation capacity in the Company's markets, including the addition of new supplies of power as a result of the development of new power plants, expansion of existing power plants or additional transmission capacity;

- changes in power transmission or fuel transportation capacity constraints or inefficiencies;

- power supply disruptions, including power plant outages and transmission disruptions;

- weather conditions;

- quarterly and seasonal fluctuations;

- changes in the demand for power or in patterns of power usage, including the potential development of demand-side management tools and practices;

- development of new fuels or new technologies for the production of power;

- federal and state power, market and environmental regulation and legislation; and

- changes in basic charges, capacity prices and capacity markets.

The Company typically enters into hedging agreements in order to manage the Company's commodity price risks. These activities, although intended to mitigate price

volatility, expose the Company to other risks. When the Company sells power ahead, the Company may be required to post significant amounts of cash collateral or other credit support to their counterparties and the Company gives up the opportunity to sell power at higher prices if spot prices are higher in the future. Further, if the values of the financial contracts change in a manner that the Company does not anticipate, or if a counterparty fails to perform under a contract, it could harm the Company's financial condition, results of operations and cash flows.

2.      Competition

The energy and power generation industry is characterized by intense competition, and the Company encounters competition from utilities, industrial companies, marketing and trading companies and other independent power producers. In addition, many states are implementing or considering regulatory initiatives designed to increase competition in the domestic power industry. This competition has put pressure on power utilities to lower their costs, including the cost of purchased power, and increasing competition in the supply of power in the future could increase this pressure. In addition, construction during the last decade has created excess power supply and higher reserve margins in the power trading markets, putting downward pressure on prices.

3.      Expiration or Termination of the PPAs

All of the capacity and energy currently generated by the Plants is sold under mid to long-term PPAs or financial hedges that expire at various times. When the terms of each of the various PPAs expire, it is possible that the price paid to the Company for the generation of energy under subsequent arrangements may be significantly less than the price that had been paid under the PPA or financial hedge. Plants without long-term PPAs or financial hedges involve risk and uncertainty in forecasting future demand load for merchant sales because they are exposed to market fluctuations for some or all of their generating capacity and output. A significant under- or over-estimation of load requirements may increase the Company's operating costs. Without the benefit of the PPAs or financial hedges, the Company may not be able to sell any or all of the power generated by the Plants at commercially attractive rates and the Plants may not be able to operate profitably.

4.      Management

The Company's success is largely dependent on the skills, experience and efforts of managers and other employees. The loss of the services of one or more members of the Company's senior management or of numerous employees with critical skills could have a negative effect on the Debtors' and the Reorganized Debtors' business, financial condition and results of operations and future growth if the Company were unable to replace them.

In addition, CEM is a party to certain change of control agreements with members of its upper-level management that provide for lump sum payments to such employees upon certain events if CEM is subject to a "Change of Control" as defined in such agreements. The transactions contemplated under the Plan may qualify as a "Change of Control" under these agreements.

01:12060597.1

73

5.    Vendors; Raw Material Costs

The Company obtains substantially all of their natural gas and coal supply from third parties pursuant to arrangements that vary in term, pricing structure, firmness and delivery flexibility.  The Company's natural gas tolling and coal supply arrangements must be coordinated with transportation agreements, balancing agreements, storage services, financial hedging transactions and other contracts so that the natural gas and coal is delivered to the Plants at the times, in the quantities and otherwise in a manner that meets the needs of the Company's generation portfolio and their customers.  The Company must also comply with laws and regulations governing natural gas transportation.

If significant suppliers or distributors are unable to perform their agreements with the Company, or if the agreements with such parties are suddenly and unexpectedly terminated, or if the terms by which the Reorganized Debtors' purchase products are significantly amended in a manner adverse to the Reorganized Debtors, supply costs could increase and disruptions in distribution could occur during the transition to other natural gas and coal suppliers which could have an adverse effect on the Reorganized Debtors' business, liquidity and results of operations.

6.    Seismic, Weather and Major World Events

Certain of the Plants are subject to frequent low-level seismic disturbances.  More significant seismic disturbances are possible. In addition, other areas in which the Company operates experience severe weather, including snowstorms.  Such events could damage or shut down the Plants, power transmission or the fuel supply facilities upon which the Company's electric generation business is dependent.  The Plants have been built to withstand relatively significant levels of seismic and other disturbances, and the Company believes they maintain adequate insurance protection.  However, earthquake, property damage or business interruption insurance may be inadequate to cover all potential losses sustained in the event of serious damage or disturbances to the Plants or the Company's operations due to natural disasters.

In addition to physical damage to the Plants, the risk of future terrorist activity could result in adverse changes in the insurance markets and disruptions in the energy and power markets.  These events could also adversely affect the U.S. economy, create instability in the financial markets and, as a result, have an adverse effect on the Company's ability to access capital on acceptable terms and conditions.

Further, to the extent that an economic downturn continues or intensifies and affects the markets in which the Company operates, demand for energy and power prices may be depressed, and the Company's revenues and operating cash flows could be negatively impacted. In addition, challenges currently affecting the economy could cause the Company's customers, counterparties, vendors and service providers to experience deteriorating credit and serious cash flow problems. As a result, these conditions could cause counterparties in the natural gas and power markets, particularly in the energy commodity derivative markets that the Company relies on for their hedging activities, to be unable to perform, or to withdraw from participation in those markets.

01:12060597.1

7.      Operation of the Plants

The operation of the Plants involves risks, including the breakdown or failure of electric generation equipment, transmission lines, or other equipment or processes, performance below expected levels of output or efficiency and risks related to the creditworthiness of the Company's contract counterparties and the creditworthiness of the Company's counterparties' customers or other parties with whom the Company's counterparties have contracted.  From time to time the Plants have experienced unplanned outages, including extensions of scheduled outages due to equipment breakdowns, failures or other problems and are an inherent risk of the Company's business.  Unplanned outages typically can result in lost revenues, increase the Company's maintenance expenses and may reduce the Company's profitability.  In addition, an unplanned outage may prevent the affected Plant from performing under any applicable PPAs, commodity contracts or other contractual arrangements.  Such failure may allow a counterparty to terminate an agreement and/or seek liquidated damages.  Although insurance is maintained to partially protect against operating risks, the proceeds of insurance may not be adequate to cover lost revenues or increased expenses.

8.      Environmental Laws

The Company is subject to extensive environmental laws and regulations and potential environmental liabilities, which could result in significant costs and liabilities.  The Company is subject to extensive laws and regulations imposed by federal, state, and local government authorities in the ordinary course of operations with regard to the environment, including environmental laws and regulations relating to air and water quality, solid waste disposal, coal ash and other environmental considerations.  The Company believes that it is in material compliance with environmental regulatory requirements; however, possible future developments, including the promulgation of more stringent environmental laws and regulations, and the timing of future enforcement proceedings that may be taken by environmental authorities could affect the costs and the manner in which the Company conducts its business and could require the Company to make substantial additional capital expenditures.

Environmental laws, particularly with respect to air emissions, disposal of ash, wastewater discharge and cooling water systems, are generally becoming more stringent, which may require the Company to make additional facility upgrades or restrict their operations.  There is a growing concern nationally and internationally about global climate change and the contribution of emissions of greenhouse gases (GHGs) including, most significantly, carbon dioxide.  This concern has led to increased interest in legislation at the federal level, actions at the state level, as well as litigation relating to GHG emissions.  Increased pressure for carbon dioxide emissions reduction also is coming from investor organizations.  If legislation or regulations are passed at the federal or state levels imposing mandatory reductions of carbon dioxide and other GHGs on generation facilities, the cost to the Company of such reductions could be significant.  Many of these environmental laws and regulations create permit and license requirements and provide for substantial civil and criminal fines which, if imposed, could result in material costs or liabilities.  The Company cannot predict with certainty the occurrence of private tort allegations or government claims for damages associated with specific environmental conditions.  The Company may be required to make significant expenditures in

connection with the investigation and remediation of alleged or actual spills, personal injury or property damage claims, and the repair, upgrade or expansion of their facilities to meet future requirements and obligations under environmental laws.  In addition, failure to comply with environmental requirements could require the Plants to shut down or reduce production.

        9.      Complaints or Litigation[11]

The Company is from time to time subject to employee claims alleging injuries, wage and hour violations, discrimination, harassment or wrongful termination, as well as customer and third party claims.  Regardless of whether any claims against the Reorganized Debtors are valid or whether they are ultimately determined to be liable, claims may be expensive to defend and may divert time and money away from the Reorganized Debtors' operations and hurt the Reorganized Debtors' financial performance.  A significant judgment for any claim(s) could materially adversely affect the Reorganized Debtors' financial condition or results of operations.

        10.      Goodwill and Intangible Assets

The Company is required to evaluate goodwill and other intangibles for impairment whenever changes in circumstances indicate that the carrying amount may not be recoverable from estimated future cash flows or at least annually.  This evaluation requires the use of projections of future cash flows from the reporting segment.  These projections are based on growth rates, anticipated future economic conditions, the appropriate discount rates relative to risk and estimates of residual values.  If changes in growth rates, future economic conditions, discount rates or estimates of residual values were to occur, goodwill and other intangibles may become impaired.  This could result in material charges that could be adverse to the Reorganized Debtors' operating results and financial position.

   **C.**      **Ability to Refinance Certain Indebtedness and Restrictions Imposed by Indebtedness**

As discussed above, following the Effective Date of the Plan, the Reorganized Debtors' working capital needs and letter of credit requirements are anticipated to be funded by the Exit Facility.  The Exit Facility will likely restrict, among other things, the Reorganized Debtors' ability to incur additional indebtedness, consummate certain asset sales, create liens on assets, make investments, loans or advances, consolidate or merge with or into any other person or convey, transfer or lease all or substantially all of their assets or change the business to be conducted by the Reorganized Debtors.  In addition, the Exit Facility may contain certain other and more restrictive covenants.  A breach of any of these covenants could result in a default

---

[11]    The Debtors are currently involved in two significant lawsuits:  (i) a petition to vacate the adverse arbitration award in the Hobbs Arbitration captioned Colorado Energy Management, LLC v. Lea Power Partners, LLC, Index No. 650127/2012 (N.Y. Sup. Ct.) and (ii) an indemnification action related to costs and expenses incurred in connection with the Hobbs Arbitration, including against MDU Resources Group, Inc., captioned Centennial Energy Holdings, Inc. and Centennial Energy Resources LLC v. Colorado Energy Management, LLC and Bicent Power LLC, Index. No. 651926/2010 (N.Y. Sup. Ct.).

under the Exit Facility.  It is also anticipated that substantially all of the assets of the Reorganized Debtors will be pledged as security under the Exit Facility.  The Backstop Lenders entered into a commitment letter with respect to the Exit Facility attached as Exhibit <u>C</u> to the Restructuring Support Agreement discussed herein.

The Debtors cannot provide any assurances that they will be able to generate sufficient cash flow from operations to enable them to repay their indebtedness under the Exit Facility and they may not be able to extend the maturity of or refinance this indebtedness on commercially reasonable terms or at all.

### D.      Certain Bankruptcy Law Considerations

1.      <u>Risk of Non-Confirmation of the Plan</u>

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Court, there can be no assurance that the Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes to accept the Plan, as modified.  If the Plan is not confirmed, significant delay will ensue, which the Debtors believe will hamper their prospects for reorganization and likely result in smaller recoveries to creditors.

2.      <u>Risk of Non-Occurrence of the Effective Date</u>

Although the Debtors believe that the Effective Date will occur during the third calendar quarter of 2012, there can be no assurance as to such timing or that such conditions to the Effective Date contained in the Plan will ever occur.

Lengthy Chapter 11 Cases could involve additional expenses and divert the attention of the Debtors' management from operation of the business, as well as create concerns for employees, vendors and customers.  The disruption that lengthy Chapter 11 Cases could inflict upon the business could increase with the length of time it takes to conclude the cases and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties, including essential vendors, employees, and customers.

3.      <u>The Debtors' Management Teams May Allocate Less Time to the Operation of the Debtors' Business Operations</u>

So long as the Chapter 11 Cases continue, the Debtors' management teams will be required to spend a significant amount of their time attending to the Debtors' restructuring instead of focusing exclusively on the Debtors' business operations.

    4.    <u>In Certain Instances, Any of the Chapter 11 Cases May be Converted to a Case under Chapter 7 of the Bankruptcy Code</u>

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of creditors, any of the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate assets for distribution in accordance with the priorities established by the Bankruptcy Code.

    5.    <u>Parties in Interest May Object to the Debtors' Classification of Claims</u>

Bankruptcy Code Section 1122 provides that a chapter 11 plan of reorganization may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies in all material respects with the requirements set forth in the Bankruptcy Code. After the Petition Date, however, a Claim or Equity Interest Holder could challenge the classification. In such event, the cost of the Plan and the time needed to confirm the Plan could increase and the Bankruptcy Court may not agree with the Debtors' classification of Claims and Equity Interests, as applicable. If the Bankruptcy Court concludes that the classification of Claims and Equity Interests under the Plan does not comply with the requirements of the Bankruptcy Code, the Debtors will need to modify the Plan. If the Bankruptcy Court determines that the Debtors' classification of Claims and Equity Interests is not appropriate or if the Bankruptcy Court determines that the different treatment provided to Claim or Equity Interest Holders is unfair or inappropriate, the Plan will not be confirmed. If this occurs, the amended plan of reorganization that would ultimately be confirmed may be less attractive to certain Classes of Claims than the Plan.

**E.    Certain Risks Relating to the Equity Securities under the Plan**

    1.    <u>Significant Holders</u>

If holders of a significant aggregate percentage of shares of the New Bicent Common Interests were to act as a group, such holders could be in a position to control the outcome of actions requiring member approval, including the election of directors. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Bicent Common Interests and the New Warrants.

Further, one or more of the holders of a significant aggregate percentage of the New Bicent Common Interests may determine to sell all or a large portion of their New Bicent Common Interests in a short period of time, which may adversely affect the market price of the New Bicent Common Interests and the New Warrants.

    2.    <u>Lack of Established Market for New Bicent Common Interests</u>

The New Bicent Common Interests issued under the Plan will be a new issue of equity interests for which no trading market currently exists and will not be listed on any

exchange or over-the-counter-market. There can be no assurance that an active trading market for the New Bicent Common Interests will develop. Accordingly, no assurance can be given that a holder of the New Bicent Common Interests will be able to sell such interests in the future or as to the price at which any such sale may occur. If such market were to develop, the liquidity of the market for the New Bicent Comment Interests and the prices at which such interests would trade will depend upon many factors, including the number of holders, investor expectations for the Debtors, and other factors beyond the Debtor's control. In addition, the New Bicent Common Interests will be issued to prepetition creditors of the Debtors, some of whom may prefer to liquidate their investment rather than to hold it on a long-term basis, which may create an initial imbalance in the market if and when one were to develop. In addition, the marketability of the New Bicent Common Interests also will be impacted by the terms and provisions of the New Bicent LLC Agreement and creditors receiving such equity interests should familiarize themselves with the terms of such agreement (which will be contained in the Plan Supplement).

3.    <u>Lack of Publicly Available Information about the Debtors</u>

After the Effective Date, holders of the New Bicent Common Interests may not be entitled to receive information concerning the results of operations and financial condition of the Reorganized Debtors, which may make it difficult for such holders to assess and evaluate their investment in the New Bicent Common Interests.

## XI.

## CONFIRMATION PROCEDURE

At the Confirmation Hearing, the Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors and equity interest holders that are impaired under the Plan.

1.    <u>Acceptance</u>

Classes 3, 4, 5, 6, 7, 8, 10 and 11 are Impaired under the Plan. Classes 1, 2 and 9 are unimpaired and, therefore, are conclusively presumed to accept the Plan. Classes 5, 6, 7, 8, 10 and 11 are deemed to reject the Plan because they will not receive a distribution under the Plan. Thus, only Classes 3 and 4 are entitled to vote to accept or reject the Plan. Because Classes 5, 6, 7, 8, 10 and 11 are Impaired and are deemed to reject the Plan, the Debtors will seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, with respect to such Classes. In addition to the extent an Impaired Class entitled to vote on the Plan rejects the Plan, the Debtors may, with the consent of the Requisite Consenting First Lien Lenders, also seek the nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such rejecting Class. Finally, the Debtors reserve their rights to amend the Plan in accordance with Article X.B. of the Plan with respect to any such rejecting Class.

2.    <u>Unfair Discrimination and Fair and Equitable Tests</u>

To obtain nonconsensual confirmation of the Plan, also referred to as a "cram down," it must be demonstrated to the Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, nonaccepting Class.

The test to determine whether the Plan unfairly discriminates applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfies the foregoing requirements for nonconsensual Confirmation.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code provides that a plan is "fair and equitable" with respect to a class of creditors or equity holders if:

(a)    <u>Secured Creditors</u>.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds as provided in clause (i) or (iii) of this subparagraph, or (iii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim.

(b)    <u>Unsecured Creditors</u>.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims or interests of the nonaccepting class will not receive any property under the plan.

(c)    <u>Equity Interests</u>.  Either (i) each holder of an interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of its interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Classes 5, 6, 7, 8, 10 and 11 are not receiving a distribution because there is no Class of equal priority receiving more favorable treatment and no Classes junior to Classes 5, 6, 7, 8, 10 and 11 will receive or retain any property on account of the Claims or Interests in such Class.

3.    <u>Feasibility</u>

The Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by a liquidation or the need for further financial reorganization of the debtor.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed

their ability to meet their obligations under the Plan.  Based upon the Financial Projections attached hereto as <u>Exhibit C</u> and the assumptions set forth therein, the Debtors believe that they will be able to make all distributions required pursuant to the Plan and to fund their operations going forward and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

            4.       <u>Best Interests Test</u>

With respect to each Impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To determine what holders of Claims and Equity Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7, the Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The Cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash, if any, held by the Debtors at the time of the commencement of the liquidation case.  Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases.  The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Creditors' Committee during the Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Allowed Unsecured Claims (including secured creditor deficiency claims).

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the claims described above that might arise in a liquidation case, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and Interest holders in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the likely erosion in value of assets in a chapter 7 case in the context of an expeditious liquidation

and the "forced sale" atmosphere that would prevail under chapter 7 and (iii) the substantial increases in unsecured claims, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to a liquidation of the Debtors under chapter 7.

[The Debtors' Liquidation Analysis is attached hereto as <u>Exhibit D</u>.  The information set forth therein provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Court would liquidate the assets of the Debtors' estates.  As reflected in the Debtors' Liquidation Analysis, the Debtors believe the Plan satisfies the best interests test of section 1129(a)(7) of the Bankruptcy Code].

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation.  [The chapter 7 liquidation period is assumed to be a period of six (6) months, allowing for, among other things, the (i) discontinuation of the Debtors' operations, (ii) sale of assets and (iii) collection of receivables.]

## XII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) an alternative plan of reorganization or a plan of liquidation and (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan of Reorganization or Plan of Liquidation

If the Plan is not confirmed, the Court could confirm a different chapter 11 plan.  The Plan is, in essence, a reorganization of the Debtors' business and a different plan might involve either a reorganization or continuation of the Debtors' business or an orderly liquidation of the Debtors' assets.  The Debtors believe that the Plan, as described herein, enables creditors to realize the highest and best value under the circumstances.  The Debtors believe that any liquidation of the Debtors' assets or alternative form of chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the far greater returns and certainty provided by the Plan.  Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs.  The Debtors believe that their Plan provides the best recovery to their creditors.

### B.    Liquidation Under Chapter 7

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to

liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in the Liquidation Analysis attached as <u>Exhibit D</u> to this Disclosure Statement.  For the reasons articulated in Article XI above, the Debtors believe that a liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan.

## XIII.

## SECURITIES LAW MATTERS

No registration statement will be filed under the Securities Act, or any state securities laws with respect to the offer and distribution under the Plan of the New Bicent Common Interests, the New Warrants (and the New Bicent Common Interests issuable pursuant to the exercise thereof), if any (collectively, as used in this Article, the "<u>Plan Securities</u>").  The Debtors believe that the provisions of section 1145(a) of the Bankruptcy Code exempt the offer and distribution of the Plan Securities from federal and state securities registration requirements (including, without limitation, Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security of registration of licensing of an issuer or a security).

### A.    Bankruptcy Code Exemptions from Registration Requirements

1.    <u>Initial Offer and Sale of Plan Securities</u>

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan; (ii) the recipients of the securities must each hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.  Section 1145(a)(2) of the Bankruptcy Code exempts the offer of a security through any warrant, option or right to subscribe or conversion privilege that was sold in a manner specified in section 1145(a)(1) of the Bankruptcy Code, or the sale of a security upon the exercise of such a warrant, option, right or privilege.  The Debtors believe that the offer and sale of the Plan Securities under the Plan satisfy the requirements of section 1145(a) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

The exemptions provided for in section 1145 of the Bankruptcy Code do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b). Section 1145(b) identifies four types of "underwriters":

(a)      persons who purchase a claim against, an interest in, or a claim for administrative expense against, the debtor, with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

(b)      persons who offer to sell securities offered under a plan for the holders of such securities ("distributors");

(c)      persons who offer to buy securities from the holders of such securities, if the offer to buy is (a) with a view to distributing such securities and (b) made under a distribution agreement; and

(d)      a person who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(11) of the Securities Act.

To the extent that Section 1145(a) is not available to exempt any specific issuance of Plan Securities, the Debtors believe that Section 4(2) of the Securities Act will apply to exempt such issuance from the registration requirements of the Securities Act.

2.      Subsequent Transfers of Plan Securities

The Debtors believe that, pursuant to section 1145(c) of the Bankruptcy Code, the Plan Securities issued in accordance with section 1145(a) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.

To the extent that the issuance of the Plan Securities is covered by section 1145 of the Bankruptcy Code, all resales and subsequent transactions in the Plan Securities will generally be exempt from registration under the Securities Act pursuant to section 4(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to such securities.

As used in this definition, an "issuer" includes any "affiliate" of the issuer which means any person directly or indirectly controlling, controlled by or under common control with the issuer.  Under section 2(12) of the Securities Act, a "dealer" is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.  Whether or not any particular person would be deemed to be an "underwriter" or a "dealer" with respect to any Plan Security or to "control," be under "common control with," or be "controlled" by, an issuer would depend upon various facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any person would be an "underwriter" or a "dealer" with respect to any Plan Security or to "control," be under "common control with," or be "controlled" by, an issuer.

The SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators and distributors of securities who are not affiliates of the

issuer of such securities are exempt from registration under the Securities Act if effected in "ordinary trading transactions."  The staff of the SEC has indicated in this context that a transaction by such non-affiliates may be considered an "ordinary trading transaction" if it is made on an exchange or in the over-the-counter market and does not involve any of the following factors:

(a)    (i) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (ii) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

(b)    the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto, and documents filed with the SEC pursuant to the Exchange Act; or

(c)    the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The views of the SEC on the matter have not, however, been sought by the Debtors and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above.  Any person intending to rely on such exemption is urged to consult their counsel as to the applicability thereof to their circumstances.

In addition, affiliates of the issuer will not be deemed to be engaged in a distribution of the Plan Securities and therefore not be deemed to be "underwriters" under section 2(11) of the Securities Act if they comply with the requirements of Rule 144 under the Securities Act ("Rule 144")  under the Securities Act for the resale of their Plan Securities.  Rule 144 allows a holder of securities that is an affiliate of the issuer of such securities to sell, without registration, within any three-month period a number of such securities that does not exceed the greater of one percent (1%) of the number of outstanding securities in question or the average weekly trading volume in the securities in question during the four (4) calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of current public information regarding the issuer.

To the extent that issuances of Plan Securities are exempt only under Section 4(2) of the Securities Act, such Plan Securities will be "restricted securities" as defined in Rule 144(a)(3) and may be resold pursuant to the requirements of Rule 144 described above and the additional requirement that such shares be held for a minimum holding period.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, AFFILIATE OR DEALER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY

PERSON TO TRADE IN THE PLAN SECURITIES.  THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

       State securities laws generally provide registration exemptions for subsequent transfers by a bona-fide owner for its own account to institutional or accredited investors.  Such exemptions are generally expected to be available for subsequent transfers of Plan Securities; however, the availability of such exemptions cannot be known unless individual state securities laws are examined and recipients of Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption under any relevant state securities laws.

       Under Section 1145(a)(4) of the Bankruptcy Code, stockbrokers effecting transactions in the Plan Securities prior to the expiration of 40 days after the Effective Date are required to deliver to the purchaser of such securities a copy of this Disclosure Statement (and supplements hereto, if any, if ordered by the Court) at or before the time of delivery of such securities to such purchaser.

       THE DEBTORS DO NOT PRESENTLY INTEND TO SUBMIT ANY NO-ACTION OR INTERPRETATIVE REQUESTS TO THE SEC WITH RESPECT TO ANY SECURITIES LAWS MATTERS DISCUSSED HEREIN.

       Following the Effective Date, the Plan Securities will not be listed for trading on any stock exchange or any national quotation system.  Additionally, none of the Debtors  or New Bicent Power will be obligated to file, and they do not intend to file, any annual, quarterly or other reports under the Securities Exchange Act.

**XIV.**

**CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS**

       The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are not impaired (e.g., Other Priority Claims and Priority Tax Claims).  In addition, the following summary does not address the federal income tax consequences to holders of Equity Interests as they are deemed to reject the Plan.

       The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

       The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to

the interpretation that the IRS will adopt.  In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to holders of Allowed Claims that are not "United States persons" (as such term is defined in the Tax Code), special classes of taxpayers (such as broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organization (including, without limitation, certain pension funds), persons holding an equity interest as part of an integrated constructive sale or straddle, and investors in partnerships and pass-through entities).

For United States federal income tax purposes, income earned through a foreign or domestic partnership or other flow-through entity is attributed to its owners.  Accordingly, the United States federal income tax treatment of the holder will generally depend on the status of the partner or other owner and the activities of the partnership or other flow-through entity. Partners in partnerships or other flow-through entities that own Claims should discuss the tax consequences of the Plan with their own tax advisor.

*Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

***IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.***

### A.    Consequences to the Debtors

Prior to the Effective Date, each of the Debtors (other than as described below) is treated as a "disregarded entity" for U.S. federal income tax purposes. Accordingly, the U.S. federal income tax consequences of the Plan will generally not be borne by the Debtors and instead will be borne by the direct and indirect owners of the Debtors.

CEM Energy Services, Inc. is treated as a corporation for U.S. federal income tax purposes. Section 382 of the Tax Code (and certain other applicable provisions) will limit the use following the Effective Date of any net operating losses and certain other tax attributes of CEM Energy Services, Inc. existing as of the Effective Date as a result of the change in ownership of CEM Energy Services, Inc.  The Debtors currently expect that CEM Energy Services, Inc. has minimal assets, and thus, will not have any material net operating losses at the Effective Date that would be subject to limitations under Section 382 of the Tax Code or otherwise.

01:12060597.1

**B.**    **Consequences to Holders of Certain Claims**

As discussed in more detail below, this discussion of the federal income tax consequences of the Plan assumes that New Bicent Power will be treated as a partnership for federal income tax purposes.

1.    Consequences to Holders of First Lien Credit Facility Claims and Second Lien Credit Facility Claims

The Plan permits, but does not require, that the Brush Sale be completed before the Effective Date. If the Brush Sale occurs, the Brush Sale Proceeds will be available for distribution to the holders of the First Lien Credit Facility Claims as provided in the Plan. In that case, holders of First Lien Credit Facility Claims would receive cash, in addition to the New Bicent Common Interests as described below, when the Plan is consummated, and the value of New Bicent Common Interests will generally be worth less than would have been the case if the Brush Sale did not occur.

Pursuant to the Plan, on the Effective Date the following Restructuring Transactions, among others, will occur in the following order:

(a)    Simultaneously, (i) all of the Equity Interests in Bicent Power will be cancelled, and (ii) the New Bicent Common Interests will be issued to the First Lien Agent on behalf of the holders of Allowed First Lien Credit Facility Claims, in accordance with Article IV.C of the Plan; and;

(b)    The First Lien Agent shall then distribute 100% of the New Bicent Common Interests (subject to dilution by equity issued pursuant to the Management Incentive Plan, if any, and the exercise of New Warrants) to the holders of Allowed First Lien Credit Facility Claims and the Backstop Lenders, in accordance with the terms of the Plan. The Second Lien Agent will, as applicable, issue to the holders of Allowed Second Lien Credit Facility Claims to the extent Class 4 has voted to accept the Plan their *pro rata* share of New Warrants and cash in accordance with Article IV. D of the Plan.

Each holder of an Allowed First Lien Credit Facility Claim or Allowed Second Lien Credit Facility Claim generally should recognize gain or loss in connection with its deemed receipt for federal income tax purposes of an undivided interest in the underlying assets of New Bicent Power in an amount equal to the difference between (x) the sum of (A) the fair market value of the interest in such underlying assets deemed received by the holder (if any), plus (B) (I) in the cash of the Allowed First Lien Credit Facility Claims, the Brush Sale Proceeds (if the Brush Sale occurs), and (II) in the case of the Allowed Second Lien Credit Facility Claims, cash, in each case, received in satisfaction of its Claim (other than any Claim for accrued but unpaid interest), (y) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). For a discussion of the tax consequences of any Claim for accrued but unpaid interest, see Article XIV.B.2 below ("*Distributions in Discharge of Accrued but Unpaid Interest*").

The deemed contribution for federal income tax purposes of the undivided interest in the assets each holder of an Allowed First Lien Credit Facility Claim or Allowed Second Lien Credit Facility Claim is deemed to receive to New Bicent Power should be treated in part as a tax-free contribution under Section 721 of the Tax Code to the extent New Bicent Common Interests are received, and should be treated in part as a taxable exchange in which gain or loss will be recognized to the extent New Warrants are received. A holder of a Second Lien Credit Facility Claim that receives New Warrants generally should have little, if any, gain in respect of the receipt of the New Warrants as the holder should have received a fair market value tax basis in its share of the assets of New Bicent Power deemed exchanged therefor.

Pursuant to the Plan, all parties to the New Bicent LLC Agreement (including the Reorganized Debtors and the holders of New Bicent Common Interests and New Warrants) and the holders of the Preconfirmation Equity Interests will be required to report for all federal income tax purposes consistent with the characterization of the Restructuring Transactions described above.

As soon as possible after the Effective Date, but in no event later than thirty (30) days thereafter, the New Board will determine the value of the underlying assets of New Bicent Power and its subsidiaries as of the Effective Date and the portions of such value which are allocable, respectively, to the New Bicent Common Interests and the New Warrants. Such allocation will take into account the relative fair market values of the New Bicent Common Interests and the New Warrants. The New Board will apprise, in writing, all parties of such valuation and allocation. Pursuant to the Plan, all parties to the New Bicent LLC Agreement (including the Reorganized Debtors and the holders of New Bicent Common Interests and New Warrants) and the holders of Preconfirmation Equity Interests will be required to report consistent with the valuation and allocation for all federal income tax purposes.

Where gain or loss is recognized by a holder of an Allowed First Lien Credit Facility Claim or Allowed Second Lien Credit Facility Claim in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction. Where gain is recognized by a holder of a Second Lien Credit Facility Claim in respect of the contribution of assets to New Bicent Power, the character of such gain should be treated as short-term capital gain. Holders of Second Lien Credit Facility Claims are urged to consult their tax advisors regarding the character of any gain recognized on the contribution to New Bicent Power.

A holder's initial tax basis in the New Bicent Common Interests received should equal the fair market value of the membership interest (as such value should be equal to the fair market value tax basis of the holder's undivided interest in the underlying assets of New Bicent Power treated as contributed therefor), increased for the portion of New Bicent Power's liabilities that is allocated to the holder. A holder's initial tax basis in the New Warrants received should equal their fair market value. A holder's holding period for any New Bicent

Common Interests and New Warrants generally should begin the day following the Effective Date.

2.    Distributions in Discharge of Accrued but Unpaid Interest

Holders of Allowed Claims for accrued interest that have not previously included such accrued interest in taxable income will be required to recognize ordinary income equal to the fair market value of any property treated as received with respect to such Claims for accrued interest.  Conversely, a Holder may recognize a loss (which may be capital) to the extent that any accrued interest was previously included in income and is not paid in full.

Pursuant to the Plan, distributions to any holder of Allowed Claims will be allocated first to the principal amount of such Claims, as determined for federal income tax purposes, and thereafter to the portion of such Claim, if any, representing accrued but unpaid interest.  Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a bankruptcy plan of reorganization is binding for U.S. federal income tax purposes.  However, no assurance can be given that the IRS will not challenge such allocation.  If a distribution with respect to a Claim is entirely allocated to the principal amount of such Claim, a holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the holder's gross income.

Holders are urged to consult their own tax advisor regarding the particular U.S. federal income tax consequences of the treatment of accrued but unpaid interest, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

3.    Ownership and Disposition of New Bicent Common Interests

Under current Treasury Regulations, a domestic entity that has two or more members and that is not organized as a corporation under U.S. federal or state law will generally be classified as a partnership for federal income tax purposes, unless it elects to be treated as a corporation.  Pursuant to the Plan and the New Bicent LLC Agreement, an election for New Bicent Power to be classified as a corporation for federal income tax purposes will not be made on or prior to the Effective Date.  Thus, subject to the discussion of "publicly traded partnerships" below, and subject to the discussion regarding a possible election to be treated as a corporation after the Effective Date, New Bicent Power will be treated as a partnership for U.S. federal income tax purposes.

Under the "publicly traded partnership" provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation.  The New Bicent LLC Agreement will prohibit the transfer of membership interests in New Bicent if such transfer would jeopardize the status of New Bicent Power as a partnership for federal income tax purposes (prior to an actual conversion for federal income tax purposes to corporate status), and the Warrant Documents will contain such a restriction on transfers of the New Warrants.  Any

purported transfer in violation of such provisions will be null and void and would not be recognized by New Bicent Power.

The New Bicent LLC Agreement will provide that, upon the decision of the board of New Bicent Power, New Bicent Power may (i) make an election to be treated as a corporation for United States federal and applicable state and local income tax purposes or (ii) convert into a corporation by filing a certificate of conversion with the requisite Secretary of State, in each case to be effective after the Effective Date.  After the Effective Date, each owner would be required to cooperate fully with any such election or conversion, including through the execution of any necessary or appropriate forms.  Furthermore, the New Bicent LLC Agreement will provide that at any time after any such election or conversion, each owner that holds equity interests in New Bicent Power through a corporation will have the right to merge such corporation with and into New Bicent Power (or its successor), provided in each case that at the time of such merger such corporation has no material assets other than equity interests in New Bicent Power and has no liabilities.  This discussion does not address any tax consequences resulting from any such an election, conversion or merger, and each holder of a First Lien Credit Facility Claim and Second Lien Credit Facility Claim is urged to consult its own tax advisor regarding such tax consequences.

As a partnership, New Bicent Power itself will not be subject to federal income tax. Instead, New Bicent Power will file an annual partnership information return with the IRS which will report the results of New Bicent Power's operations.  Each New Bicent Power member will be required to report on its federal income tax return, and will be subject to tax in respect of, its distributive share of each item of New Bicent Power's income, gain, loss, deduction and credit for each taxable year of New Bicent Power ending with or within the member's taxable year.  Each item generally will have the same character as if the member had realized the item directly.  Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from New Bicent Power for such taxable year, and thus may incur income tax liabilities in excess of any distributions from New Bicent Power.  For purposes of calculating New Bicent Power's items of income, gain, loss and deduction, upon the implementation of the Plan, New Bicent Power should have a new cost tax basis and holding period in the underlying assets of New Bicent Power and its subsidiaries (other than the assets of CEM Energy Services, Inc.).

A member is allowed to deduct its allocable share of New Bicent Power losses (if any) only to the extent of such member's adjusted tax basis (discussed below) in its membership interest at the end of the taxable year in which the losses occur.  In addition, various other limitations in the Tax Code may significantly limit a member's ability to deduct its allocable share of deductions and losses of New Bicent Power against other income (including the passive loss rules and at risk rules).

New Bicent Power will provide each member with the necessary information to report its allocable share of New Bicent Power's tax items for federal income tax purposes.  However, no assurance can be given that New Bicent Power will be able to provide such information prior to the initial due date of the members' federal income tax return and the

members may therefore be required to apply to the IRS for an extension of time to file their tax returns.

Under the New Bicent LLC Agreement, the New Board will decide how items will be reported on New Bicent Power's federal income tax returns, and all members will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. If the income tax returns of New Bicent Power are audited by the IRS, the tax treatment of New Bicent Power income and deductions generally will be determined at the New Bicent Power level in a single proceeding, rather than in individual audits of the members. The New Bicent LLC Agreement will generally provide that the members will elect one member to be the "Tax Matters Partner" for New Bicent Power, as such term is defined in Section 6231(a)(7) of the Tax Code. The Tax Matters Partner will have considerable authority under the Tax Code and the New Bicent LLC Agreement to make decisions affecting the tax treatment and procedural rights of all members.

A member generally will not recognize gain or loss on the receipt of a distribution of cash or property from New Bicent Power (provided that the member is not treated as exchanging such member's share of New Bicent Power's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together "ordinary income items") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, under certain circumstances, marketable securities, from New Bicent Power (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of New Bicent Power) to the extent such cash distribution or the fair market value of such marketable securities exceeds such member's adjusted tax basis in its membership interest. Such distribution would be treated as gain from the sale or exchange of a membership interest.

A member will recognize gain on the complete liquidation of its membership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of marketable securities, in certain circumstances, are treated as distributions of money for purposes of determining gain. Any gain recognized by a member on the receipt of a distribution from the Partnership generally will be capital gain, but may be taxable as ordinary income, either in whole or in part, under certain circumstances. No loss can be recognized on a distribution in liquidation of a membership interest, unless the member receives no property other than money and ordinary income items.

A member's adjusted tax basis in its membership interest generally will be equal to such member's initial tax basis (see Article XIV.B.1, above), increased by the sum of (i) any additional capital contribution such member makes to New Bicent Power, (ii) the member's allocable share of the income of New Bicent Power, and (iii) increases in the member's allocable share of the indebtedness of New Bicent Power, and reduced, but not below zero, by the sum of (iv) the member's allocable share of the losses of New Bicent Power, and (v) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of indebtedness of New Bicent Power.

A sale of all or part of a member's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds (taking into account the member's relief of its share of the partnership liabilities as amount realized under Section 752(d) of the Tax Code) and such member's adjusted tax basis for the portion of the interest disposed of (taking into account liabilities included in such member's basis). Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent that the proceeds of the sale are attributable to a member's allocable share of certain ordinary income items of New Bicent Power. A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the Tax Code.

Each holder of a First Lien Credit Facility Claim and Second Lien Credit Facility Claim is urged to consult its tax advisor regarding the tax consequences of owning and disposing of membership interests in New Bicent Power.

### 4.    Ownership and Disposition of New Warrants

The tax consequences relating to the ownership and disposition (including exercise) of the New Warrants are not clear. The Treasury has promulgated proposed regulations dealing with the receipt, ownership and exercise of noncompensatory warrants issued by an entity that is treated as a partnership for federal income tax purposes. However, such regulations have not yet been finalized and, when finalized, such regulations are to be effective on a prospective basis. The description below is based on the proposed regulations. Accordingly, no assurance can be given that the IRS would not challenge the treatment described below and holders of Second Lien Credit Facility Claims are urged to consult their tax advisors as to tax consequences of the ownership and disposition of New Warrants.

The proposed regulations contain rules that would treat a holder of an option to acquire a partnership interest as being a partner in the partnership if the option provides the holder with rights that are substantially similar to the rights afforded to a partner and as of the date that the option is issued, transferred or modified, there is a strong likelihood that the failure to treat the holder as a partner would result in a substantial reduction in the present value of the partners' and the holder's aggregate tax liabilities. New Bicent Power does not currently intend to treat holders of New Warrants as owning partnership interests by reason of their ownership of the New Warrants, all holders of New Bicent Common Interests and New Warrants shall report consistently therewith (unless the New Board determines otherwise), and the remainder of this discussion assumes that the holders of New Warrants would not be so treated. If the IRS were to successfully challenge this position, the consequences described below would not be applicable.

A holder of a New Warrant should not recognize gain or loss upon the exercise of the New Warrant. Upon exercise, the holder should be treated as having contributed to New Bicent Power an amount equal to (i) the tax basis of the New Warrant (see Article XIV.B.1, above), plus (ii) the exercise price paid by the holder of the New Warrant. In addition, in connection with the exercise of the New Warrant, New Bicent Power will revalue its property immediately following the exercise of the New Warrant. After New Bicent Power revalues its property, the New Warrant holder's capital account should reflect the entire amount that the

holder would be entitled to if New Bicent Power were to sell all of its assets for their fair market value in a taxable transaction and then liquidate.  To the extent it would be necessary to transfer capital from or to other New Bicent Power members' capital accounts in order for the New Warrant holder's initial capital account to reflect the amount described in the prior sentence, New Bicent Power would be required to make special allocations of gross income (or gross loss), solely for tax purposes, to the holder of the New Warrant or to the other members to whom capital was transferred (or, in the case of gross loss, from whom capital was transferred) in an aggregate amount equal to the amount of capital that was transferred.

Upon the lapse or disposition of a New Warrant, the holder generally would recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the warrant.  In general, such gain or loss would be a capital gain or loss, long term or short term, depending whether the requisite holding period was satisfied.

### C.    Information Reporting and Withholding

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions (including certain "reportable transactions" and "listed transactions") in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

***The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable  under the Plan.***

01:12060597.1

## XV.

### CONCLUSION

The Debtors believe that confirmation of the Plan is in the best interests of all Creditors and urge all creditors who receive ballots to vote in favor of the Plan.

Dated:  April 30, 2012

BICENT HOLDINGS LLC

By:_____

Name:  Christopher L. Ryan
Title:    Chief Financial Officer


BICENT R.E. LLC

By:_____

Name:  Christopher L. Ryan
Title:    Chief Financial Officer


BICENT POWER LLC

By:_____

Name:  Christopher L. Ryan
Title:    Chief Financial Officer


BICENT FUNDING LLC

By:_____

Name:  Christopher L. Ryan
Title:    Chief Financial Officer

COLORADO ENERGY MANAGEMENT, LLC

By: _____

Name:  Kenneth Deane
Title:   Chief Financial Officer

CEM ENERGY SERVICES, INC.

By: _____

Name:  Douglas Halliday
Title:   Chief Executive Officer

COLORADO COGEN OPERATORS, LLC

By: _____

Name:  Douglas Halliday
Title:   Chief Executive Officer

ROCKY MOUNTAIN POWER, LLC

By: _____

Name:  Douglas Halliday
Title:   Chief Executive Officer

SAN JOAQUIN COGEN, L.L.C.

By: _____

Name:  Christopher L. Ryan
Title:   Chief Financial Officer

HARTWELL, LLC

By: _____

Name:  Douglas Halliday
Title:   Chief Executive Officer

**HART COUNTY IPP, LLC**

By:_____
     Name:  Christopher L. Ryan
     Title:   Chief Financial Officer


**HARTWELL INDEPENDENT POWER**
     **PARTNERS, LLC**

By:_____
     Name:  Christopher L. Ryan
     Title:   Chief Financial Officer


**HARTWELL POWER COMPANY**

By:_____
     Name:  Christopher L. Ryan
     Title:   Chief Financial Officer

## EXHIBIT A

**Plan of Reorganization**

**THIS PLAN HAS NOT BEEN APPROVED BY THE COURT FOR DISSEMINATION. UNTIL SO APPROVED, IT SHOULD NOT BE RELIED UPON BY ANY PERSON OR ENTITY, NOR MAY IT BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BICENT HOLDINGS LLC, a Delaware corporation, *et al.*,[1] | ) Case No. 12-11304 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

## DEBTORS' JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE


YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Joel A. Waite (No. 2925)
Rodney Square 1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571 - 6600
Facsimile: (302) 571 - 1253

*Proposed Counsel for the Debtors and Debtors-in-Possession*

Dated: Wilmington, Delaware
      April 30, 2012

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Bicent Holdings LLC (9347); Bicent R.F. LLC (8269); Bicent Funding LLC (2270); Bicent Power LLC (8567); Colorado Energy Management, LLC (8296); CEM Energy Services, Inc. (9642); Colorado Cogen Operators, LLC (3737); San Joaquin Cogen, L.L.C. (8299); Rocky Mountain Power, LLC (7088); Hartwell, LLC (N/A); Hartwell Power Company (5414); Hartwell Independent Power Partners, LLC (7195); Hart County IPP, LLC (7194). The Debtors' mailing address is 2575 Park Lane, 2nd Floor, Lafayette, Colorado 80026.

# TABLE OF CONTENTS

Page

**I. DEFINITIONS AND CONSTRUCTION OF TERMS** ...............................................**3**
    A.    Definitions. ......................................................................................................3
    B.    Interpretation, Application of Definitions and Rules of
          Construction.................................................................................................23
    C.    Appendices and Plan Supplement Documents. .........................................24

**II. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** ...........................**24**
    A.    Introduction.................................................................................................24

**III. TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX**
    **CLAIMS** .................................................................................................................**26**
    A.    Administrative Claims. ...............................................................................26
    B.    Bar Dates for Administrative Claims. .......................................................26
    C.    Fee Claims....................................................................................................27
    D.    Priority Tax Claims.....................................................................................27
    E.    DIP Financing Claims; DIP Fee Claims; Backstop Fee. ..........................28

**IV. TREATMENT OF CLAIMS AND EQUITY INTERESTS**...................................**29**
    A.    Class 1 — Other Priority Claims. ..............................................................29
    B.    Class 2— Other Secured Claims. ...............................................................29
    C.    Class 3 — First Lien Credit Facility Claims. ............................................30
    D.    Class 4 — Second Lien Credit Facility Claims..........................................31
    E.    Class 5— Mezzanine Credit Facility Claims..............................................32
    F.    Class 6 — General Unsecured Claims........................................................32
    G.    Class 7 – Intercompany Claims. .................................................................33
    H.    Class 8 – Equity Interests in Bicent Holdings, Bicent
          R.F. LLC, Bicent Funding and Bicent Power.............................................33
    I.    Class 9 – Equity Interests in Subsidiaries.................................................33

**V. PROVISIONS REGARDING MEANS OF IMPLEMENTATION AND**
    **CORPORATE GOVERNANCE OF THE REORGANIZED DEBTORS**.....**34**
    A.    Restructuring and Other Transactions. ......................................................34
    B.    Appointment of Officers and Directors. ....................................................37
    C.    Powers of Officers. ......................................................................................37
    D.    Management of Reorganized Debtors. .......................................................38
    E.    Indemnification of Directors, Officers and Employees.............................38
    F.    Corporate Action. .......................................................................................38

**VI. SUBSTANTIVE CONSOLIDATION OF THE DEBTORS** .................................**39**

**VII. PROVISIONS REGARDING VOTING, DISTRIBUTIONS, AND TREATMENT OF DISPUTED CLAIMS**................................................**40**

    A.    Brush Sale Proceeds; Indemnification Proceeds. ......................40
    B.    Exit Facility. .............................................................................41
    C.    Voting of Claims.......................................................................41
    D.    Distributions.............................................................................41
    E.    Insured Claims. ........................................................................45
    F.    Estimation. ...............................................................................45
    G.    Nonconsensual Confirmation. ..................................................45
    H.    New Bicent LLC Agreement. ...................................................45
    I.    Liens. .......................................................................................46
    J.    Swap Agreements. ....................................................................46
    K.    Enforcement of Subordination..................................................47

**VIII. EFFECT OF CONFIRMATION OF THE PLAN**...........................................**47**

    A.    Continued Corporate Existence. ...............................................47
    B.    Dissolution of Creditors' Committee.........................................48
    C.    Vesting of Property...................................................................48
    D.    Discharge of the Debtors. .........................................................48
    E.    Injunction. ................................................................................49
    F.    Preservation of Causes of Action. .............................................49
    G.    Votes Solicited in Good Faith...................................................49
    H.    Administrative Claims Incurred After the Confirmation Date.........................................................................................50
    I.    Releases by the Debtors.............................................................50
    J.    Releases by non-Debtors. .........................................................51
    K.    Exculpation and Injunction in Respect of Released Parties. .....................................................................................52
    L.    Term of Bankruptcy Injunction or Stays. ..................................52
    M.    Preservation of Insurance. ........................................................52
    N.    Indemnification Obligations Owed by the Debtors.....................53
    O.    Binding Effect; Plan Binds All Holders of Claims and Equity Interests. ......................................................................53

**IX. RETENTION OF JURISDICTION** ........................................................................**53**

**X. MISCELLANEOUS PROVISIONS** .......................................................................**54**

    A.    Payment of Statutory Fees. .......................................................54
    B.    Modification of the Plan. ..........................................................54
    C.    Governing Law. ........................................................................55
    D.    Filing or Execution of Additional Documents...........................55
    E.    Withholding and Reporting Requirements. ...............................55
    F.    Exemption From Transfer Taxes. ..............................................55
    G.    Section 1145 Exemption. ..........................................................55
    H.    Waiver of Federal Rule of Civil Procedure 62(a)......................56
    I.    Exhibits/Schedules....................................................................56
    J.    Notices. ....................................................................................56

Page

K.    Plan Supplement. ........................................................................57
L.    Conflict. .....................................................................................57
M.    Second Lien Consenting Lenders Review and Consent
      Rights. ........................................................................................57

**XI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .............................**57**
A.    Assumption and Rejection of Executory Contracts and
      Unexpired Leases.........................................................................57
B.    Limited Extension of Time to Assume or Reject. ....................58
C.    Cure.............................................................................................58
D.    Rejection Damage Claims. ........................................................59

**XII. BENEFIT PLANS**..................................................................................**59**

**XIII. EFFECTIVENESS OF THE PLAN** ........................................................**60**
A.    Condition Precedent to Confirmation.........................................60
B.    Conditions Precedent to Effectiveness. .....................................60
C.    Waiver of Conditions..................................................................61
D.    Effect of Failure of Conditions..................................................61
E.    Vacatur of Confirmation Order. .................................................61
F.    Revocation, Withdrawal, or Non-Consummation. .....................61

01:12060541.1

**THIS PLAN HAS NOT BEEN APPROVED BY THE COURT FOR DISSEMINATION. UNTIL SO APPROVED, IT SHOULD NOT BE RELIED UPON BY ANY PERSON OR ENTITY, NOR MAY IT BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES.**

## INTRODUCTION

Bicent Holdings, LLC, Bicent R.F. LLC, Bicent Funding, LLC, Bicent Power LLC, Colorado Energy Management, LLC, CEM Energy Services, Inc., Colorado Cogen Operators, LLC, San Joaquin Cogen, L.L.C., Rocky Mountain Power, LLC, Hartwell, LLC, Hartwell Power Company, Hartwell Independent Power Partners, LLC, and Hart County IPP, LLC, the above-captioned debtors and debtors in possession, propose the following joint plan of reorganization under section 1121(a) of the Bankruptcy Code.

The Debtors' Chapter 11 Cases are being jointly administered pursuant to an order of the Court, and the Plan is being presented as a joint plan of reorganization of the Debtors. Claims against and Interests in the Debtors are classified and/or treated in Articles II, III and IV hereof.

Reference is made to the Disclosure Statement accompanying this Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, results of operations, and projections for future operations and risk factors, together with a summary and analysis of this Plan. All Claim or Interest holders entitled to vote on this Plan are encouraged to consult the Disclosure Statement and to read this Plan carefully before voting to accept or reject this Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AND APPROVED BY THE COURT, HAVE BEEN AUTHORIZED BY THE COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

# I.

## DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    <u>Definitions.</u>

Unless otherwise defined herein, or the context otherwise requires, the following terms shall have the respective meanings set forth below:

| | |
|---|---|
| *Administrative Claim* | means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' business, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business, including for the acquisition or lease of property or an interest in property or the rendition of services, the Fee Claims, any fees or charges assessed against the Debtors' estates under section 1930 of chapter 123 of title 28 of the United States Code, any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code, the DIP Financing Claims, the DIP Fee Claims, the First Lien Agent Fee Claims, the Second Lien Agent Fee Claims and Swap Counterparties Fee Claims. |
| *Administrative Claims Bar Date* | shall have the meaning ascribed to it in Article II.B. of the Plan. |
| *Allowed* | means, with reference to any Claim or any Administrative Claim, (a) any Claim or any Administrative Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of Claim has been filed with respect to an Administrative Claim, Priority Tax Claim or Other Priority Claim, (b) any Claim or any Administrative Claim specifically allowed under the Plan, (c) any Claim or any Administrative Claim that is not Disputed by the Claims Objection |

Deadline or (d) any Claim or any Administrative Claim the amount or existence of which, if Disputed, (i) has been determined by a Final Order of a court of competent jurisdiction other than the Court, or (ii) has been allowed by Final Order of the Court, in either case, to the extent so provided; provided, however, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Court, "Allowed Administrative Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Claim or Allowed Claim from or after the Petition Date.  An Allowed Claim shall be net of any setoff amount of any Claim that may be asserted by any Debtor against the holder of such Claim, which amount shall be deemed setoff pursuant to the terms of the Plan.  For the avoidance of doubt, the DIP Financing Claims, the DIP Fee Claims, the First Lien Credit Facility Claims, the First Lien Agent Fee Claims, the Second Lien Credit Facility Claims, the Second Lien Agent Fee Claims and the Swap Counterparties Fee Claims are Allowed in full and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

***Backstop Fee***

means the 5% of New Bicent Common Interests, (subject to dilution by the exercise of New Warrants and profits interests issued pursuant to the Management Agreement) that the Backstop Lenders shall receive as a fee on the Effective Date for backstopping the DIP Credit Facility in accordance with the terms of the DIP Credit Facility and as approved pursuant to the Interim DIP Order; provided that, for the avoidance of doubt, the Backstop Lenders shall not receive any other Distributions on account of the Backstop Fee.

***Backstop Lenders***

means, collectively, one or more entities or accounts managed by Strategic Value Partners or GSO Capital Partners.

***Ballots***

means each of the ballot forms distributed with the Disclosure Statement to each holder of an Impaired Claim (other than to holders not entitled to vote on the

4

|  | Plan) upon which is to be indicated, among other things, acceptance or rejection of the Plan. |
|---|---|
| **Bankruptcy Code** | means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the date hereof as applicable to these chapter 11 cases. |
| **Bankruptcy Rules** | means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and local rules of the Court, as the context may require. |
| **Barclays Swap Agreements** | means those certain (i) Amended Rate Swap Confirmation, dated May 30, 2007, between Barclays Bank PLC and Mountain Acquisition Company LLC, (ii) Rate Swap Confirmation, dated June 11, 2007, between Barclays Bank PLC and Bicent Power, (iii) ISDA Master Agreement, dated October 9, 2007, between Barclays Bank PLC and Bicent Power, and the related ISDA Schedule and each related schedule, exhibit or annex thereto, (iv) Amended Rate Swap Confirmation, dated September 20, 2007, between Barclays Bank PLC and Bicent Power, (v) Commodity Swap Confirmation, dated June 13, 2007, between Barclays Bank PLC and Bicent Power, (vi) First Lien Guaranty (Hardin Hedge Agreement), dated June 10, 2007, (vii) First Lien Guaranty (Barclays Interest Rate Hedge Agreement), dated July 10, 2007, (viii) ISDA Master Agreement, dated June 14, 2007, between Barclays Bank PLC and Bicent Power, along with the related ISDA Schedule and confirmation pursuant thereto on June 13, 2007, and each related schedule, exhibit or annex thereto, and (ix) Commodity Hedge and Power Sale Agreement entered into in respect of Brush 4D Gas Fired Project. |
| **Barclays Termination Payment** | means the net cancellation fee arising in connection with one or more termination confirmations or similar agreements with respect to transactions under the Barclays Swap Agreements. |
| **Beowulf** | means Beowulf Energy LLC |
| **Bicent Holdings** | means Bicent Holdings LLC |
| **Bicent Funding** | means Bicent Funding LLC |
| **Bicent Power** | means Bicent Power LLC |
| **Brush Assets** | means the assets comprising the Debtors' Brush 1&3 and Brush 4 power generation facilities. |

5

| | |
|---|---|
| ***Brush Sale*** | means any sale of the Brush Assets or the equity interests in the direct or indirect owners of the Brush Assets, including, without limitation, Colorado Power Partners, BIV Generation Company, LLC, Brush Generation Company, LLC, Morgan Generation Company, LLC, Brush Power, LLC, and/or Centennial Power, LLC, under (a) section 363 of the Bankruptcy Code, (b) the Plan or (c) pursuant to rights and remedies exercised by the First Lien Agent as directed by Required First Lien Lenders pursuant to the First Lien Credit Facility, Intercreditor Agreement, and any related documentation. |
| ***Brush Sale Proceeds*** | means the Cash proceeds from any Brush Sale (net of documented, reasonable and customary out-of-pocket costs, fees, commissions or taxes incurred in connection with the Brush Sale, including documented, reasonable and customary out-of-pocket costs and fees of Paul, Weiss, Rifkind, Wharton & Garrison LLP, as special counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, as counsel to the Debtors and Royal Bank of Canada). |
| ***Business Day*** | means any day on which commercial banks are open for business, and not authorized to close, in the City of New York, New York, except any day designated as a legal holiday by Bankruptcy Rule 9006(a). |
| ***Cash*** | means legal tender of the United States of America. |
| ***Causes of Action*** | means all claims, without limitation, choses in action and causes of action (including those assertable derivatively), liabilities, obligations, suits, debts, sums of money, damages, demands, judgments, and Claims, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, now owned or hereafter acquired by and belonging to the Debtors, in law, equity or otherwise, based in whole or in part upon any act, failure to act, error, omission, transaction, occurrence or other event arising or occurring prior to the Petition Date or during the course of the Chapter 11 Cases, up to and including the Effective Date, and the Cash and non-Cash proceeds thereof, whether arising under the Bankruptcy Code or other federal, state or foreign law, equity or otherwise, including any causes of action arising under sections 510, 544, 547, 548, 549, 550, 551 or any other section |

6

|  | of the Bankruptcy Code. |
|---|---|
| ***CEM*** | means Colorado Energy Management, LLC. |
| ***Chapter 11 Cases*** | means the chapter 11 cases commenced by the Debtors in the Court. |
| ***Claim*** | means any claim, as such term is defined in section 101(5) of the Bankruptcy Code. |
| ***Claims Agent*** | means Epiq Bankruptcy Solutions, LLC or any successor thereto. |
| ***Claims Objection Deadline*** | means the first business day that is one hundred eighty (180) days after the Effective Date, or such later date the Court may establish upon a motion by the Reorganized Debtors, which motion may be filed before or after such deadline and may be approved without a hearing and without notice to any party. |
| ***Class*** | means a group of Claims or Equity Interests as classified under the Plan. |
| ***Collateral*** | means any property or interest in property of the Debtors' estates subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law. |
| ***Confirmation Date*** | means the date on which the Confirmation Order is entered by the Court. |
| ***Confirmation Hearing*** | means the hearing to consider confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, as it may be adjourned or continued from time to time; provided that the Confirmation Date shall occur no later than one hundred and five (105) days from the Petition Date. |
| ***Confirmation Order*** | means the order entered by the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code in form and substance satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party. |
| ***Court*** | means, (a) the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases; (b) to the extent there is no reference pursuant to section 157 of title 28 of the United States |

7

|  | Code, the United States District Court for the District of Delaware; and (c) any other court having jurisdiction over the Chapter 11 Cases or proceedings arising therein. |
|---|---|
| *Creditors' Committee* | means any Official Committee of Unsecured Creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code in the Debtors' Chapter 11 Cases, as constituted from time to time. |
| *Debtors* | means Bicent Holdings, LLC, Bicent R.F. LLC, Bicent Funding, LLC, Bicent Power LLC, Colorado Energy Management, LLC, CEM Energy Services, Inc., Colorado Cogen Operators, LLC, San Joaquin Cogen, L.L.C., Rocky Mountain Power, LLC, Hartwell, LLC, Hartwell Power Company, Hartwell Independent Power Partners, LLC, and Hart County IPP, LLC. |
| *Debtors in Possession* | means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. |
| *DIP Agent* | means Barclays Bank PLC, in its capacity as Administrative and Collateral Agent under the DIP Credit Facility. |
| *DIP Credit Facility* | means that certain Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of April 25, 2012, by and among Bicent Power, Bicent Funding and the subsidiary guarantors named therein, the lenders from time to time party thereto and the DIP Agent, as amended from time to time. |
| *DIP Fee Claims* | means all Claims, to the extent not already paid, for the fees, documented expenses, costs and other charges of the DIP Agent under the DIP Credit Facility (including the fees and expenses of counsel and the financial advisor to the DIP Agent) without any requirement for the filing of retention applications or fee applications in the Chapter 11 Cases, which shall be Allowed in full and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity. |
| *DIP Financing Claims* | means all Claims arising under or relating to the DIP Credit Facility and all agreements and instruments |

8

relating thereto (excluding DIP Fee Claims) pursuant to the DIP Credit Facility and the order(s) approving same, which shall be Allowed in full and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

**DIP Lenders**    means the lenders, banks, other financial institutions or other non-Debtor entities that may become lenders under the DIP Credit Facility from time-to-time.

**Disclosure Statement**    means the written disclosure statement that relates to this Plan, as approved by the Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time (including all schedules and exhibits thereto), and in form and substance that is satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance that is satisfactory to the applicable affected party.

**Disputed**    means, with reference to any Claim or Administrative Claim, (a) any Claim or Administrative Claim as to which the Debtors or any other party in interest has filed an objection or request for estimation on or before the deadline fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Court, except to the extent that such objection or request for estimation is withdrawn or determined by a Final Order in favor of the holder of such Claim, (b) any Claim or Administrative Claim that is scheduled by the Debtors in the Schedules as contingent, unliquidated, or disputed, (c) during the period prior to the deadline fixed by this Plan and/or the Court for objecting to a Claim, any Claim or Administrative Claim that is in excess of the amount scheduled as other than disputed, unliquidated or contingent, (d) any Claim or Administrative Claim that may be subject to section 502(d) of the Bankruptcy Code, (e) any Claim or Administrative Claim that is otherwise disputed by any of the Debtors or any other party in interest, or is subject to any right of setoff or recoupment, or the holder thereof is subject to any Claim or Cause of

9

|  | Action, in accordance with applicable law, which dispute, right of setoff or recoupment, Claim or Cause of Action, has not been withdrawn or determined in favor of such holder by a Final Order. |
|---|---|
| ***Distributions*** | means the distribution in accordance with this Plan of (a) Cash, (b) New Bicent Common Interests, (c) New Warrants, or (d) some other form of consideration, as the case may be. |
| ***Effective Date*** | means the first Business Day on which all of the conditions specified in Article XIII.B of the Plan have been satisfied or waived in accordance with Article XIII.C of the Plan; provided, however, that if a stay of the Confirmation Order is in effect on such date, the Effective Date will be the first Business Day after such stay is no longer in effect. |
| ***Equity Interest or Interest*** | means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors as of the Petition Date, including any membership or partnership interest, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest. |
| ***Estates*** | means the estates of the Debtors, individually or collectively, as is appropriate in the context created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code. |
| ***Exit Facility*** | means that certain exit financing facility in form and substance that is satisfactory to the Requisite DIP Lenders and Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance that is satisfactory to the applicable affected party, to be entered into by the Reorganized Debtors on or prior to the Effective Date, the obligations under which shall be secured by a first priority security interest in substantially all of the Reorganized Debtors' assets. |
| ***Fee Claims*** | means an Administrative Claim under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including reasonable expenses of the members of any Creditors' Committee incurred as members of the Creditors' Committee in discharge of |

10

their duties as such), but specifically excluding the fees and expenses incurred by the professionals and advisors to the DIP Agent, the First Lien Agent, the Second Lien Agent and the Swap Counterparties.

**Final DIP Order**    means the order entered by the Court on [____], 2012 and appearing at Docket No. [__] in the Chapter 11 Cases, as it may be amended from time to time in accordance with the DIP Credit Facility.

**Final Order**    means an order or judgment of the Court, or other court of competent jurisdiction, as entered on the docket, the operation or effect of which has not been stayed, reversed, vacated or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) (a) the time to appeal, petition for certiorari, or seek review, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review, reargument or rehearing was filed or (b) if any appeal, writ of certiorari, right of review, reargument or rehearing thereof has been sought, with respect to an order or judgment of the Court, such order or judgment of the Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a right of review, reargument or rehearing shall have expired; provided, however, that the possibility of a motion pursuant to Rule 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule being filed with respect to such order shall not cause such order to be deemed a non-Final Order.

**First Lien Agent**    means Barclays Bank PLC, in its capacity as Administrative and Collateral Agent under the First Lien Credit Facility.

**First Lien Agent's Advisors**    means, in their capacities as such, (i) Milbank, Tweed, Hadley & McCloy LLP, (ii) any local Delaware counsel, (iii) two separate environmental counsel, (iv) RPA Advisors, LLC, and (v) any other counsel or advisor retained by the First Lien Agent in connection with any of the Chapter 11 Cases or the First Lien Credit Facility.

**First Lien Agent Fee Claims**    means all Claims, to the extent not already paid, for the fees and expenses of the First Lien Agent under and to the extent provided in the First Lien Credit Facility, including the fees and expenses of the First Lien Agent's Advisors, without any requirement for the

11

filing of retention applications or fee applications in the Chapter 11 Cases, which shall be Allowed in full and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

| | |
|---|---|
| ***First Lien Lenders*** | means the lenders party from time to time to the First Lien Credit Facility. |
| ***First Lien Consenting Lenders*** | means the lenders party to the Restructuring Support Agreement, each of which is the lender of, or the investment advisor to a holder or holders of (and in such capacity having the power to bind such holder), certain indebtedness of the Debtors incurred pursuant to the First Lien Credit Facility. |
| ***First Lien Credit Agreement*** | means that certain First Lien Credit Agreement, dated as of July 10, 2007 (as amended, restated, supplemented or otherwise modified), among Bicent Power, as borrower, Bicent Funding and the subsidiary guarantors named therein, as guarantors, the First Lien Credit Facility Lenders, and the First Lien Agent. |
| ***First Lien Credit Facility*** | means the First Lien Credit Agreement, all related guarantee, security, and collateral agreements and documents, and all exhibits and other ancillary documentation in respect thereof, and any other "First Lien Loan Documents" (as defined in the First Lien Credit Agreement). |
| ***First Lien Credit Facility Claims*** | means all Claims (including, for the avoidance of doubt, the Goldman Termination Payment, the Barclays Termination Payment, if any, Swap Counterparties Fee Claims, and the First Lien Agent Fee Claims) arising under or relating to the First Lien Credit Facility, which shall be Allowed in full and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity. |
| ***First Lien Credit Facility Lenders*** | means the lenders party to the First Lien Credit Facility. |
| ***First Lien Secured Parties*** | has the meaning assigned to such term in the Intercreditor Agreement. |

12

| | |
|---|---|
| ***General Unsecured Claim*** | means a Claim against any of the Debtors that is not an Administrative Claim, Ordinary Course Administrative Claim, Priority Tax Claim, Other Priority Claim, Fee Claim, DIP Financing Claim, DIP Fee Claim, Backstop Fee, Other Secured Claim, First Lien Agent Fee Claim, Second Lien Agent Fee Claim, Swap Counterparties Fee Claim, First Lien Credit Facility Claim, Termination Payment, Second Lien Credit Facility Claim, Mezzanine Credit Facility Claim, Subordinated Securities Claim or Subordinated Claim and shall include, without limitation, (a) Claims of employees of the Debtors that are not Priority Claims, (b) Claims arising as a result of the rejection by any of the Debtors of executory contracts or unexpired leases pursuant to section 365 of the Bankruptcy Code, (c) Claims arising as a result of pre-Petition Date litigation against any of the Debtors that are not subordinated under section 510(b) of the Bankruptcy Code, (d) Claims of vendors, suppliers and/or customers that are not Other Priority Claims, (e) Tort Claims, (f) Insured Claims, and (g) any LPP Claim. |
| ***Goldman Swap Agreement*** | means that certain (i) ISDA Master Agreement dated as of October 16, 2007, between Goldman Sachs Bank USA (formerly known as Goldman Sachs Capital Markets L.P.), (ii) the Revised Confirmation, dated June 27, 2007, as amended on July 2, 2009, between Goldman Sachs Bank USA and Bicent Power, and (iii) the Confirmation, dated September 7, 2007, between Goldman Sachs Bank USA and Bicent Power. |
| ***Goldman Termination Payment*** | means the net cancellation fee arising in connection with one or more termination confirmations or similar agreements with respect to transactions under the Goldman Swap Agreement. |
| ***Governmental or Regulatory Approvals*** | means all required or necessary licenses, registrations, reports, notices, permits and other approvals, filings or submissions, including, among others, of the Federal Energy Regulatory Commission or any successor thereto and Federal Trade Commission or any successor thereto and any other federal or state governmental or regulatory licenses, registrations, permits, consents, reports, notices and other approvals, filings or submissions. |
| ***Governmental Unit*** | has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code. |

13

| | |
|---|---|
| ***Hartwell Debtors*** | means the Debtors Hartwell, LLC, Hartwell Power Company, Hartwell Independent Power Partners, LLC, and Hart County IPP, LLC. |
| ***Hobbs Arbitration*** | means that certain arbitration proceeding captioned <u>Lea Power Partners, LLC v. Colorado Energy Management, LLC</u>, relating to disputes between LPP and CEM regarding their rights and claims in connection with the Hobbs Contract and Hobbs Project. |
| ***Hobbs Contract*** | means that certain engineering, procurement and construction contract entered into between LPP and CEM in November 2006 for the construction of a combined cycle power plant in Hobbs, New Mexico. |
| ***Hobbs Project*** | means that certain project relating to the construction of a combined cycle power plant in Hobbs, New Mexico pursuant to the Hobbs Contract. |
| ***Impaired*** | means, when used with reference to a Claim, a Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| ***Indemnification Claims*** | means the claims, causes of action, and rights of any of the Debtors in connection with any action for indemnification relating to costs, expenses and other amounts incurred in connection with the Hobbs Arbitration, including against MDU Resources Group, Inc. |
| ***Indemnification Claims Sale*** | means the sale, assignment or other disposition to a third party of the Indemnification Claims. |
| ***Indemnification Proceeds*** | means (i) the net proceeds received by the Debtors or Reorganized Debtors in connection with the Indemnification Claims pursuant to any final judgment, order, settlement, payment or otherwise, or (ii) the net proceeds received by the Debtors or Reorganized Debtors from any Indemnification Claims Sale.  The Indemnification Proceeds are net of, among other things, amounts payable to Beowulf under the Management Agreement and the fees and expenses required to be paid by Bicent Power to Cooley LLP pursuant to an engagement letter dated as of April 17, 2012, which letter will be assumed by the Debtors in these Chapter 11 Cases on and as of the Effective Date. The Indemnification Proceeds shall be distributed as provided for pursuant to Article VII.A of the Plan. |
| ***Initial Distribution Date*** | means the Effective Date or as soon thereafter as practicable, but no later than thirty (30) days after the |

14

|  | Effective Date. |
|---|---|
| **Insider** | has the meaning set forth in section 101(31) of the Bankruptcy Code. |
| **Insured Claim** | means any Claim or portion of a Claim (other than a Workers' Compensation Claim) that is insured under the Debtors' insurance policies, but only to the extent of such coverage. |
| **Intercreditor Agreement** | means that certain Collateral Agency and Intercreditor Agreement, dated as of July 10, 2007 (as amended, restated, supplemented, or otherwise modified), among Bicent Power, the subsidiary guarantors party thereto, the First Lien Agent, the Second Lien Agent, and certain other parties thereto from time to time in accordance with the terms thereof. |
| **Intercompany Claims** | means any Claim held by one of the Debtors against any other Debtor, including (a) any account reflecting intercompany book entries by such Debtor with respect to any other Debtor, (b) any Claim not reflected in book entries that is held by such Debtor, and (c) any derivative Claim asserted or assertable by or on behalf of such Debtor against any other Debtor. |
| **Interim DIP Order** | means the order entered by the Court on April 24, 2012 and appearing at Docket No. 30 in the Chapter 11 Cases, approving the DIP Credit Facility and providing related relief on an interim basis. |
| **Lien** | has the meaning set forth in section 101(37) of the Bankruptcy Code. |
| **LPP** | means Lea Power Partners, LLC. |
| **LPP Claim** | means any claim, right or cause of action of LPP against CEM relating to the Hobbs Arbitration, Hobbs Contract, or Hobbs Project that is Allowed pursuant to a Final Order. |
| **Management Agreement** | means that certain Second Amended and Restated Management Agreement between Beowulf Energy LLC and New Bicent Power to be entered into on the Effective Date, a copy of which is attached as Exhibit H to the Restructuring Support Agreement and which shall be included in the Plan Supplement. |
| **Mezzanine Credit Facility** | means, as amended, that certain Mezzanine Credit Agreement dated July 10, 2007, by and between Bicent R.F. LLC and Barclays Bank PLC, as agent, and the lenders from time to time party thereto. |

15

| | |
|---|---|
| ***Mezzanine Credit Facility Claims*** | means all Claims arising under or relating to the Mezzanine Credit Facility. |
| ***Mezzanine Credit Facility Lenders*** | means the lender-parties under the Mezzanine Credit Facility. |
| ***New Bicent Power*** | means Bicent Power as constituted after the Effective Date and taking into account the transactions pursuant to the Plan. |
| ***New Bicent Common Interests*** | means the common interests in New Bicent Power that will be issued by New Bicent Power pursuant to the Plan, the principal terms of which will be described in the Plan Supplement. |
| ***New Bicent LLC Agreement*** | shall have the meaning ascribed to it in Article VII.H. of the Plan. |
| ***New Board*** | means the Board of Directors of New Bicent Power to be constituted as of the Effective Date pursuant to Article V.B of the Plan. |
| ***New Rocky Mountain*** | means Rocky Mountain Power, LLC as constituted after the Effective Date and taking into account the transactions pursuant to the Plan. |
| ***New Warrants*** | means warrants issued under the Plan consisting of warrants in Series A and Series B that will entitle (A) holders of warrants in Series A to acquire, upon the exercise of all of such warrants for cash, their *pro rata* share of New Bicent Common Interests representing in the aggregate five percent (5.0%) of the total outstanding New Bicent Common Interests, the aggregate exercise price of which shall be as set forth in the New Warrant Term Sheet and (B) holders of warrants in Series B to acquire, upon the exercise of all of such warrants for cash, their *pro rata* share of New Bicent Common Interests representing in the aggregate seven and one-half percent (7.5%) of the total outstanding New Bicent Common Interests, the aggregate exercise price of which shall be as set forth in the New Warrant Term Sheet.   The New Warrants shall (i) expire ten years from the Effective Date, (ii) be exercisable by payment of the exercise price in cash or, at the option of the holder, by "cashless" exercise under the circumstances set forth in the New Warrant Documents, and (iii) contain customary anti-dilution protections for splits, dividends, and extraordinary transactions (<u>e.g.</u>, spin-offs and sales of material subsidiaries). |

16

| | |
|---|---|
| ***New Warrant Documents*** | means the form of warrant certificate, the New Warrant Term Sheet and the warrant agreement governing the New Warrants, substantially in the form to be included in the Plan Supplement. |
| ***New Warrant Term Sheet*** | means that certain term sheet attached as an exhibit to the Restructuring Support Agreement that sets forth the terms, conditions and governance documentation for the New Warrants to be issued pursuant to, and subject to the terms and conditions set forth in, the Plan, in form and substance that is satisfactory to the Requisite First Lien Consenting Lenders and the Requisite Second Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance that is satisfactory to the applicable affected party. |
| ***Ordinary Course Administrative Claims*** | means Administrative Claims against the Debtors that represent liabilities (a) to sellers of goods or services on account of such seller's provision of goods and/or services to the Debtors in Possession and (b) that were incurred in the ordinary course of business by the Debtors in Possession. |
| ***Other Priority Claim*** | means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Claims and Priority Tax Claims), including certain allowed employee compensation and benefit claims of the Debtors' employees incurred within one hundred eighty (180) days prior to the Petition Date. |
| ***Other Secured Claims*** | means any Claim (other than the DIP Financing Claims, the DIP Fee Claims, the First Lien Credit Facility Claims and the Second Lien Credit Facility Claims) to the extent reflected in the Schedules, or otherwise agreed to by the Debtors, which is secured by a Lien on Collateral, to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff. |
| ***Person*** | means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity. |

17

01:12060541.1

| | |
|---|---|
| ***Petition Date*** | means April 23, 2012. |
| ***Plan*** | means this Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, as it may be amended or modified from time to time in accordance with Article X.B, in form and substance that is satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance that is satisfactory to the applicable affected party, together with all addenda, exhibits, schedules or other attachments, if any. |
| ***Plan Supplement*** | means the supplemental appendix to this Plan, to be filed no later than three (3) business days before the Voting Deadline, which will contain, among other things, drafts in substantially final form or signed copies, as the case may be, of the Plan Supplement Documents, in form and substance satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party. |
| ***Plan Supplement Documents*** | means the forms of documents to be executed, delivered, and/or performed in connection with the consummation of this Plan including, but not limited to, the New Warrant Documents, the New Bicent LLC Agreement, Exit Facility, Schedule of Rejected Contracts and Leases (if any), and the Management Agreement, each such document to be in form and substance satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party. |
| ***Preconfirmation Equity Interests*** | means all Equity Interests in Bicent Power, whether or not transferable as of the Effective Date. |
| ***Priority Claims Bar Date*** | shall have the meaning ascribed to it in Article II.D.1 of the Plan. |
| ***Priority Tax Claim*** | means any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code. |
| ***Professional*** | means (i) any professional employed in the Chapter 11 Cases pursuant to section 327, 328, 330 or 1103 of the Bankruptcy Code or otherwise and (ii) any professional |

18

or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b) of the Bankruptcy Code but excluding the advisors and professionals for the DIP Agent, the First Lien Agent and the Swap Counterparties.

*Pro Rata*                  means, with respect to any Allowed Claim, at any time, the proportion that the amount of an Allowed Claim in a particular Class bears to the aggregate amount of all Claims (including Disputed Claims) in such Class, unless in each case the Plan provides otherwise.

*Record Date*               means (a) for purposes of making distributions under the Plan on account of Allowed Claims, the Confirmation Date, and (b) for purposes of casting Ballots, the date set forth in the order approving the Disclosure Statement that accompanies this Plan.

*Reinstated*                means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Equity Interest entitles the holder of such Claim or Equity Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of a Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation under a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim for any pecuniary loss incurred by such holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder thereof.

*Released Parties*          has the meaning assigned to such term in Article VIII.I of the Plan.

*Reorganized Debtors*       means New Bicent Power and the Reorganized Subsidiaries, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective

19

Date.

| | |
|---|---|
| ***Reorganized Subsidiaries*** | means the Subsidiaries, collectively, on or after the Effective Date, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date. |
| ***Required First Lien Lenders*** | has the meaning assigned to such term in the Intercreditor Agreement. |
| ***Requisite DIP Lenders*** | means DIP Lenders holding more than 75% of the aggregate undrawn commitments and outstanding loans under the DIP Credit Facility. |
| ***Requisite First Lien Consenting Lenders*** | means First Lien Consenting Lenders holding no less than two-thirds in amount of the First Lien Credit Facility Claims held at such time by all of the First Lien Consenting Lenders. |
| ***Requisite Second Lien Consenting Lenders*** | means Second Lien Consenting Lenders holding at least one-half in Second Lien Credit Facility Claims held at such time by the Second Lien Consenting Lenders; provided, however, that with respect to any amendment, modification, waiver or supplement to this Plan that adversely affects the economic treatment of the Second Lien Consenting Lenders as set forth in this Plan or the Warrant Term Sheet, the Requisite Second Lien Consenting Lenders shall mean Second Lien Consenting Lenders holding at least two-thirds in Second Lien Credit Facility Claims held at such time by the Second Lien Consenting Lenders. |
| ***Restructuring Support Agreement*** | means that certain Restructuring Support Agreement, dated as of April 18, 2012, by and among the Debtors, Centennial Power, LLC and the Restructuring Support Parties, as amended, supplemented or otherwise modified from time to time in accordance therewith. |
| ***Restructuring Support Agreement Attachments*** | has the meaning ascribed to such term in the Restructuring Support Agreement. |
| ***Restructuring Support Parties*** | means, as of the relevant time, the "Restructuring Support Parties" as such term is defined in the Restructuring Support Agreement. |
| ***Restructuring Transactions*** | means the transactions described in Article V.A. |
| ***Scheduled*** | means, with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules. |
| ***Schedules*** | means the schedules of assets and liabilities, statements of financial affairs, and lists of holders of Claims and |

20

Equity Interests filed with the Court by each of the Debtors, including any amendments or supplements thereto.

| | |
|---|---|
| **Schedule of Rejected Contracts and Leases** | means that certain schedule, if any, to be included in the Plan Supplement that specifically designates certain executory contracts and/or unexpired leases as contracts or leases to be rejected pursuant to the Plan. |
| **Second Lien Agent** | means U.S. Bank National Association, as successor in interest to Barclays Bank PLC, as Administrative and Collateral Agent under the Second Lien Credit Facility. |
| **Second Lien Agent Fee Claims** | means the Claims, to the extent not already paid, solely for the reasonable and documented fees and expenses incurred by the legal advisors to the Second Lien Agent, without any requirement for the filing of retention applications or fee applications in the Chapter 11 Cases, which shall be Allowed and payable in accordance with Articles III and IV hereof up to an aggregate amount of $500,000, which amount shall include fees and expenses incurred before the Petition Date and during these Chapter 11 Cases, and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity. |
| **Second Lien Consenting Lenders** | means each of the lenders party to the Restructuring Support Agreement, each of which is the lender of, or the investment advisor to a holder or holders of (and in such capacity having the power to bind such holder), certain indebtedness of the Debtors incurred pursuant to the Second Lien Credit Facility. |
| **Second Lien Credit Agreement** | means that certain Second Lien Credit Agreement, dated as of July 10, 2007 (as amended, restated, supplemented or otherwise modified), among Bicent Power, as borrower, Bicent Funding and the subsidiary guarantors named therein, as guarantors, the Second Lien Credit Facility Lenders and the Second Lien Agent. |
| **Second Lien Credit Facility** | means the Second Lien Credit Agreement, all related guarantee, security, and collateral agreements and documents, and all exhibits and other ancillary documentation in respect thereof, and any other "Second Lien Loan Documents" (as defined in the |

Second Lien Credit Agreement).

| | |
|---|---|
| **Second Lien Credit Facility Claims** | means all Claims arising under or relating to the Second Lien Credit Facility, which shall be Allowed in full and shall not be subject to avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity. |
| **Second Lien Credit Facility Lenders** | means the lender-parties under the Second Lien Credit Facility. |
| **Second Lien Secured Parties** | has the meaning assigned to such term in the Intercreditor Agreement. |
| **Security** | means any Security, as such term is defined in section 101(49) of the Bankruptcy Code. |
| **Subordinated Claims** | means any Claim that is determined to be subordinated to other Claims pursuant to section 510(c) of the Bankruptcy Code. |
| **Subordinated Securities Claims** | means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a Security of any of the Debtors, or for damages arising from the purchase of sale of such a Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.  For the avoidance of doubt, the Second Lien Credit Facility Claims are not Subordinated Securities Claims. |
| **Subsidiaries** | means San Joaquin Cogen, L.L.C., Rocky Mountain Power, LLC, Colorado Energy Management, LLC, CEM Energy Services, Inc., Colorado Cogen Operators, LLC, Hartwell, LLC, Hartwell Power Company, Hartwell Independent Power Partners, LLC, and Hart County IPP, LLC. |
| **Swap Agreements** | means the Barclays Swap Agreements and the Goldman Swap Agreement. |
| **Swap Counterparties** | means Barclays Bank, PLC and Goldman Sachs Bank U.S.A. |
| **Swap Counterparties Fee Claims** | means the fees and expenses of the Swap Counterparties and their respective advisors as provided for in their Swap Agreements, which shall be Allowed in full and shall not be subject to any avoidance, |

22

|  | reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity. |
|---|---|
| ***Termination Payments*** | means the Barclays Termination Payment and Goldman Termination Payment. |
| ***Tort Claims*** | means any pre-petition Claim or portion thereof relating to personal injury, wrongful death or any similar litigation Claim asserted against any of the Debtors. |
| ***Unimpaired*** | means a Claim or Interest that is not Impaired. |
| ***Voting Deadline*** | means the date specified in the Disclosure Statement, the order approving the Disclosure Statement, the Ballots, or related solicitation documents approved by the Court as the last date for holders of impaired Claims entitled to vote to submit their Ballots with respect to this Plan, as such date has been, and may be further, extended; <u>provided</u> that the Confirmation Date shall occur no later than one hundred and five (105) days from the Petition Date. |
| ***Workers' Compensation Claim*** | means a Claim held by a current or former employee of the Debtors for workers' compensation insurance coverage under the workers' compensation laws applicable in the particular state in which the employee is or was employed by the Debtors. |

## B.    Interpretation, Application of Definitions and Rules of Construction.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, such meanings to be applicable to both the singular and plural forms of the terms defined. Capitalized terms in the Plan that are not defined herein shall have the same meanings assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be. The words "herein," "hereof," and "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section or subsection in the Plan unless expressly provided otherwise. The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included. Captions and headings to articles, sections and exhibits are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan. Any reference in this Plan to (i) a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form

23

or substantially on such terms and conditions, and/or (ii) an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented (in accordance with Article X.B, as applicable); <u>provided</u> that the Plan and such documents referred to in (i) and/or (ii) shall be in form and substance satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party.  The rules of construction set forth in section 102 of the Bankruptcy Code (except for section 102(5)) shall apply to this Plan.  In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### C.     Appendices and Plan Supplement Documents.

All Plan Supplement Documents and appendices to the Plan are incorporated into this Plan by reference and are a part of this Plan as if set forth in full herein.  The documents contained in the exhibits and the Plan Supplement shall be approved by the Court pursuant to the Confirmation Order.  Holders of Claims and Equity Interests may inspect a copy of the Plan Supplement Documents, once filed, in the Office of the Clerk of the Court during normal business hours, or at http://dm.epiq11.com/BHL, or obtain a copy of the Plan Supplement Documents by sending a written request to the following address: (i) for regular mail:  Bicent Holdings Ballot Processing, Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 5014, New York, NY 10150-5014 or (ii) for overnight mail/federal express: Bicent Holdings Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017.

## II.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

### A.     Introduction.

All Claims and Equity Interests, except Administrative Claims, Priority Tax Claims, DIP Financing Claims and Fee Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, DIP Financing Claims, DIP Fee Claims, Fee Claims, and claims related to the Backstop Fee as described below, have not been classified.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in another Class(es) to the extent that any portion of the Claim or Equity Interest falls within the description of such other Class(es).  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

1.     **Unclassified Claims (not entitled to vote on the Plan).**

(a)     <u>Administrative Claims</u>.

24

(b)    <u>Fee Claims.</u>

(c)    <u>Priority Tax Claims</u>.

(d)    <u>DIP Financing Claims.</u>

2.    **Unimpaired Classes of Claims (deemed to have accepted the <u>Plan and, therefore, not entitled to vote on the Plan).</u>**

(a)    <u>Class 1</u>:  Other Priority Claims.

Class 1 consists of all Other Priority Claims.

(b)    <u>Class 2</u>:  Other Secured Claims.

Class 2 consists of all Other Secured Claims.

3.    **<u>Impaired Classes of Claims (entitled to vote on the Plan).</u>**

(a)    <u>Class 3</u>:  First Lien Credit Facility Claims

Class 3 consists of all First Lien Credit Facility Claims.

(b)    <u>Class 4</u>:  Second Lien Credit Facility Claims.

Class 4 consists of all Second Lien Credit Facility Claims.

4.    **<u>Impaired Classes of Claims (not entitled to vote on the Plan).</u>**

(a)    <u>Class 5</u>:  Mezzanine Credit Facility Claims

Class 5 consists of all Mezzanine Credit Facility Claims.

(b)    <u>Class 6</u>:  General Unsecured Claims.

Class 6 consists of all General Unsecured Claims.

(c)    <u>Class 7</u>:  Intercompany Claims

Class 7 consists of all Intercompany Claims.

(d)    <u>Class 10</u>: Subordinated Claims

Class 10 consists of all Subordinated Claims.

(e)    <u>Class 11</u>: Subordinated Securities Claims

Class 11 consists of all Subordinated Securities Claims.

5.    **Impaired Class of Interests (not entitled to vote on the Plan).**

(a)    Class 8:  Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power.

Class 8 consists of all Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power.

6.    **Unimpaired Class of Interests (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).**

(a)    Class 9:  Equity Interests in Subsidiaries.

Class 9 consists of all Equity Interests in the Subsidiaries.

**III.**

**TREATMENT OF ADMINISTRATIVE
CLAIMS AND PRIORITY TAX CLAIMS**

A.    **Administrative Claims.**

Each holder of an Allowed Administrative Claim shall receive from the Debtors (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of the Effective Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors and such holder shall have agreed upon in writing; provided, however, that Allowed Ordinary Course Administrative Claims that are not due to be paid on the Effective Date shall be paid in full in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided, further, that First Lien Agent Fee Claims, DIP Fee Claims and Swap Counterparties Fee Claims, to the extent outstanding, shall be paid in full in Cash on the Effective Date, without any requirement for the filing of fee applications with the Court, provided, further, that if, and only if, the Class of Second Lien Credit Facility Claims votes to accept the Plan, the Reorganized Debtors shall pay the Second Lien Agent Fee Claims in full in Cash on the Effective Date, and without any requirement for the filing of a fee application with the Court.

B.    **Bar Dates for Administrative Claims.**

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing applications for allowance of Administrative Claims (except for (i) Fee Claims, (ii) Ordinary Course Administrative Claims, (iii) the post-petition claims of the First Lien Agent under the First Lien Credit Facility, (iv) the post-petition claims of the DIP Agent and the DIP Lenders under the DIP Credit Facility, (v) the fees and expenses of the professionals of the First

26

Lien Agent under the First Lien Credit Facility and the DIP Agent under the DIP Credit Facility, (vi) the Swap Counterparties Fee Claims, and (vii) DIP Financing Claims), which date will be the first business day that is thirty (30) days after the Confirmation Date (the "Administrative Claims Bar Date").  Holders of Administrative Claims, except for those identified in (i)-(vii) in the prior sentence not paid prior to the Confirmation Date shall submit written requests for payment on or before the Administrative Claims Bar Date or forever be barred from doing so and collecting payment on such Claims.  The notice of confirmation of the Plan to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute good and sufficient notice of the Administrative Claims Bar Date.  The Reorganized Debtors shall have 120 days (or such longer period as may be allowed by order of the Court, which may be entered without notice or a hearing) following the Administrative Claims Bar Date to review and object to all Administrative Claims.  **Failure of a holder of an Administrative Claim(s) to timely and properly file and serve a written notice or request for payment on or before the Administrative Claims Bar Date shall result in such holder's Administrative Claim(s) being forever barred and discharged.**

> **C.    Fee Claims.**

All requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed with the Court and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, counsel to any Creditors' Committee, counsel to the First Lien Agent and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than forty-five (45) days after the Effective Date.  Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date.  Objections to any Fee Claims must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, and the requesting party no later than seventy-five (75) days after the Effective Date.  For the avoidance of doubt, this Article III.C of the Plan shall not apply to the DIP Fee Claims, the First Lien Agent Fee Claims, Second Lien Agent Fee Claims or the Swap Counterparties Fee Claims.

> **D.    Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors (subject to the consent of the Requisite First Lien Consenting Lenders) or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, but no later than thirty (30) days after the Effective Date, or (b) through equal annual installment payments in cash (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; (ii) over a period ending not later than five (5) years after the Petition Date; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan.

27

1.      **Priority Claims Bar Date**

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing applications for allowance of Priority Tax Claims or any Other Priority Claims, which date will be the first business day that is thirty (30) days after the Confirmation Date (the "Priority Claims Bar Date"), unless such date is less than 180 days after the Petition Date, in which case, the Priority Claims Bar Date will be 180 days from the Petition Date solely with respect to Priority Tax Claims. Holders of Priority Tax Claims or any Other Priority Claims shall submit written requests for payment on or before the Priority Claims Bar Date or forever be barred from doing so and collecting payment on such Claims. The notice of confirmation of the Plan to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Priority Claims Bar Date and constitute good and sufficient notice of the Priority Claims Bar Date. The Reorganized Debtors shall have 120 days (or such longer period as may be allowed by order of the Court, which may be entered without notice or a hearing) following the Priority Claims Bar Date to review and object to all Priority Tax and Other Priority Claims. **Failure of a holder of a Priority Tax Claim(s) or Other Priority Claim(s) to timely and properly file and serve a written notice or request for payment on or before the Priority Claims Bar Date shall result in such holder's Priority Claim(s) being forever barred and discharged.**

E.      **DIP Financing Claims; DIP Fee Claims; Backstop Fee.**

On or before the Effective Date, (a) holders of DIP Financing Claims shall receive payment in full in Cash of all DIP Financing Claims or shall have such DIP Financing Claims refinanced or converted in accordance with the terms of the DIP Credit Facility and the Exit Facility and (b) holders of DIP Fee Claims shall receive payment in full in Cash of all DIP Fee Claims, except to the extent that the holders of DIP Financing Claims or DIP Fee Claims agree to a different treatment. Notwithstanding anything to the contrary contained herein, the liens and security interests securing the DIP Financing Claims shall continue in full force and effect until the DIP Financing Claims have been paid in full in Cash or refinanced as part of (or converted into) the Exit Facility, unless the holders of the DIP Financing Claims agree to a different treatment; provided further that, notwithstanding anything to the contrary herein, the DIP Financing Claims and DIP Fee Claims shall not be waived, discharged, or released unless and until such claims are paid in full in Cash, or, solely with respect to the DIP Financing Claims, unless and until the DIP Financing Claims are refinanced or converted in accordance with the terms of the DIP Credit Facility and the Exit Facility.

Any and all indemnification obligations that are provided in connection with the DIP Credit Facility shall continue and be in effect with the same force and to the same extent in connection with the execution and entry into the Exit Facility.

On the Effective Date, each Backstop Lender shall receive its *pro rata* share of the Backstop Fee (based upon each Backstop Lender's backstop commitments under the DIP Credit Facility); provided that each Backstop Lender, as a condition precedent to receiving its respective share of distribution of New Bicent Common Interests, shall be required to execute the New Bicent LLC Agreement and deliver to New Bicent Power a counterpart signature page to the New Bicent LLC Agreement; provided further that the issuance of the New Bicent Common

28

Interests in accordance with this paragraph shall be subject to dilution on account of the exercise of the New Warrants.

## IV.

## TREATMENT OF CLAIMS AND
## EQUITY INTERESTS

**A.**    **Class 1 — Other Priority Claims.**

1.    **Distributions.**

Except to the extent that a holder of an Allowed Other Priority Claim shall have agreed in writing to a different treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim in Class 1 shall receive payment in an amount equal to such Allowed Other Priority Claim in full in Cash as soon as practicable after the later of the Effective Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim.

2.    **Impairment and Voting.**

Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims in Class 1 are presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

**B.**    **Class 2— Other Secured Claims.**

1.    **Distributions.**

Except to the extent that a holder of an Allowed Other Secured Claim shall have agreed in writing to a different treatment, at the option of the Debtors, subject to the consent of the Requisite First Lien Consenting Lenders, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of (a) thirty (30) days after Effective Date, and (b) the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable (but no later than thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim) or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim as soon as is practicable, on the later of (y) thirty (30) days after Effective Date and (z) the date such Other Secured Claim becomes an Allowed Other Secured Claim.

29

Notwithstanding the foregoing, to the extent an Allowed Other Secured Claim arises on account of property taxes, such Allowed Other Secured Claim shall be treated as a Priority Tax Claim, and any applicable liens shall remain unimpaired until such Allowed Other Secured Claim is paid in full.  Any applicable interest shall be calculated in a manner consistent with section 511 of the Bankruptcy Code.

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving Distributions under the Plan.

2. **Impairment and Voting.**

Class 2 is unimpaired under the Plan.  Holder of Other Secured Claims in Class 2 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

C. **Class 3 — First Lien Credit Facility Claims.**

1. **Allowance.**

The First Lien Credit Facility Claims shall be deemed Allowed Claims, in an aggregate amount equal to (a) approximately $147.2 million plus all accrued and unpaid pre-petition interest and, to the extent allowed under applicable law, post-petition interest, calculated in accordance with the First Lien Credit Facility (i) at the non-default rate until February 24, 2012 and (ii) at the default rate from February 24, 2012 through the Effective Date, plus (b) First Lien Agent Fee Claims and Swap Counterparties Fee Claims, plus (c) the Goldman Termination Payment, plus (d) the Barclays Termination Payment, if any, and shall not be subject to any avoidance, reductions, setoffs, offsets, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objections or any challenges under any applicable law or regulation by any Person.

2. **Distributions.**

Except to the extent that a holder of a First Lien Credit Facility Claim shall have agreed in writing to a different treatment:

(i) each holder of an Allowed First Lien Credit Facility Claim in Class 3 shall receive, in full and final satisfaction of such Claim, on the Effective Date, its *Pro Rata* share (based upon the principal amount of First Lien Credit Facility Claims held by each holder) of (a) 95% of the New Bicent Common Interests to be issued on the Effective Date; provided, that each holder of an Allowed First Lien Credit Facility Claim in Class 3, as a condition precedent to receiving its respective share of such distribution of New Bicent Common Interests, shall be required to execute the New Bicent LLC Agreement and deliver to New Bicent Power a counterpart signature page to the New Bicent LLC Agreement; provided further that the issuance of the New Bicent Common Interests in accordance with this paragraph shall be subject to dilution on account of the exercise of the New Warrants and profits interests issued pursuant to

30

the Management Agreement, and (b) distributions of Brush Sale Proceeds, if any, as provided for in Article VII.A hereof; and

(ii) all outstanding First Lien Agent Fee Claims and Swap Counterparties Fee Claims shall be paid in Cash, in full, to the First Lien Agent and Swap Counterparties, respectively, on or before the Effective Date.

Notwithstanding anything to the contrary herein and notwithstanding the satisfaction, release, termination and extinguishment of the Claims and Liens of the First Lien Secured Parties against the Debtors pursuant to this Plan, nothing in this Plan or the Confirmation Order shall release, terminate, extinguish, prejudice or in any way affect the Liens, guaranties, and claims of the First Lien Secured Parties securing any rights, claims, interests and obligations against, in or with respect to any non-debtor affiliates or subsidiaries of the Debtors, and such Liens, guaranties and claims shall remain intact and enforceable in accordance with applicable non-bankruptcy law as if the Liens, guaranties and claims against the Debtors had not been extinguished or cancelled in the first instance.

3.    **Impairment and Voting.**

Class 3 is Impaired under the Plan.  The holders of First Lien Credit Facility Claims in Class 3 are entitled to vote to accept or reject the Plan.

D.    **Class 4 — Second Lien Credit Facility Claims.**

1.    **Allowance**

The Second Lien Credit Facility Claims shall be deemed Allowed Claims, in an aggregate amount equal to approximately $128.5 million plus all accrued and unpaid pre-petition interest calculated in accordance with the Second Lien Credit Facility (i) at the non-default rate until April 6, 2012 and (ii) at the default rate from April 6, 2012 through the Petition Date, and shall not be subject to any avoidance, reductions, setoffs, offsets, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objections or any challenges under any applicable law or regulation by any Person.

2.    **Distributions.**

Except to the extent that a holder of a Second Lien Credit Facility Claim shall have agreed in writing to a different treatment, on or as soon as reasonably practicable after the Effective Date:  (i) each holder of an Allowed Second Lien Credit Facility Claim in Class 4 shall receive, in full and final satisfaction of such Claim, its *Pro Rata* share (based upon the principal amount of Second Lien Credit Facility Claims held by each holder) of (a) Cash in an amount equal to $1,500,000 in the aggregate, and (b) New Warrants; and (ii) all outstanding Second Lien Agent Fee Claims shall be paid in Cash in full; provided that to receive the foregoing distributions in (i) and (ii), (1) the Class of Second Lien Credit Facility Claims must vote to accept the Plan and (2) each such holder, as a condition precedent to receiving its respective share of such distribution of New Warrants, shall execute and deliver to New Bicent Power a

31

counterpart signature page to each of the New Warrant Documents that provides for a signature by the holders of New Warrants; provided further that the issuance of the New Warrants in accordance with this paragraph shall be subject to dilution on account of profits interests issued pursuant to the Management Agreement.  The New Warrant Documents shall be binding on all parties receiving, and all holders of, New Warrants, including all transferees of New Warrants, regardless of whether such parties execute the New Warrant Documents.  If the Class of Second Lien Credit Facility Claims does not vote to accept the Plan, holders of Allowed Second Lien Credit Facility Claims shall neither receive distributions nor retain any property under the Plan on account of such Allowed Second Lien Credit Facility Claims.

### 3. **Impairment and Voting.**

Class 4 is Impaired under the Plan.  Each holder of an Allowed Second Lien Credit Facility Claim in Class 4 is entitled to vote to accept or reject the Plan.

### E. **Class 5— Mezzanine Credit Facility Claims.**

#### 1. **Distributions.**

The holders of Mezzanine Credit Facility Claims shall neither receive distributions nor retain any property under the Plan on account of such Mezzanine Credit Facility Claims.

#### 2. **Impairment and Voting.**

Class 5 is Impaired under the Plan.  Holders of Allowed Mezzanine Credit Facility Claims in Class 5 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

### F. **Class 6 — General Unsecured Claims.**

#### 1. **Distributions.**

The holders of General Unsecured Claims shall neither receive distributions nor retain any property under the Plan on account of such General Unsecured Claims; provided, however, that holders of Insured Claims may be entitled to recovery solely in accordance with Article VII.E hereof.

#### 2. **Impairment and Voting.**

Class 6 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims in Class 6 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

G. **Class 7 – Intercompany Claims.**

    1. **Distribution.**

At the option of the Debtors, with the consent of the Requisite First Lien Consenting Lenders, or the Reorganized Debtors, as applicable, each Intercompany Claim shall be, either (i) Reinstated, in full or in part, and treated in the ordinary course of business, or (ii) eliminated in full or in part by offset, distribution, cancellation, assumption or contribution of such Intercompany Claim or otherwise; provided, however, that any election by the Debtors, with the consent of the Requisite First Lien Consenting Lenders, or the Reorganized Debtors hereunder shall not impact any recoveries under this Plan; provided, further, that if Intercompany Claims are Reinstated they shall be subordinated in right of payment to all other Claims. The holders of Intercompany Claims shall not receive or retain any property on account of such Intercompany Claims to the extent such claim is cancelled and discharged as provided herein.

    2. **Impairment and Voting.**

Class 7 is Impaired under the Plan. The holders of Intercompany Claims in Class 7 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

H. **Class 8 – Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power.**

    1. **Distributions.**

The holders of Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power shall neither receive distributions nor retain any property under the Plan on account of such Equity Interests. On the Effective Date, the Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power shall be cancelled.

    2. **Impairment and Voting.**

Class 8 is Impaired under the Plan. The holders of Equity Interests in Class 8 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

I. **Class 9 – Equity Interests in Subsidiaries**

    1. **Distributions.**

The holders of Equity Interests in the Subsidiaries shall have such Equity Interests Reinstated on the Effective Date.

    2. **Impairment and Voting.**

Class 9 is Unimpaired under the Plan. The holders of Allowed Equity Interests in the Subsidiaries in Class 9 are presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

F.      **Class 10 – Subordinated Securities Claims**

1.      **Distributions.**

The holders of Subordinated Securities Claims shall neither received distributions nor retain any property under the Plan on account of such Subordinated Securities Claims.

2.      **Impairment and Voting.**

Class 10 is Impaired under the Plan.  Holders of Subordinated Securities Claims in Class 10 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

G.      **Class 11 – Subordinated Claims**

1.      **Distributions.**

The holders of Subordinated Claims shall neither received distributions nor retain any property under the Plan on account of such Subordinated Claims.

2.      **Impairment and Voting.**

Class 11 is Impaired under the Plan.  Holders of Subordinated Claims in Class 10 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

**V.**

**PROVISIONS REGARDING MEANS OF IMPLEMENTATION AND CORPORATE GOVERNANCE OF THE REORGANIZED DEBTORS**

A.      **Restructuring and Other Transactions.**

1.      **Restructuring Transactions.**

(a)      Without limiting any rights and remedies of the Debtors, Reorganized Debtors, the DIP Agent, the DIP Lenders, the First Lien Agent, or the First Lien Secured Parties under this Plan or applicable law, (i) prior to the Effective Date, the Debtors (with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party), and (ii) on or after the Effective Date, the Reorganized Debtors, may enter into such transactions and may take such actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or to otherwise simplify the overall corporate structure of the Debtors.  Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations or dissolutions, as may be determined by the Debtors, prior to the Effective Date (with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party), or Reorganized Debtors, on or after the Effective Date, to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities,

34

duties and obligations of certain of the Debtors or Reorganized Debtors vesting in one or more surviving, resulting, or acquiring corporations (collectively, the "Restructuring Transactions"); provided such Restructuring Transactions comply with the terms of (including applicable lender or shareholder consent requirements), and are not prohibited by, the Plan or the Restructuring Support Agreement.

(b)     The actions to effect the Restructuring Transactions may include (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of this Plan and the Restructuring Support Agreement and that satisfy the applicable requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of this Plan and the Restructuring Support Agreement and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions; provided that, the actions and documents referred to in (i) through (iv) shall be subject through the Effective Date to the consent of and shall be in form and substance satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, the applicable affected party.  In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to the Debtors or Reorganized Debtors, such surviving, resulting or acquiring corporation will perform the obligations of the Debtors or Reorganized Debtors pursuant to this Plan to pay or otherwise satisfy the Allowed Claims to the extent not already paid or satisfied.

(c)     The Restructuring Transactions shall include, without limitation, the following actions on the Effective Date:

(i)     100% of the equity interests in New Rocky Mountain shall be deemed automatically transferred to New Bicent Power, the result of which shall cause New Rocky Mountain to be directly owned by New Bicent Power.

(ii)     Simultaneously, (1) in accordance with Article IV.H, all of the Equity Interests in Bicent Holdings, Bicent R.F. LLC, Bicent Funding and Bicent Power shall be cancelled, and (2) the New Bicent Common Interests shall be issued to the First Lien Agent on behalf of the holders of Allowed First Lien Credit Facility Claims, in accordance with Article IV.C of the Plan.

(iii)     The First Lien Agent shall then distribute 100% of the New Bicent Common Interests (subject to dilution by the exercise of the New Warrants and profits interests issued pursuant to the Management Agreement) to the holders of Allowed First Lien Credit Facility Claims and the Backstop Lenders, in accordance with Articles IV.C.2 and III.E. of the Plan.  The Second Lien Agent shall, as applicable, issue to the holders of Allowed Second Lien Credit Facility Claims to the extent Class 4 has voted to accept the Plan their *pro rata* share of New Warrants in accordance with Article IV.D of the Plan.

35

(iv)     The Hartwell Debtors shall be dissolved without the need to file a certificate of dissolution or take any other action with respect to or receive any approval or any governmental authority that would ordinarily be required under applicable law to dissolve or implement the termination of the legal existence of the Hartwell Debtors.  As part of the dissolution and winding-up of the Hartwell Debtors, all assets of the Hartwell Debtors shall be deemed automatically transferred to New Bicent Power without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person.

## 2.     **Tax Reporting.**

(a)     All parties (including the Reorganized Debtors, the holders of Preconfirmation Equity Interests and the holders of New Bicent Common Interests and New Warrants) shall report for all U.S. federal income tax purposes the Restructuring Transactions as a sale of the assets of Bicent Power to the holders of First Lien Credit Facility Claims and Second Lien Credit Facility Claims (to the extent Class 4 votes to accept the Plan and the holders of Allowed Second Lien Credit Facility Claims receive New Warrants), followed by a contribution of those assets to New Bicent Power (a new partnership for U.S. federal income tax purposes) in exchange for the consideration described in Articles IV.C. and D in a transaction intended to be governed by Section 721 of the United States Internal Revenue Code of 1986, as amended.

(b)     As soon as possible after the Effective Date, but in no event later than thirty (30) days thereafter, the New Board shall determine the value of the assets of New Bicent Power and its subsidiaries that were deemed sold pursuant to 2(a) above, and the portions of such value which are allocable, respectively, to the New Bicent Common Interests and New Warrants. Such allocation shall take into account the relative fair market values of the New Bicent Common Interests and New Warrants. The New Board shall apprise, in writing, all parties to the New Bicent LLC Agreement and the holders of Preconfirmation Equity Interests of such valuation and allocation. The valuation and allocation shall be used consistently by all parties to the New Bicent LLC Agreement (including the Reorganized Debtors and the holders of New Bicent Common Interests and New Warrants) and the holders of Preconfirmation Equity Interests for all U.S. federal income tax purposes.

(c)     Consistent with the intent that New Bicent Power shall initially be treated as a partnership for federal income tax purposes, no election shall be made by New Bicent Power (or any direct or indirect subsidiaries) to be taxed as a corporation for federal income tax purposes that is effective on or prior to the Effective Date. All parties (including the Reorganized Debtors and the holders of New Bicent Common Interests and New Warrants, if any) shall not treat the holders of New Warrants, if any, as owning partnership interests in New Bicent Power for federal income tax purposes by reason of their ownership of any such New Warrants, unless the New Board determines otherwise.

(d)     The parties (including the Debtors and Reorganized Debtors, the holders of Preconfirmation Equity Interests, and the holders of New Bicent Common Interests and New Warrants shall treat the Brush Sale and Indemnification Claims Sale

36

as sales of assets for U.S. federal income tax purposes to the purchasers in exchange for Cash (and assumed liabilities, if any).

### 3. **Asset Sales.**

The Debtors are authorized to sell (and/or direct one or more of their affiliates or subsidiaries to sell) the Brush Assets, as applicable, (i) pursuant to section 363 of the Bankruptcy Code, (ii) pursuant to the Plan or (iii) pursuant to the rights and remedies exercised by the First Lien Agent as directed by Required First Lien Lenders pursuant to the First Lien Credit Facility, Intercreditor Agreement, and any related documentation; provided, however, that any Brush Sale shall only be authorized, pursued and consummated with the consent of, and on the terms and documentation satisfactory to, the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of, and on the terms and documentation approved by, the applicable affected party.  Brush Sale Proceeds shall be distributed as provided for pursuant to Article VII.A of the Plan.

The Debtors are authorized to sell and assign the Indemnification Claims to a third party; provided that such sale and assignment shall only be authorized, pursued and consummated with the consent of, and on the terms and documentation satisfactory to, the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of, and on the terms and documentation approved by, the applicable affected party.  Indemnification Proceeds shall be distributed as provided for pursuant to Article VII.A of the Plan.

### 4. **Incurrence of New Indebtedness.**

The Reorganized Debtors' entry into the Exit Facility, the incurrence of the indebtedness thereunder on the Effective Date, and the payment of any associated fees and expenses, are hereby authorized without the need for any further corporate action, any further action by holders of Claims or Interests, or any further court, corporate, board, member, partner, Equity Interest holder or other approval, authority or action.

### B. **Appointment of Officers and Directors.**

The initial board of directors of New Bicent Power shall be a six-member board of which (a) five (5) voting members shall be designated by the Requisite Consenting First Lien Lenders as part of the Plan Supplement, and (b) one (1) non-voting member shall be Paul Prager who shall serve as the CEO of the Reorganized Debtors.

### C. **Powers of Officers.**

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

**D.      Management of Reorganized Debtors.**

The Reorganized Debtors shall be managed by Beowulf in accordance with the terms of the Management Agreement.

**E.      Indemnification of Directors, Officers and Employees.**

Upon the Effective Date, the charter, by-laws, operating agreements and other organizational documents of each Reorganized Debtor that is a corporation, and the limited liability company agreement of each Reorganized Debtor that is a limited liability company, shall contain provisions which (i) eliminate the personal liability of the Debtors' and the Reorganized Debtors' then-present and future directors and officers for post-Effective Date monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify the Reorganized Debtors' directors and officers, serving on or after the Effective Date for all post-Effective Date claims and actions to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized, provided, that with respect to each Reorganized Debtor that is a limited liability company, "to the fullest extent permitted by applicable law" shall mean (a) for purposes of clause (i), the fullest extent that would be permitted if such Reorganized Debtor was a corporation and (b) for purposes of clause (ii), the fullest extent to which such Reorganized Debtor, if it was a corporation, could indemnify its directors and officers under the applicable state corporations statute (including Section 145 of the Delaware General Corporation Law for any Reorganized Debtor that is a Delaware limited liability company) and related case law.

**F.      Corporate Action.**

Except as set forth herein, any action under the Plan to be taken by or required of the Debtors or the Reorganized Debtors, including the adoption or amendment of certificates of incorporation, by-laws, operating agreements and other organizational documents, the issuance of securities, membership interests, partnership interests and instruments or the selection of officers or directors, execution of definitive documentation for the Exit Facility, and/or payment of all fees and expenses authorized pursuant to the Plan, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or Reorganized Debtors' boards of directors or managers, as applicable, security holders or holders of membership or partnership interests.

The Debtors (with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party) or the Reorganized Debtors, as applicable, shall be authorized to execute, deliver, file, and record such documents (including the Plan Supplement Documents), contracts, instruments, releases and other agreements and take such other actions as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further court, corporate, board, shareholder, member, manager or partner approval or action.  In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any

requirement of further action by the board of directors, board of managers, or membership or partnership interest holders of the applicable Reorganized Debtor.  The certificates, instruments and other documents referred to in this Article V.G shall be part of the Plan Supplement and in form and substance satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party.

The appropriate officers of the Debtors (with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party) and/or the Reorganized Debtors and members of their respective boards of directors are authorized to issue, execute and deliver, and consummate the transactions, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtors and/or the Reorganized Debtors, in each case without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person.

## VI.

## SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

Solely in connection with Distributions to be made to the holders of Allowed Claims, the Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Court provide in the Confirmation Order for the substantive consolidation of the Estates of the Debtors into a single Estate for purposes of this Plan and the Distributions hereunder.  To the extent a Claim (including any Disputed Claim) becomes an Allowed Claim, such Claim shall be satisfied solely in accordance with the provisions of the Plan.

Pursuant to the Confirmation Order, except as expressly provided herein, (i) all assets and liabilities of the substantively consolidated Debtors will be deemed to be merged solely for purposes of this Plan and Distributions to be made hereunder, (ii) the obligations of each Debtor will be deemed to be the obligation of the substantively consolidated Debtors solely for purposes of this Plan and Distributions hereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the substantively consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor hereunder will be deemed to be made by the substantively consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the substantively consolidated Debtors.  Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim.  Notwithstanding the foregoing, such substantive consolidation shall not affect (a) the legal and corporate structure of

39

the Reorganized Debtors or (b) guarantees that are required to be maintained post-Effective Date (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed, (ii) pursuant to the express terms of the Plan, or (iii) in connection with the Exit Facility.  The substantive consolidation proposed herein shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6).  Such obligations shall continue until an order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.  The substantive consolidation effected pursuant to this section shall not affect, without limitation, (i) defenses to any Cause of Action or requirements for any third party to establish mutuality in order to assert a right to setoff, or (ii) distributions out of any insurance policies or proceeds of such policies.

Unless the Court has approved the substantive consolidation of the Estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Estates as set forth in this Plan.  If no objection to substantive consolidation under this Plan is timely filed and served, then the holders of Claims will be deemed to have consented to substantive consolidation for the purpose of this Plan only and the Court may approve substantive consolidation of the Debtors' Estates in the Confirmation Order.  If an objection(s) to the substantive consolidation provided for in this Plan is timely filed and served, a hearing with respect to the substantive consolidation of the Estates and the objection(s) thereto shall be scheduled by the Court, which hearing may coincide with the Confirmation Hearing.

Furthermore, the Debtors reserve the right to seek (subject to the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party) confirmation of the Plan without implementing substantive consolidation (including, without limitation, in the event the Court determines that substantive consolidation of the Debtors as provided for above is not appropriate), and to request that the Court approve the treatment of and distribution to the different Classes under the Plan on a Debtor-by-Debtor basis.  In the event the Debtors seek confirmation of the Plan without implementing substantive consolidation of the Debtors as provided for above, any vote in favor of the Plan on a substantively consolidated basis, shall be deemed a vote in favor of the Plan of each of the applicable Debtors on an individual Debtor basis.

## VII.

### PROVISIONS REGARDING VOTING, DISTRIBUTIONS, AND TREATMENT OF DISPUTED CLAIMS

### A.    **Brush Sale Proceeds; Indemnification Proceeds.**

The holders of First Lien Credit Facility Claims shall receive their *Pro Rata* share of all Brush Sale Proceeds from any Brush Sale that occurs prior to or after the Effective Date (based upon the principal amount of First Lien Credit Facility Claims held by each holder on the Record Date); provided that, for the avoidance of doubt, the payment of Brush Sale Proceeds to the holders of First Lien Credit Facility Claims shall be in addition to, and shall not prejudice, the

rights, claims, interests, treatment and distributions provided to the holders of First Lien Credit Facility Claims under the Plan; provided further that the holders of First Lien Credit Facility Claims shall not receive more than 100% of their Allowed First Lien Credit Facility Claims set forth in Article IV.C.1 hereof.

Any Indemnification Proceeds received by the Debtors or the Reorganized Debtors shall be retained by the Debtors or Reorganized Debtors, as applicable.  Upon the entry of any final judgment, order, settlement, payment or otherwise, or the consummation by the Debtors or the Reorganized Debtors, as the case may be, of any Indemnification Claims Sale, and the receipt by the Debtors or the Reorganized Debtors of the proceeds from any of the foregoing, the Debtors or the Reorganized Debtors shall pay first Cooley LLP, pursuant to its engagement letter dated as of April 17, 2012, and then Beowulf, pursuant to the Management Agreement, the amounts owed to each under its respective agreements; provided that, pursuant to the Management Agreement, no amount shall be payable to Beowulf prior to the Effective Date. The Debtors' engagement letter with Cooley LLP shall be assumed on and as of the Effective Date in accordance with Article XI.A. below.

     **B.**     **Exit Facility.**

On the Effective Date, the Debtors shall have closed on the Exit Facility.  The amounts borrowed under the Exit Facility shall be used to (i) pay in full in Cash the DIP Financing Claims and the DIP Fee Claims, (ii) satisfy certain Plan-related expenses, (iii) pay all fees and expenses associated with the Exit Facility, and (iv) fund the Reorganized Debtors' on-going working capital needs.

     **C.**     **Voting of Claims.**

Each holder of an Allowed Claim in an Impaired Class of Claims entitled to vote on the Plan shall be entitled to vote to accept or reject the Plan as provided hereunder or in any order that may be entered by the Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Court.

     **D.**     **Distributions.**

     1.     **Allowed Claims.**

(a)     *Delivery of Distributions.*  Distributions under the Plan shall be made by the Reorganized Debtors or their designee to the holders of Allowed Claims in all Classes at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 by the Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address); except as provided in Article V(1)(a) with respect to distributions by the First Lien Agent on behalf of the First Lien Credit Facility Lenders.

01:12060541.1

(b)     *Distribution of Cash*.  Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made by wire transfer from a domestic bank selected by the Reorganized Debtors.

(c)     *Unclaimed Distributions of Cash*.  Any distribution of Cash under the Plan that is unclaimed after one year after it has been delivered (or attempted to be delivered) shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall become the property of the Reorganized Debtor that is the successor of the Debtor against which such Claim was Allowed notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

(d)     *Saturdays, Sundays, or Legal Holidays*.  If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

(e)     *Fractional New Bicent Common Interests.* Notwithstanding any other provision in the Plan to the contrary, no fractional interests of New Bicent Common Interests or New Warrants (if any) shall be issued or distributed pursuant to the Plan.  Whenever any payment of a fraction of a unit of New Bicent Common Interests or a fraction of a New Warrant would otherwise be required under the Plan, the actual distribution made shall reflect a rounding of such fraction to the nearest whole unit or warrant (up or down), as the case may be, with units or warrants less than half units or warrants being rounded down and fractions equal to half units or warrants or greater than half units or warrants being rounded up.  If two or more holders are entitled to equal fractional entitlements and the number of holders so entitled exceeds the number of whole units or warrants, as the case may be, which remain to be allocated, the Reorganized Debtors shall allocate the remaining whole units or warrants to such holders by random lot or such other impartial method as the Reorganized Debtors deem fair, in the Reorganized Debtors' sole discretion.  Upon the allocation of all of the whole New Bicent Common Interests and New Warrants (if any) authorized under the Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

(f)     *Distributions for Claims Allowed as of the Effective Date*. On the Effective Date, the Reorganized Debtors shall distribute Cash and New Bicent Common Interests, as applicable, to the holders of Claims in Class 3.

(g)     *Distributions for Claims Allowed as of the Initial Distribution Date*.  On the Initial Distribution Date, the Reorganized Debtors shall provide Distributions under the Plan as set forth herein, to the extent not already provided, and if Class 4 votes to accept the Plan, the Reorganized Debtors shall provide the distributions of New Warrants and Cash to the holders of Allowed Claims in Class 4 in accordance with Article IV.D.

(h)     *Distributions as of the Record Date.*  As of the close of business on the Record Date, the Claims register shall be closed, and there shall be no further

42

changes in the record holders of any Claims or Equity Interests.  The Debtors (with the consent of the First Lien Agent) and the Reorganized Debtors shall have no obligation to, but may in their sole and absolute discretion, recognize any transfer of any Claims occurring after the Record Date.  The Debtors and the Reorganized Debtors shall be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Record Date.

(i)     *Interest on Claims*.  Except as specifically provided for in the Plan or the Final DIP Order, no Claims (including Administrative Claims), Allowed or otherwise, shall be entitled, under any circumstances, to receive any interest on a Claim.

(j)     *Allocation Between Principal and Accrued Interest*.  The aggregate consideration paid to holders of Claims with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claim (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

2.    **Objections To And Resolution Of Claims.**

The Reorganized Debtors shall have the exclusive right to make and to file objections to, or otherwise contest the allowance of, Administrative Claims (other than Fee Claims) and Claims subsequent to the Confirmation Date.  Unless otherwise ordered by the Court, objections to, or other proceedings concerning the allowance of Administrative Claims and Claims (other than Tort Claims) shall be filed and served upon the holders of the Administrative Claims or Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable, but in no event later than the Claims Objection Deadline.  Objections to Fee Claims shall be filed and served within seventy-five (75) days of the Effective Date (or such longer period as may be allowed by order of the Court).

Objections to, or other proceedings contesting the allowance of, Administrative Claims and Claims may be litigated to judgment, settled or withdrawn, in the Reorganized Debtors' sole discretion.  The Reorganized Debtors may settle any such objections or proceedings without Court approval or may seek Court approval without notice to any Person.  Notwithstanding anything herein to the contrary, Tort Claims shall be liquidated, determined and satisfied in accordance with Article VII.E hereof.  While an objection and any related proceeding is pending against an Administrative Claim or Claim, no distributions on account of such claims shall be made until the Administrative Claim or Claim is Allowed.

Unless an order of the Court specifically provides for a later date, any party filing a proof of Claim after the bar date established by the Court with respect to an Administrative Claim, Priority Tax Claim or Other Priority Claim shall not be entitled to treatment as a creditor with respect to such Claim for the purposes of voting on and distribution under the Plan, unless and until the party filing such Claim either obtains the written consent of the Reorganized Debtors to file such Claim late or obtains an order of the Court upon written motion on notice to the Reorganized Debtors that permits the filing of the Claim.  If any proof of Claim with respect to an Administrative Claim, Priority Tax Claim or Other Priority Claim is permitted to be filed after the Claims Objection Deadline, the Reorganized Debtors shall have ninety (90) days from

43

the date of such order or agreement to object to such Claim, which deadline may be extended by the Court on motion of the Reorganized Debtors without a hearing or notice to Creditors.

For the avoidance of doubt, this Article VII.D.2 of the Plan shall not apply to the DIP Financing Claims, DIP Fee Claims, the Backstop Fee, First Lien Credit Facility Claims, First Lien Agent Fee Claims, Termination Payments, Swap Counterparties Fee Claims, Second Lien Agent Fee Claims, and/or Second Lien Credit Facility Claims, which claims shall be Allowed in full and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

### 3. **Distributions Following Allowance**.

Notwithstanding anything to the contrary set forth herein or in the Confirmation Order, each holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Initial Distribution Date shall receive the Distribution to which such holder of an Allowed Claim is entitled at such time that the Reorganized Debtors determine, in their discretion, to make subsequent Distributions to holders of other Allowed Claims following the Initial Distribution Date, provided that the Reorganized Debtors shall make such Distributions at least semi-annually.  Nothing set forth herein is intended to, nor shall it, prohibit the Debtors, in their discretion, from making a Distribution on account of any Disputed Claim at any time after such Disputed Claim becomes an Allowed Claim.  For the avoidance of doubt, distributions under the Plan shall not be made to the holder of any Disputed Claim unless and until such Claim is Allowed and only in the amount such Claim is Allowed.

### 4. **Setoff**.

The Debtors, with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party, or Reorganized Debtors may, but shall not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim in respect of which distribution shall be made), any claims of any nature whatsoever that the Debtors or Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim the Debtors or Reorganized Debtors may have against the holder of such Claim, provided, that in the event the Debtors or Reorganized Debtors seek to exercise such setoff rights against the holder of a Claim that is a debtor in a case under the Bankruptcy Code, the Debtors or Reorganized Debtors shall comply with the requirements of the Bankruptcy Code, including seeking relief from the automatic stay; provided, further, that nothing contained herein is intended to limit the ability of a Swap Counterparty or holder of a Claim to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 556, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment.

### E.    Insured Claims.

Any Insured Claims including employer liability claims and Tort Claims, but specifically excluding Workers' Compensation Claims, as to which the Debtors have insurance coverage for such claim shall be determined and liquidated in accordance with applicable non-bankruptcy law.  Recovery on account of any such Claims shall be limited to applicable insurance.

### F.    Estimation.

The Reorganized Debtors may at any time, request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim.  The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim.  If the Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan, or (c) a maximum limitation on such Claim, as determined by the Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors, or the Reorganized Debtors as the case may be, may elect to object to ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### G.    Nonconsensual Confirmation.

The Debtors, with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party, will seek to have the Court confirm the Plan under section 1129(b) of the Bankruptcy Code; provided, that the Debtors shall not seek nor be permitted to confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to Class 3.

### H.    New Bicent LLC Agreement.

On the Effective Date, New Bicent Power and all of the holders of New Bicent Common Interests then outstanding shall be deemed to be parties to an amended and restated limited liability company agreement of New Bicent Power (the "New Bicent LLC Agreement"), substantially in the form contained in the Plan Supplement, without the need for execution by any such holder other than New Bicent Power.  Holders of Allowed First Lien Credit Facility Claims shall not receive their respective distributions of New Bicent Common Interests pursuant to the Plan (including, as applicable, in their capacities as Backstop Lenders) unless and until each such holder executes the New Bicent LLC Agreement and delivers to New Bicent Power a counterpart signature page to the New Bicent LLC Agreement.

Holders of New Warrants shall not receive their respective New Bicent Common Interests pursuant to the exercise of any New Warrants unless and until each such holder of New Warrants executes and delivers to New Bicent Power documentation, in form and substance

45

satisfactory to New Bicent Power, and consistent with the Warrant Term Sheet, pursuant to which holder of New Warrants agrees to become a party to the New Bicent LLC Agreement and be bound by all of the terms and conditions of the New Bicent LLC Agreement, and executes the New Bicent LLC Agreement and delivers to New Bicent Power a counterpart signature page thereto.  The New Bicent LLC Agreement shall be binding on all parties receiving, and all holders of, New Bicent Common Interests (including New Bicent Common Interests issued pursuant to the exercise of New Warrants), including all transferees of New Bicent Common Interests, regardless of whether such parties execute the New Bicent LLC Agreement.  In the period pending distribution of the New Bicent Common Interests to any holder entitled pursuant to this Plan to receive New Bicent Common Interests, such holder shall be bound by and shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such holder's New Bicent Common Interests (including receiving any proceeds of permitted transfers of such New Bicent Common Interests) and to exercise all other rights in respect of the New Bicent Common Interests (so that such holder shall be deemed for tax purposes to be the owner of the New Bicent Common Interests).

     **I.**      **Liens.**

     (a)     Notwithstanding anything to the contrary contained herein, the substantive consolidation of the Debtors pursuant to Article VI of this Plan shall not affect the extent or validity of any Lien.

     (b)     Upon the treatment or other satisfaction of any secured Claims in accordance with the Plan, the Liens securing such secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; <u>provided</u> that, notwithstanding anything to the contrary herein and notwithstanding the satisfaction, release, termination and extinguishment of the Claims and Liens of the First Lien Secured Parties against the Debtors pursuant to this Plan, nothing in this Plan or the Confirmation Order shall release, terminate, extinguish, prejudice or in any way affect the Liens, guaranties, and claims of the First Lien Secured Parties securing any rights, claims, interests and obligations against, in or with respect to any non-debtor affiliates or subsidiaries of the Debtors, and such Liens, guaranties and claims shall remain intact and enforceable in accordance with applicable non-bankruptcy law as if the Liens, guaranties and claims against the Debtors had not been extinguished or cancelled in the first instance.

     **J.**      **Swap Agreements.**

     Each Swap Agreement is a "swap agreement," "forward contract," and "master netting agreement" as those terms are defined in sections 101(53B), 101(25), and 101(38A), respectively, of the Bankruptcy Code.  Each Swap Counterparty is a "swap participant," "financial participant," "forward contract merchant," and "master netting agreement participant" as those terms are defined in sections 101(53B), 101(22A), 101(26), and 101(38B), respectively, of the Bankruptcy Code.  Each Swap Agreement and Swap Counterparty is entitled to, and shall have, all the rights and protections afforded to "swap agreements," "forward contracts," "master netting agreements," "swap participants," "financial participants," "forward contract merchants," and "master netting agreement participants" under the Bankruptcy Code, including, without

limitation, under sections 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 546(e), 546(g), 546(j), 548(d)(2)(B), 548(d)(2)(D), 548(d)(2)(E), 553(a)(2)(B)(ii), 553(a)(3)(C), 553(b)(1), 556, 560, 561, and 562 of the Bankruptcy Code and any other "safe harbor" provisions under the Bankruptcy Code or other applicable law.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Swap Agreements, Goldman Termination Payment, Barclays Termination Payment, and any other obligations under or in connection with the Swap Agreements shall be enforceable by the Swap Counterparties pursuant to sections 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 556, 560, and 561 of the Bankruptcy Code, notwithstanding the automatic stay provided under section 362(a) of the Bankruptcy Code or any order of the Court.

 The Swap Agreements, Goldman Termination Payment, and Barclays Termination Payment shall not, in any manner, be subject to any challenge, dispute, subordination, avoidance, or objection, whether directly or indirectly, including with respect to their validity or enforceability, or that any claims or obligations thereunder are not entitled to the same treatment as the First Lien Credit Facility Claims.

 **K.** **Enforcement of Subordination.**

 The classification and manner of satisfying all Claims and Equity Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Notwithstanding the occurrence of the Effective Date, the Intercreditor Agreement shall be enforceable among the parties thereto in determining the relative priorities and rights of the First Lien Secured Parties and the Second Lien Secured Parties, such priorities and rights shall continue to be governed by the Intercreditor Agreement, the First Lien Credit Facility and the Second Lien Credit Facility, including with respect to the non-Debtors party to the First Lien Credit Agreement and Second Lien Credit Agreement; provided, however, that notwithstanding the Intercreditor Agreement or otherwise, the holders of the Second Lien Credit Facility Claims, shall not be required to pay or turn over any distributions received by them as holders of Allowed Second Lien Credit Facility Claims pursuant to Article IV.D (including the New Warrants).

## VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

 **A.** **Continued Corporate Existence.**

 Bicent Power and the Subsidiaries, as New Bicent Power and the Reorganized Subsidiaries respectively, shall continue to exist after the Effective Date with all powers of a corporation or limited liability company, as the case may be, under the laws of the respective states governing their formation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.  In addition, the Reorganized Debtors may operate their business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or by

the Court, subject only to the terms and conditions of the Plan as well as the documents and instruments executed and delivered in connection therewith, including the documents and instruments included in the Plan Supplement.  The Reorganized Debtors shall be responsible for filing required post-confirmation reports and each Reorganized Debtor shall pay quarterly fees of such Debtor due to the Office of the United States Trustee until such time as a final decree is entered closing the applicable Chapter 11 Case or the Bankruptcy Code orders otherwise.

### B.    Dissolution of Creditors' Committee.

Any Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, any Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents shall terminate as of the Effective Date; provided, however, such attorneys and financial advisors shall be entitled to pursue their own Fee Claims and represent the Creditors' Committee in connection with the review of and the right to be heard in connection with all Fee Claims.

### C.    Vesting of Property.

The property of Bicent Power's and the Subsidiaries' estates, including all Causes of Action, shall be revested in the Reorganized Debtors, as applicable, on the Effective Date.

### D.    Discharge of the Debtors.

**The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Debtors in Possession, the Reorganized Debtors or any of their respective assets or properties, arising prior to the Effective Date. Except as otherwise expressly specified in the Plan or the Confirmation Order, the Confirmation Order shall act as of the Effective Date, to the fullest extent provided under section 1141(d) and other applicable provisions of the Bankruptcy Code, as a discharge of all debts of, Claims against, and Liens on the Debtors or their estates, their respective assets and properties, arising at any time before the Effective Date, regardless of whether a proof of Claim with respect thereto was filed, whether the Claim is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a distribution hereunder. Except as otherwise expressly specified in the Plan or the Confirmation Order, after the Effective Date, any holder of such discharged Claim shall be precluded from asserting against the Debtors, the Reorganized Debtors, or any of their respective assets or properties, any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order. For the avoidance of doubt and notwithstanding anything to the contrary herein, the DIP Financing Claims and DIP Fee Claims shall not be waived, discharged, or released unless and until such claims are paid in full in Cash, or, solely with respect to the DIP Financing Claims, unless and until the DIP Financing Claims are**

48

**refinanced or converted in accordance with the terms of the DIP Credit Facility and the Exit Facility.**

      **E.**      <u>**Injunction.**</u>

        **Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Court, all entities who have held, hold, or may hold Claims against the Debtors or their estates that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors, with respect to any such Claim, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors on account of any such Claim, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim, and (d) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim. Such injunction shall extend to successors of the Debtors (including the Reorganized Debtors) and their respective properties and interests in property. Such injunction shall not apply in respect of Ordinary Course Administrative Claims, the DIP Fee Claims, the First Lien Agent Fee Claims, Second Lien Agent Fee Claims and/or the Swap Counterparties Fee Claims.**

      **F.**      <u>**Preservation of Causes of Action.**</u>

        The Reorganized Debtors shall retain all Causes of Action, other than as expressly provided herein. Except as expressly provided in this Plan or the Confirmation Order, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Cause of Action. Nothing contained in this Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Causes of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date that is not specifically waived or relinquished by this Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any claim that are not specifically waived or relinquished by this Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

      **G.**      <u>**Votes Solicited in Good Faith.**</u>

        The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors, the First Lien Agent, the Second Lien Agent and the DIP Agent (and each of their respective affiliates, agents, directors, officers, members, shareholders, managers, partners, employees, advisors, attorneys and representatives) have participated in good

faith and in compliance with the applicable provisions of the Bankruptcy Code in connection with the Plan and the offer and issuance of the New Bicent Common Interests (and New Warrants, if applicable) offered and to be issued under the Plan and therefore have not, and on account of the Plan or the offer and issuance of the New Bicent Common Interests (and New Warrants, if applicable) will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the New Bicent Common Interests (and New Warrants, if applicable) offered and distributed under the Plan.

### H.    Administrative Claims Incurred After the Confirmation Date.

Administrative Claims incurred by the Debtors after the Confirmation Date including Claims for Professionals' fees and expenses incurred after such date, may be paid by the Debtors in the ordinary course of business and without application for or Court approval.

### I.    Releases by the Debtors.

**On the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their Estates, shall be deemed to release unconditionally (a) all of their respective direct and indirect shareholders and owners as well as their, and each of their direct and indirect shareholders' and owners', respective officers, directors, members, employees, partners, managers, advisors, attorneys, financial advisors, accountants, and other professionals and representatives, including Bicent Prime Holdings LLC, Beowulf, Beowulf (Bicent) LLC, Beowulf (Bicent) IU LLC, Natural Gas Partners VIII, L.P., Natural Gas Partners IX, L.P., NGP IX Offshore Holdings, L.P. and Paul Prager, (b) (i) the DIP Agent, DIP Lenders and the Issuing Bank (as defined in the DIP Credit Facility), (ii) the First Lien Agent, First Lien Credit Facility Lenders, First Lien Consenting Lenders, Swap Counterparties and the Issuing Bank (as defined in the First Lien Credit Agreement) and other agents thereunder (in each case, except with respect to the DIP Agent and First Lien Agent, only to the extent such First Lien Credit Facility Lender, First Lien Consenting Lender, Swap Counterparty, Issuing Bank or other agent does not mark its respective Ballot to indicate its refusal to grant the releases by non-Debtors provided for in this Plan), and (iii) the Second Lien Agent, Second Lien Credit Facility Lenders and Second Lien Consenting Lenders (in each case, except with respect to the Second Lien Agent, only to the extent such Second Lien Credit Facility Lender or Second Lien Consenting Lender does not mark its respective Ballot to indicate its refusal to grant the releases by non-Debtors provided for in this Plan); and (c) officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals and representatives of each of the parties listed in clauses (b)(i) through (b)(iii) above (all such parties in (a), (b) and (c), collectively, the "Released Parties," and each a "Released Party") from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise (including without limitation those arising under 11 U.S.C. §§ 541-550 and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses and incidental, consequential and punitive damages payable to third parties), based in whole or in part upon actions taken solely in their respective capacities described above or any omission,**

50

transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases or the Plan, except that (i) no individual shall be released from any act or omission that constitutes gross negligence or willful misconduct as determined by a Final Order, (ii) the Reorganized Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of setoff or recoupment against any Claims of any such persons asserted against the Debtors, (iii) the foregoing release shall not apply to any obligations that remain outstanding in respect of loans or advances made to individuals by the Debtors, and (iv) the foregoing release applies to the Released Parties solely in their respective capacities described above.

> J.    **Releases by non-Debtors.**

On the Effective Date, all Persons who (a) directly or indirectly, have held, hold, or may hold Claims, (b) vote to accept the Plan as set forth on the relevant Ballot, and (c) do not mark their Ballot to indicate their refusal to grant the releases provided in this paragraph, shall be deemed, by virtue of their receipt of Distributions and/or other treatment contemplated under the Plan, to have forever released and covenanted with the Reorganized Debtors and the Released Parties not to (y) sue or otherwise seek recovery from any of the Reorganized Debtors or any Released Party on account of any Claim in any way related to the Debtors or their business and affairs, including any Claim based upon tort, breach of contract, violations of law or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date or (z) assert against any of the Reorganized Debtors or any Released Party any claim, obligation, right, cause of action or liability that any holder of a Claim may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, **provided**, **however**, that (i) none of the Released Parties shall be released from any claim based on any act or omission that constitutes gross negligence or willful misconduct as determined by a Final Order, (ii) the foregoing release shall not apply to obligations of the Debtors or Reorganized Debtors, as the case may be, arising under the Plan, and (iii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan; **provided**, **further** that notwithstanding anything to the contrary herein and notwithstanding the satisfaction, release, termination and extinguishment of the Claims and Liens of the First Lien Secured Parties against the Debtors pursuant to this Plan, nothing in this Plan or the Confirmation Order shall release, terminate, extinguish, prejudice or in any way affect the Liens, guaranties, and claims of the First Lien Secured Parties securing any rights, claims, interests and obligations against, in or with respect to any non-debtor affiliates or subsidiaries of the Debtors, and such Liens, guaranties and claims shall remain intact and enforceable in accordance with applicable non-bankruptcy law as if the Liens, guaranties and claims against the Debtors had not been extinguished or cancelled in the first instance.

51

**K.** **Exculpation and Injunction in Respect of Released Parties.**

1. **Exculpation.**

The Debtors, the Reorganized Debtors, and the other Released Parties (i) shall have no liability whatsoever to any holder or purported holder of an Administrative Claim, a Claim, or an Equity Interest for any act or omission in connection with, or arising out of, the Plan, the Disclosure Statement, the Restructuring Support Agreement, the negotiation of the Plan, the Disclosure Statement or the Restructuring Support Agreement, the negotiation of the Plan Supplement Documents, the pursuit of approval of the Plan or Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration and implementation of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.

2. **Injunction.**

Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, a Claim or an Equity Interest shall be permitted to commence or continue any action, employment of process, or any act to collect, offset, or recover any Claim against a Released Party that accrued on or prior to the Effective Date and that has been released or waived pursuant to this Plan.

**L.** **Term of Bankruptcy Injunction or Stays.**

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**M.** **Preservation of Insurance.**

The Debtors' discharge and release from all Claims as provided herein, except as necessary to be consistent with this Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors (including its officers and current and former directors), the Reorganized Debtors or any other person or entity. The Debtors shall obtain tail coverage under their existing directors and officers liability insurance policy covering their current officers and directors for any and all Claims brought against them, which coverage shall extend for a period of not less than six (6) years after the Effective Date.

01:12060541.1

### N.    Indemnification Obligations Owed by the Debtors.

Indemnification obligations owed to directors, officers, members, shareholders, managers and employees of the Debtors (or the estates of any of the foregoing) who served or were employed by the Debtors as of or after the Petition Date, excluding claims which have been determined by Final Order to have resulted from gross negligence, willful misconduct, breach of fiduciary duty, or intentional tort, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

Indemnification obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and order of the Court, to the extent that such Indemnification Obligations relate to the period after the Petition Date, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

### O.    Binding Effect; Plan Binds All Holders of Claims and Equity Interests.

1.    On the Effective Date, and effective as of the Effective Date, the Plan shall, and shall be deemed to, be binding upon the Debtors and all present and former Holders of Claims against and Equity Interests in any Debtor, and their respective predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and for each of the foregoing, each of their respective members, partners, equity-holders, officers, directors, employees, representatives, advisors, attorneys, notaries (pursuant to the laws of the United States and any other jurisdiction), auditors, agents and professionals, in each case acting in such capacity on or any time after the Petition Date, and any Person claiming by or through any of them, regardless of whether any such Holder of a Claim or Equity Interest has voted or failed to vote to accept or reject this Plan.

2.    Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, the Debtors and any other necessary party, at the sole expense of the Debtors, shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to effect a transfer of property, a satisfaction of a Lien or a release of a Claim dealt with by the Plan, and to perform any other act, including, without limitation, the execution of documents necessary to effectuate the Exit Facility, New Warrant Documents, New Bicent LLC Agreement, any other documents necessary to effectuate the Plan and Restructuring Transactions, and all other documents set forth or contemplated in the Plan or Plan Supplement that are necessary for the consummation of the Plan and the transactions contemplated herein.

## IX.

## RETENTION OF JURISDICTION

The Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(1) to hear and determine motions for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (4) to resolve disputes as to the ownership of any Claim or Equity Interest; (5) to hear and determine objections to Claims and to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Claim; (6) to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified or vacated; (7) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (8) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order; (9) to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (10) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; (11) to hear and determine any issue for which the Plan requires a Final Order of the Court; (12) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (13) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered during the period commencing on the Petition Date through and including the Effective Date; (14) to hear and determine any Causes of Action preserved under the Plan under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3); (15) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (16) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article VIII of the Plan and to enforce same; and (17) to enter a final decree closing the Chapter 11 Cases.

## X.

### MISCELLANEOUS PROVISIONS

**A.    Payment of Statutory Fees.**

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date.  Each Reorganized Debtor shall pay such fees payable after the Effective Date until such time as a final decree is entered closing the applicable Chapter 11 Case or the Court orders otherwise.

**B.    Modification of the Plan.**

The Debtors and Reorganized Debtors, as the case may be, reserve the right and shall be permitted to, in accordance with the Bankruptcy Code and the Bankruptcy Rules, amend or modify the Plan (1) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, except with respect to Class 3 of the Plan; and (2) after the entry of the Confirmation Order upon order of the Court in accordance with section 1127(b) of the Bankruptcy Code; provided, however, that any such amendments or modifications in (1) or (2) or otherwise shall be subject in all respects to the

01:12060541.1

limitations contained in the Plan and the consent of the Requisite First Lien Consenting Lenders and, to the extent such amendments or modifications affect the rights of the DIP Agent or the First Lien Agent, the consent of the applicable affected party.

### C.  Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or the laws of the state of organization of a particular Debtor, the laws of the State of New York (without reference to the conflicts of laws provisions thereof that would require the application of the law of any other jurisdiction) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

### D.  Filing or Execution of Additional Documents.

On or before the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### E.  Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

### F.  Exemption From Transfer Taxes.

Pursuant to, and to the fullest extent permitted by, section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange under the Plan of the New Bicent Common Interests, New Warrants (if any) and the security interests in favor of the lenders under the Exit Facility, (b) the making or assignment of any lease or sublease, (c) the making or delivery of any other instrument whatsoever, (d) any Brush Sale pursuant to, or in accordance with, the Plan, and/or (e) any Indemnification Claims Sale pursuant to, or in accordance with, the Plan, in furtherance of or in connection with the Plan shall not be subject to any stamp tax or other similar tax.

### G.  Section 1145 Exemption.

Pursuant to, in accordance with, and solely to the extent provided under section 1145 of the Bankruptcy Code, the issuance of the New Bicent Common Interests and New Warrants (if any) and distributions thereof to the Debtors' creditors under the Plan will be exempt from registration under applicable securities laws (including Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Code, and

55

may be sold without registration to the extent permitted under section 1145 of the Code and is deemed to be a public offering.

**H.      Waiver of Federal Rule of Civil Procedure 62(a).**

The Debtors, with the consent of the Requisite First Lien Consenting Lenders and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, the consent of the applicable affected party, may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

**I.      Exhibits/Schedules.**

All exhibits and schedules to the Plan and the Plan Supplement Documents are incorporated into and constitute a part of the Plan as if set forth herein, and shall be in form and substance satisfactory to the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party.

**J.      Notices.**

All notices, requests, and demands hereunder to be effective shall be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:  Bicent Power LLC, 575 Broadway, Third Floor, New York, NY 10012, Attention: General Counsel, Tel:  (212) 343-8353, Fax:  (212) 343-9949 with a copy to Young Conaway Stargatt & Taylor, LLP, Rodney Square 1000 North King Street, , Wilmington, DE 19801, Attention:  Pauline K. Morgan, Esq., Tel:  (302) 571-6600, Fax:  (302) 571-1253.

To the Creditors' Committee: [      ].

To the Exit Facility Agent, DIP Agent, or First Lien Agent:  In care of Milbank Tweed, Hadley & McCloy, 1 Chase Manhattan Plaza, New York, New York 10005, Attention Albert A. Pisa, Esq., Abhilash M. Raval, Esq. and Michael E. Comerford, Esq., Tel: (212) 530-5000, Fax: (212) 530-5219.

To Goldman Sachs Bank USA, as Swap Counterparty or First Lien Consenting Lender:  In care of Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281, Attention: Ivan Loncar, Esq., Tel: (212) 504-6339, Fax: (212) 504-6666.

To the First Lien Consenting Lenders:  In care of the parties and addresses set forth in the Restructuring Support Agreement beneath each First Lien Consenting Lenders signature block.

To the Second Lien Agent or Second Lien Consenting Lenders:  In care of the parties and addresses set forth in the Restructuring Support Agreement beneath the Second Lien Agent and each Second Lien Consenting Lenders signature block.

**K.**     **Plan Supplement.**

Forms of the Plan Supplement Documents (which may be in substantially final form) or term sheets relating to the Exit Facility, the New Bicent LLC Agreement, the New Warrant Documents, the Schedule of Rejected Contracts and Leases, if any, the equity issued under the Plan, amendments to certificates of incorporation, by-laws and other constituent documents, and such other documents as the Debtors and Requisite First Lien Consenting Lenders determine to be necessary or appropriate to the implementation and/or confirmation of the Plan shall be contained in the Plan Supplement, which will be filed with the Clerk of the Court no later than three (3) business days before the Voting Deadline.  The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at https://ecf.deb.uscourts.gov or http://dm.epiq11.com/BHL.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors in accordance with Article X.J of the Plan.  The Plan Supplement and Plan Supplement Documents, as may be amended, modified, or supplemented, shall be in form and substance satisfactory to the Debtors, Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party.

**L.**     **Conflict.**

The terms of this Plan shall govern in the event of any inconsistency with the summaries of the Plan set forth in the Disclosure Statement or the Restructuring Support Agreement.

**M.**     **Second Lien Consenting Lenders Review and Consent Rights.**

Any consent rights of the Requisite Consenting Second Lien Lenders shall be governed by the Restructuring Support Agreement and the Restructuring Support Agreement Attachments.

## XI.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

To the extent not (i) assumed in the Chapter 11 Cases prior to the Confirmation Date, (ii) rejected in the Chapter 11 Cases prior to the Confirmation Date, (iii) subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date, or (iv) specifically identified on the Schedule of Rejected Contracts and Leases, if any, included in the Plan Supplement and rejected pursuant to this Plan, each executory contract and unexpired lease that exists between Debtor and any Person (subject to and conditioned on, in

57

each case, the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, the consent of the applicable affected party) shall be specifically assumed by the Debtor that is a party to such executory contract or unexpired lease as of and subject to the Effective Date.  The Plan and the Confirmation Order shall operate as an order authorizing the Debtors' assumption of such executory contracts and unexpired leases.

As provided in Article XI.C, the Debtors shall provide the counterparties to the assumed executory contracts or unexpired leases, the DIP Agent, First Lien Agent, and the Requisite First Lien Consenting Lenders, with sufficient notice regarding the assumption of such executory contracts or unexpired leases in connection with or prior to the filing of the Plan Supplement.  Such notice shall (i) include the amounts payable to non-Debtor counterparties to their respective executory contracts or unexpired leases to cure defaults under such executory contracts or unexpired leases, and (ii) be included in a schedule to the Plan Supplement, which may be filed under seal with a copy to the relevant counterparty, the First Lien Agent, and the Requisite First Lien Consenting Lenders.

    **B.**      **Limited Extension of Time to Assume or Reject.**

In the event of a dispute as to whether a contract or lease is executory or unexpired, the right of the Debtors or Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Court determining that the contract or lease is executory or unexpired.  The deemed assumptions and rejections provided for in this Article XI.B of the Plan shall not apply to such contract or lease.

If the Debtors or the Reorganized Debtors become aware after the Effective Date of the existence of an executory contract or unexpired lease that was not included in the Schedules, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the date on which the Debtors or the Reorganized Debtors become aware of the existence of such contract or lease.  The deemed assumptions and rejections provided for in this Article XI.B of the Plan shall not apply to any such contract or lease.

The Debtors (with consent of Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with consent of the applicable affected party) reserve the right to amend the Schedule of Rejected Contracts and Leases, if any, at any time prior to the Confirmation Date.

    **C.**      **Cure.**

The applicable Debtor or Reorganized Debtor, except as otherwise agreed by the parties, will cure any and all undisputed defaults under any executory contract or unexpired lease that is assumed by such Debtor pursuant to the Plan in accordance with section 365 of the Bankruptcy Code.  The amounts payable to non-Debtor counterparties to cure defaults under any executory contract or unexpired lease that is assumed by such Debtor shall be listed in a schedule, which may be filed under seal with a copy to the relevant counterparty, the First Lien Agent, and the Requisite First Lien Consenting Lenders, to be filed in the Plan Supplement.  If

58

there is a dispute as of the Effective Date regarding the amount required to cure defaults under any executory contract or unexpired lease that the Reorganized Debtors propose to assume, the Reorganized Debtors shall have until 30 days after entry of a Final Order determining the amount, if any, of the applicable Debtor or Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed by the parties, to determine whether to assume or reject the related executory contract or unexpired lease.  If the applicable Debtor, with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, the consent of the applicable affected agent, or Reorganized Debtor determines to assume the applicable executory contract or unexpired lease related to the disputed cure, such disputed cure amount shall be paid either within 30 days of the entry of a Final Order determining the amount, if any, of the applicable Debtor or Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

  **D.**  **Rejection Damage Claims.**

  All Claims for damages arising from the rejection of executory contracts or unexpired leases must be filed with the Court in accordance with the terms of the order authorizing such rejection, but in no event later than thirty (30) days after the Effective Date (unless rejected at a later date as a result of a disputed cure amount as set forth in Article XI.C. herein).  Any Claims not filed within such time will be forever barred from assertion against the Debtors, their respective estates and the Reorganized Debtors.  All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as General Unsecured Claims, as appropriate under the circumstances.

**XII.**

**BENEFIT PLANS**

  Except as otherwise provided in the Plan or any assumed or rejected employment agreement, as of and subject to the Effective Date, all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including all savings plans, retirement plans, health care plans, disability plans, incentive plans, and life, accidental death, and dismemberment insurance plans, but excluding any employment and severance agreements, plans or policies (unless, with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with consent of the applicable affected agent, such employment and severance agreements, plans or policies are assumed by the Debtors pursuant to an earlier Court order), shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan, including on the Schedule of Rejected Contracts and Leases, if any (to the extent such rejection does not violate section 1114 of the Bankruptcy Code) and (ii) such executory contracts

59

or plans as have previously been terminated, or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, contracts, or programs.

# XIII.

# EFFECTIVENESS OF THE PLAN

### A.    Condition Precedent to Confirmation.

Confirmation of this Plan is subject to the Confirmation Order being in form and substance acceptable to the Debtors and the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party.

### B.    Conditions Precedent to Effectiveness.

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to Article XIII.C:

(1)  the condition precedent to Confirmation in Article XIII.A. above shall have been satisfied, and there shall not be a stay or injunction (or similar prohibition) in effect with respect to the Confirmation Order and the Confirmation Order shall be a Final Order;

(2)  all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained;

(3)  the certificates of incorporation or other organizational documents for each of the Debtors shall have been amended as provided for herein;

(4)  the New Bicent Common Interests and New Warrants (if any) to be issued shall be consistent with the Plan and shall have been issued concurrently with the Effective Date;

(5) the DIP Financing Claims, DIP Fee Claims, Backstop Fee, First Lien Agent Fee Claims, Second Lien Agent Fee Claims and Swap Counterparties Fee Claims shall have been paid in full in accordance with the Plan;

(6)  each of the Plan Supplement Documents shall be in form and substance satisfactory to the Debtors and the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, in form and substance satisfactory to the applicable affected party, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(7)  all material consents, actions, documents, certificates and agreements necessary to implement this Plan, including any required Governmental or Regulatory Approvals, shall have been obtained, effected or executed and delivered to the required parties, and, to the extent required, filed with the applicable governmental unites in accordance with applicable laws; and

01:12060541.1

(8)  the Reorganized Debtors shall have entered into and consummated the Exit Facility and paid all fees and expenses associated with the Exit Facility.

### C.    Waiver of Conditions.

The Debtors may waive any of the conditions set forth in Article XIII.B at any time with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party, and without leave of or order of the Court and without any formal action.

### D.    Effect of Failure of Conditions.

If the Effective Date does not occur on or before forty-five (45) days after the Confirmation Date, or such later date as may be agreed by the Debtors and the Requisite First Lien Consenting Lenders, upon notification submitted by the Debtors to the Court:  (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors unless extended by Court order.

### E.    Vacatur of Confirmation Order.

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

### F.    Revocation, Withdrawal, or Non-Consummation.

#### 1.    Right to Revoke or Withdraw.

Subject to the terms of, and without prejudice to the rights of any party under, the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date, with the consent of the Requisite First Lien Consenting Lenders, and, to the extent affecting the rights of the DIP Agent or the First Lien Agent, with the consent of the applicable affected party; provided that the foregoing consent rights shall be subject to the Debtors' fiduciary duties as debtors in possession as set forth in the Restructuring Support Agreement.

2.    **Effect of Withdrawal, Revocation,
or Non-Consummation.**

If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the
Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise
embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest
or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired
leases, or benefit plans effected by the Plan, any release, exculpation or indemnification provided
for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and
void. In such event, nothing contained herein, and no acts taken in preparation for
consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against
or Interests in the Debtors or any Claims against any other Person, to prejudice in any manner the
rights of the Debtors or any Person in any further proceedings involving the Debtors, or to
constitute an admission of any sort by the Debtors or any other Person.

Dated: April 30, 2012

**BICENT HOLDINGS LLC**

By:_____

Name:  Christopher L. Ryan
Title:   Chief Financial Officer

**BICENT R.F. LLC**

By:_____

Name:  Christopher L. Ryan
Title:   Chief Financial Officer

**BICENT POWER LLC**

By:_____

Name:  Christopher L. Ryan
Title:   Chief Financial Officer

**BICENT FUNDING LLC**

By:

Name:  Christopher L. Ryan
Title:   Chief Financial Officer

**COLORADO ENERGY MANAGEMENT, LLC**

By:

Name:  Kenneth Deane
Title:   Chief Financial Officer

**CEM ENERGY SERVICES, INC.**

By:

Name:  Douglas Halliday
Title:   Chief Executive Officer

**COLORADO COGEN OPERATORS, LLC**

By:

Name:  Douglas Halliday
Title:   Chief Executive Officer

**ROCKY MOUNTAIN POWER, LLC**

By:

Name:  Douglas Halliday
Title:   Chief Executive Officer

**SAN JOAQUIN COGEN, L.L.C.**

By:

Name:  Christopher L. Ryan
Title:   Chief Financial Officer

HARTWELL, LLC

By:_____

    Name:  Douglas Halliday
    Title:  Chief Executive Officer

HART COUNTY IPP, LLC

By:_____

    Name:  Christopher L. Ryan
    Title:  Chief Financial Officer

HARTWELL INDEPENDENT POWER
    PARTNERS, LLC

By:_____

    Name:  Christopher L. Ryan
    Title:  Chief Financial Officer

HARTWELL POWER COMPANY

By:_____

    Name:  Christopher L. Ryan
    Title:  Chief Financial Officer

# **EXHIBIT B**

**Disclosure Statement Order**


**[TO COME]**

## EXHIBIT C

**Projected Financial Information**

**[TO COME]**

## **EXHIBIT D**

**Liquidation Analysis**

**[TO COME]**

**<u>EXHIBIT E</u>**

**Prepetition Organizational Chart**

**Bicent Holdings LLC Entity Chart**

